## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

YAGOUB M. MOHAMED,
*Individually and on behalf of*
*all others similarly situated,*
5920 Schering Road
Baltimore, Maryland 21206

        Plaintiff,                         **CASE NO.: 1:21-cv-1283**

vs.                                   **CLASS ACTION**

BANK OF AMERICA, N.A.,
100 North Tryon Street
Charlotte, North Carolina 28255

        SERVE ON:
        The Corporation Trust, Inc.
        2405 York Road, Suite 201
        Lutherville-Timonium, MD 21093

        Defendant.

_____/

## COMPLAINT FOR DAMAGES AND INCIDENTAL RELIEF

Plaintiff, Yagoub M. Mohamed, an individual ("Mr. Mohamed"), on behalf of himself and all other similarly situated persons, whose Maryland Unemployment Insurance ("UI"), Pandemic Unemployment Assistance ("PUA"), and other public benefits are or were paid through debit cards issued by Defendant, Bank of America, N.A., a national banking association ("Bank of America" or "Bank"),  alleges:

## INTRODUCTION

1. This matter arises from Bank of America's breach of contractual and legal obligations to provide safe and secure debit cards to Marylanders who received unemployment insurance benefits.

2. Like thousands of other Marylanders, Plaintiff lost his job through no fault of his own during the COVID-19 pandemic. Plaintiff applied for public benefits through programs administered by the Maryland Department of Labor's Division of Unemployment Insurance ("DUI") and was found eligible by DUI to receive the benefits to which he was lawfully entitled.

3. Pursuant to a state contract between DUI and Bank of America, through which the Bank provided debit cards, Plaintiff and the Class Members received their periodic payments not from DUI directly, but through bank-issued and bank-administered prepaid debit cards. ("DUI Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("DUI Debit Card Accounts" or "Accounts"). Although the Bank was legally required to take necessary and reasonable steps to protect Plaintiff's and Class Members' DUI Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so.

4. Bank of America used inexpensive, outdated debit card technology that did not properly secure customer information or comport to the industry standard of care. The Bank failed to secure Plaintiff's and Class Members' sensitive Card and Account information and issued them DUI Debit Cards without the fraud-preventing EMV chip technology that the Bank has used on all its other debit and credit cards since 2014. Instead, the Bank's DUI Debit Cards used outdated magnetic stripe technology, which makes them readily susceptible to cloning and other schemes that have allowed third

parties to fraudulently use and access Plaintiff's and Class Members' DUI Debit Cards and Accounts.

5. Marylanders experienced a high rate of fraudulent activity on their Bank of America DUI Debit Card Accounts. Instead of providing an effective and timely process for Plaintiff and Class Members to report unauthorized transactions and submit fraud claims, the Bank adopted a series of "customer service" practices and policies that required Plaintiff and Class Members to spend dozens of hours on telephone calls with customer service and that have frustrated and obstructed their efforts to submit their claims.

6. The Bank also has violated its statutory obligations to Plaintiff and Class Members under the federal Electronic Fund Transfer Act and other laws by not implementing adequate and reasonable systems, measures, and protections to permit prompt and effective identification of fraud, submission of fraud claims, provisional access to already approved benefits during the course of fraud investigations, prompt and accurate resolution of fraud claims, and prompt reimbursement of funds stolen from Plaintiff's and Class Members' Accounts.

7. By the acts and omissions alleged here, Bank of America has violated federal and state consumer protections; violated EFTA and its implementing Regulation E; acted negligently; breached its cardholder agreement with Plaintiff and Class Members; and breached its contract with DUI (to which Plaintiff and Class Members are intended third-party beneficiaries). These acts and omissions have caused substantial financial and other harm to Plaintiff and Class Members.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the Electronic Fund Transfer Act, 15 U.S.C. §§1693, *et seq.* and (b) supplemental jurisdiction under 28 U.S.C. §1367 with respect to the claims for relief arising under state law.

9. This Court has specific personal jurisdiction over Bank of America because the Bank has sufficient minimum contacts with Maryland, has purposely availed itself of the benefits and protection of Maryland law, and conducts a substantial amount of business in and with the State of Maryland (including with DUI).

10. Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the acts or omissions giving rise to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

11. Mr. Mohamed is a resident of Baltimore, Maryland. He was a mechanic and small business owner who found himself out of work during the COVID-19 pandemic. He then applied for and was found eligible by DUI to receive unemployment benefits. He received a Bank of America DUI Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He immediately discovered he was a victim of unauthorized transactions on his DUI Debit Card Account. Mr. Mohamed promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, and caused Mr. Mohamed to suffer immediate and irreparable injury. Mr. Mohamed is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

4

12. Defendant Bank of America, N.A. ("Bank of America" or "Bank"), is a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducted a substantial amount of business in Maryland. At all times relevant to this dispute, the Bank had an exclusive contract with the State of Maryland DUI to administer UI and other benefit payments through DUI Debit Cards and Accounts.

## FACTUAL ALLEGATIONS

### A.  Bank of America's Contract with the State of Maryland

13. DUI is an office of the Maryland State Department of Labor ("DOL"), formerly known as the Maryland Department of Labor, Licensing, and Regulation ("DLLR"), which is responsible for administering state programs that provide unemployment insurance (UI) benefits and currently administers four federal COVID-19 relief programs in Maryland: pandemic unemployment assistance (PUA) benefits, pandemic emergency unemployment compensation (PEUC) benefits to Marylanders, federal pandemic unemployment compensation (FPUC) and mixed-earner unemployment compensation program (MEUC) (collectively, "DUI benefits").

14. On January 17, 2013, DOL issued a "Request for Proposals for Electronic Payment Card Services for Department of Labor, Licensing and Regulation, Division of Unemployment Insurance, RFP #-DLLR-EPC-01172013." ("RFP") https://www.treasurer.state.md.us/media/52202/dllr_epc_01172013_rfp.pdf, (last accessed May 24, 2021.)

15. In the RFP, DUI stated it was "seeking an electronic payment solution for the disbursement of UI benefit payments in order to [...] ensure cardholders receive the UI benefits to which they are entitled, efficiently, timely, accurately, and securely." RFP, 3.01, "Objectives."

16. According to the RFP, DUI issues payments five days a week, with the exception of State holidays. RFP, 3.02, "Program Description."

17. The RFP provided detailed data on Claims Activity for 2008 through 2012. This represented the time period immediately following the Great Recession and demonstrated a high level of activity in Maryland during the economic crisis:

| UI Claims Activity | Activity for the past four (4) years 2008-2012 | Calendar year 2012 |
|---|---|---|
| Number of New Cards Issued | 510,292 | 75,620 |
| Number of Debit Card Payments | 10,703,573 | 2,357,145 |
| Average Payment Amount | $5,905,037,002 | $1,290,119,609 |
| Average Payment Amount | $324/wk | $325/wk |
| Average Weeks of Benefits Received Per Claimant | 17.8 | 18.0* |
| *12 months ending September 2012 | | |

*See, Id.*

18. For the calendar year 2012, DUI reported that there were 1,469 fraud credits issued in Maryland. These resulted in 30 deactivated accounts for identity theft. *See* "Questions and Answers," https://www.treasurer.state.md.us/media/52914/dllr_epc_01172013 questions_and_answers.pdf (last accessed May 24, 2021.)

19. On or about March 26, 2013, Bank of America accepted the Contract with DOL and the enumerated conditions and requirements of the RFP were incorporated by reference as a final exhibit to the Contract. ***See*, <u>Exhibit 1</u>, "Contract,"** Article I-Scope of Services.

20. Bank of America entered into an exclusive contract with DUI for the provision of Electronic Payment Card ("EPC") services, including issuance of Bank of America DUI

Debit Cards through which individuals entitled to receive DUI benefits could access those benefits.

21. On or about March 26, 2013, Bank of America acknowledged and agreed to comply with the following procedures related to consumer account security:

> [...] 5. Contractor must have in place reasonable security procedures designed to protect the confidentiality of data regarding cardholder information and cardholder accounts and to limit to authorized persons access to such data. Such procedures must, at a minimum, ensure that:
> a. Access to data regarding cardholder information and cardholder accounts is restricted to only those individuals whose access is essential to the administration of the program.
> b. Individuals with access to cardholder information or cardholder accounts is under the direction and control of the Contractor.
> c. Each individual with access to cardholder information or cardholder accounts is required to maintain the confidentiality of such data, either as a condition of employment or by written agreement, before access to this information is permitted.
> d. Contractor monitors the use of the data by individuals with access to cardholder information or cardholder accounts to ensure that such information is being used only for purposes consistent with the administration of the EPC program.
> e. All information regarding cardholders and cardholder accounts is secured in a manner which will ensure its confidentiality.

*See*, RFP, "3.05, **General Requirements**."

22. Bank of America also agreed the DOL would not indemnify it for any claims or losses arising out of the performance of the Contract. Bank of America was required to agree to indemnify and hold harmless DOL for any claims arising from any negligent act or omission in connection with providing EPC services for the disbursement of UI benefit payments. *See*, RFP, 3.05, ¶¶s 15-16.

23. Bank of America further agreed, "to assume full responsibility for any and all damage to the property of the Office, both real and personal, which results from or arises in connection with, the performance of this Contract." *See* Exhibit 1, "Contract."

24. Bank of America provided DUI with detailed information regarding its "Fraud Detection and Prevention" policies and procedures. *See*, RFP, 3.06, "Specific Services, C: Fraud Detection and Prevention."

25. Bank of America provided DUI with a detailed description of the assistance cardholders would be provided in the event their individual account information was compromised. *See, Id.*, "I: Confidentiality and Security."

26. Upon information and belief, Bank of America represented to DUI that it would provide "best-in-class" fraud monitoring.

27. The Contract required Bank of America to have the capability to provide daily, detailed reports on fraudulent activity to DUI:

    a.        Fraud control activity/risk analysis (daily reports):

        1)      Number of PIN changes;
        2)      Number of reports of stolen/lost EPCs;
        3)      Dollar amount stolen/lost;
        4)      Number of reports of fraudulent activity;
        5)      Dollar amount defrauded;
        6)      Geographical location of fraudulent activity;
        7)      Detailed listing of customers who have reported stolen/lost EPCs and/or fraudulent activity and the resolution of each;
        8)      Data to measure timeliness between the date of a reported stolen/lost
        9)      EPC or other fraudulent activity and the date the reported issue is resolved;
        10)     Number of accounts deactivated due to fraud;
        11)     Number of reissued EPCs and reasons for re-issuance;
        12)     Detailed listing of confidentiality and security breaches including steps taken to contain the breach, follow-up reports, and a corrective action plan;
        13)     Detailed listing of any and all business disruptions of four (4) hours or longer

*See*, RFP, 3.05., ¶ 6.

28. The Contract further required Bank of America to keep data on the number of frozen accounts; closed accounts; and customer service activity, including the number of account protests by type of protest. *See, Id.*

29. Following execution of the Contract, DUI began distributing DUI benefits pursuant to its contract with Bank of America, under which the default means of distributing DUI benefits payments was through Bank-issued and Bank-administered DUI Debit Cards.

30. Pursuant to the terms of the Contract, DUI and the Bank engaged in a joint undertaking to administer the DUI benefits programs and distribute DUI benefits payments to eligible claimants through DUI Debit Cards.

31. DUI Debit Cards and Accounts are an integral part of DUI's benefits distribution and administration system. Under the terms of the Contract, those Accounts can only receive deposits from the DUI and do not allow commingling of benefits payments with other funds.

32. Bank of America maintained its exclusive contract with the State of Maryland from March of 2013 through February of 2021.

33. On February 23, 2021, DOL Secretary Tiffany P. Robinson announced that "Maryland's unemployment insurance claimants will begin receiving their benefit payments through direct deposit beginning in April 2021. The transition from Bank of America debit cards to direct deposit comes as a result of a new contract with Wells Fargo." *See,* "Maryland Department of Labor Announces Direct Deposit Payments Will Be Available for Unemployment Insurance Claimants in April 2021," https://www.dllr.state.md.us/whatsnews/uidd.shtml (last accessed May 20, 2021).

### B. Bank of America's Additional Representations on Card Security to Maryland Consumers

34. In addition to the terms set forth in Bank of America's Contract with the state of Maryland, Bank of America published a separate webpage specifically tailored to Maryland UI Debit Cardholders, "Maryland UI Benefits Card," https://www.visaprepaidprocessing.com/mduidebitcard (last accessed May 20, 2021).

35. By signing up to receive UI benefits on the Bank of America Debit Card, Marylanders were subject to a Bank of America Cardholder Agreement.

36. The Bank's "Maryland Unemployment Benefits Debit Card Account Agreement," ("Cardholder Agreement,"), effective March 1, 2018, contained "Bank of America's "Zero Liability" Policy for Unauthorized Transactions." *See* **Exhibit 2, "Cardholder Agreement."** The Zero Liability Policy states,

> Federal law (described in the section below entitled "Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions ") may limit your liability for unauthorized transactions on your Account, but you may still be liable in some circumstances. Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions:
>
> [...]
>
> **"Reasonable" time defined.** Reasonable time will be determined in our sole discretion based on the circumstances but will not be less than the time frames specified under the Electronic Fund Transfer Act or Regulation E (see Section 10 below).
>
> **Your Rights under Regulation E.** If your claim does not meet the prescribed conditions for reimbursement under the above policy, you still retain any consumer rights you may have under Regulation E, as described in Sections 10 and 11 below, and we will automatically re-examine the claim in accordance with those rights.

*See*, **Exhibit 2, ¶ 6**. Emphasis in original.

37. Section 10 of the Cardholder Agreement states, in relevant part:

> **Regulation E Liability Disclosure**; Your Liability in Case of Loss, Theft, or Unauthorized Transactions. Contact Us Promptly. Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down.

*See*, **Exhibit 2, ¶ 10**. Emphasis in original.

38. In the event of a fraud claim or compromised account, Bank of America promised to provide the following dispute resolution services:

> We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your Account.
>
> [...]
>
> We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

*See*, **Exhibit 2, ¶ 11**. Emphasis in original.

39. On the Maryland UI Benefits Card webpage, Bank of America provided a "FAQs" tab, which stated, for " convenience and flexibility," account information and customer service is available 24 hours a day, 7 days a week. *See* https://www.visaprepaid processing.com/mduidebitcard/Program/FAQ (last accessed, May 20, 2021).

## C.  Maryland Unemployment Rates and Claims Rose During the COVID-19 Pandemic

40. On March 5, 2020, in response to the COVID-19 Pandemic, Governor Larry Hogan declared a State of Emergency in Maryland.

41. In April of 2020, Maryland reported 370,700 job losses, which was a sharp, 13.5% monthly decline from February of 2020. *See,* "Covid-19 Economic Crisis: By State," University of New Hampshire, Carsey School of Public Policy, April 16, 2021, https://carsey.unh.edu/COVID-19-Economic-Impact-By-State (last accessed, May 20, 2021).

42. Between February 2020 and April 2021, the industries in Maryland with the highest job losses were: (1) Arts, Entertainment, & Recreation; (2) Accommodation & Food Services; (3) Information; (4) Other Services (Named Plaintiff's category); and (5) Educational Services. *Id.*, (industry data from the U.S. Bureau of Labor Statistics.)

43. Between February 29th and March 31, 2021, the number of UI benefits payments processed in Maryland dramatically increased, reaching the highest point in April of 2020:

| Date | Total Payments |
|---|---|
| 2/29/2020 | 5,894 |
| 3/31/2020 | 20,634 |
| 4/30/2020 | 143,742 |
| 5/31/2020 | 48,670 |
| 6/30/2020 | 30,901 |
| 7/31/2020 | 21,346 |
| 8/31/2020 | 9,583 |
| 9/30/2020 | 5,219 |
| 10/31/2020 | 11,762 |
| 11/30/2020 | 5,667 |
| 12/31/2020 | 12,040 |
| 1/31/2021 | 14,785 |
| 2/28/2021 | 14,275 |
| 3/31/2021 | 12,215 |

*See, United States Department of Labor, Employment & Training Administration:*

*Benefits: Timeliness and Quality Reports, Report for 2/01/2020 through 3/31/2021:*

https://oui.doleta.gov/unemploy/btq/btqrpt.asp (last accessed May 24, 2021).

### D. Bank of America's Failures To Protect Maryland Cardholders' Information

44. As the number of Marylanders eligible for UI and pandemic relief increased, Bank of America repeatedly failed to secure Plaintiff's and Class Members' personally identifiable information, Card, and Account data, and other financial data and information (collectively, "Cardholder Information").

45. Bank of America failed to maintain, store, share, or transfer DUI Debit Cardholders' Cardholder Information in a reasonably secure manner consistent with the Bank's obligations to DUI and to Plaintiff and Class Members.

46. Bank of America violated obligations under the Contract and under its common law duty to take reasonable steps to protect Cardholder Information from unauthorized access, theft, or disclosure.

47. Plaintiff and many of the putative class members received DUI Debit Cards after unauthorized users had already stolen money from their DUI Accounts. Such unauthorized transactions could only have occurred if Bank of America failed to store or transfer Cardholder Information in a reasonably secure manner.

48. At all times relevant to this dispute, Bank of America used outdated "Magnetic Stripe Technology" on the Maryland DUI Debit Cards, instead of the common standard of technology, which were originally called "Europay, MasterCard, and Visa Chip Cards," and are now known as "EMV" chip cards. Magnetic stripes, which store data about the card, including the cardholder's name, the card number, and the card expiration date.,

are highly susceptible to fraud. Alternatively, chip cards are much safer because they have two-way magnetic stripes with more sophisticated encoding and embedded chips with personal identification numbers.

49. Magnetic stripe fraud vulnerability is well-established. For over a decade, a common credit card fraud known as "skimming" has allowed thieves to collect information on the magnetic stripe through a wireless transmitter. In 2013 and 2014, large retail stores such as Target and Home Depot became widespread victims of skimming scams, and repaid consumer cardholders millions of dollars in damages.

50. Since 2012, most card companies adopted chip technology as the standard for card security. Visa, Mastercard, Discover, American Express, Bank of America, Citibank, Wells Fargo, JPMorgan Chase, U.S. Bank, major retailers, and several credit unions have all migrated to chip technology. *See* "EMV," https://en.wikipedia.org/wiki/EMV, (last accessed, May 21, 2021).

51. Over seven years ago, Bank of America migrated to chip technology and publicly announced that it would include EMV chip technology on all consumer debit cards to help prevent fraud. According to Bank of America's website, EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." *See* "EMV Chip FAQs," https://www.bankofamerica.com/security-center/faq/emv-chip-card/#:~:text=Chip%20technology%20has%20been%20around,

many%20countries%20around%20the%20world.&text=Chip%20card%20technology%
20provides%20an,at%20a%20chip%2Denabled%20terminal, (last accessed May 24,
2021).

52. Bank of America also assures its accountholders on its website that "whether you
use the magnetic stripe or the chip to make your purchase, you can have confidence in the
protection and security features we provide for all credit and debit accounts."

53. Despite the fact that Bank of America has known that chip cards are significantly
more secure than magnetic stripe cards and is the "debit card security standard," the Bank
chose to issue DUI Debit Cards using vulnerable magnetic stripe technology to thousands
of the most financially vulnerable Marylanders.

54. Predictably, the issuance of DUI Debit Cards without chips led to rampant fraud,
resulting in the ongoing loss of thousands of dollars in DUI benefits intended to assist
Marylanders who lost their jobs, including during the COVID-19 pandemic.

**E. Marylanders Experienced Widespread UI Debit Card and Account
Fraud**

55. Since the COVID-19 Pandemic, media sources in Maryland have run stories on
stolen benefits and the DUI Debit Cards. *See*, "Unemployment claimants question debit
card security after benefits were stolen: UI debit cards lack chip technology," WMAR
Baltimore, October 28, 2020, updated on March 17, 2021,
https://www.wmar2news.com/matterformallory/unemployment-claimants-question-
debit-card-security-after-benefits-were-stolen, last accessed May 20, 2021. ("WMAR
Report").

56. The WMAR Report mentioned that "in July, the Maryland Department of Labor
uncovered a massive and sophisticated criminal enterprise involving 47,500 fraudulent

unemployment claims using identity theft totaling over $501 million." But clarified that "this appears to be a different kind of fraud. Claimants believe their debit cards were somehow cloned."

57. The WMAR reporters asked Bank of America whether the fraud had to do with the lack of chip technology on unemployment insurance debit cards. "A Bank of America spokeswoman advised, "We are in continual discussions with our clients about options for our Card technology, including the addition of chip. She added that Bank of America takes all reports of fraud very seriously and claimants should contact Bank of America (using the number on the back of their card) to report unauthorized or disputed transaction claims."

58. On March 2, 2021, Fox 5, Washington, DC reported that a Maryland resident, Dr. Keenan Cofield, reported that he was contacted online by someone who pretended to be an investor. Weeks later, he began receiving packages with batches of Maryland UI letters and cards inside. Fox 5 reported, "State Police and the FBI have been warning of these types of scams – where were scammers steal identities to submit fraudulent unemployment claims and then use people as "money mules," trying to funnel the stolen money through them. This could include using your bank account or having you go to a bank or ATM to process the transactions."

59. The "Unofficial Unemployment Maryland Information and Help," Facebook Group ("Maryland Facebook Group") contains complaints from dozens of Marylanders regarding fraudulent activity and locked accounts with Bank of America. To summarize:

      a. On April 7, 2021, a Maryland DUI recipient wrote that the source of the fraud involved duplicated personal identification numbers and a data breach within Bank of America. According to this individual, Bank of

America knew of the security breach due to widespread issues in the state of California that occurred prior to December 25, 2020.

b. As of April 7, 2021, Bank of America had not alerted its Maryland DUI recipients about the breach, and had not taken any steps to increase security on the Maryland Debit Cards or DUI Accounts.

c. The Bank told Maryland DUI recipients with fraud complaints that DUI caused the freeze on their accounts, which "automatically" caused the Bank to close its fraud investigation.

d. Multiple Maryland DUI recipients had their accounts frozen for longer than one month.  One user reported that on April 8, 2021, her account had been frozen since November of 2020.

e. Under advisement from the Bank, these Marylanders had filed police reports in multiple counties, but the Bank did not investigate their claims.

f.  Marylanders contacted DUI representatives, who explained that the DUI office had no power to unlock the Bank's accounts.

g. One Maryland DUI recipient, who had aggressively pursued his claim and received a refund, reported that the Bank wanted everyone to reach out via e-mail so that a team could be formed to help claimants. This group member advised the group to contact someone named "Ms. Jones" or email Holly O'Neill of the Bank public relations office.

h. Other Maryland consumers have reported their claims to Bank of America and have not received any credit for their stolen funds.

60. Upon information and belief from these sources, the unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and

countries, thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's DUI Debit Cards have proven highly susceptible to unauthorized use.

61. After criminals exploited the security vulnerabilities of the Bank's DUI Debit Cards and Accounts and misappropriated Card and Account information, that information can be sold on the dark web, allowing the buyer to engage in unauthorized use of funds belonging to Plaintiff and Class Members.

62. This kind of consumer account information has a market value. The RFP and Contract specifically prohibited the sale of any Marylanders' account information, over opposition from the Bank and bidders who attended the RFP Q&A Session.

63. Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new UI and PUA claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the UI and PUA benefits system by criminals.

64. Upon information and belief, the Bank knew or had reason to know that the DUI Debit Cards were not secure. In 2020, Major breaches occurred with state government UI Debit Cards the Bank issued in California and Nevada. Still, the Bank did nothing to protect Maryland DUI recipients.

65. Bank of America failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable fraud as relates to its DUI Debit Cards and Accounts.

## FACTS SPECIFIC TO THE PLAINTIFF

66. Since October of 2017, Mr. Mohamed owned and operated Amanie Express, LLC, which provided automotive mechanic services in Baltimore, Maryland.

67. By July of 2020, due to the COVID-19 Pandemic, the Maryland Stay-At-Home orders, and the declining demand for his automotive repair services, Mr. Mohamed experienced a sudden loss of income and had to close his business.

68. On or about July of 2020, Mr. Mohamed applied for and was awarded unemployment insurance benefits through the DUI.

69. Mr. Mohamed signed up to receive his benefits on a Bank of America DUI Debit Card that was to be mailed directly to his home address at 5920 Schering Road, Baltimore, Maryland 21206.

70. At all times relevant to this dispute, Mr. Mohamed has resided at 5920 Schering Road, Baltimore, Maryland 21206.

71. Between July and October of 2020, Mr. Mohamed was entitled to receive $14,644.00 in unemployment benefits.

72. Between July and October of 2020, Mr. Mohamed regularly called the DUI office. During these calls, DUI representatives advised that, due to the high number of UI applicants, Mr. Mohamed may experience a forty-five (45) to ninety (90) day delay.

73. To find new job prospects, Mr. Mohamed enrolled in a vocational training program and obtained a certification licensing in HVAC repair. For a short time, beginning on or about October 1, 2020, he stopped filing for UI benefits and worked for a home warranty company. Unfortunately, due to the COVID-19 Pandemic, the company ran out of work, and Mr. Mohamed filed for a new monthly benefit.

74. By the end of November 2020, Mr. Mohamed still had not received his DUI Debit Card. He called DUI again, and a representative advised that he should have received it by then. The representative advised that DUI did not mail out the debit cards. He advised

Mr. Mohamed to call Bank of America's Customer Service telephone line for prepaid cards at 1-855-847-2029.

75. Mr. Mohamed immediately contacted Bank of America, and a Bank representative advised that the Bank had already mailed his card to his home address. The Bank representative advised that they would re-send another debit card.

76. On or about December 5, 2020, Mr. Mohamed received the DUI Debit Card via U.S. Mail at his home address.

77. Mr. Mohamed's DUI Debit Card had a magnetic stripe and did not have an EMV chip.

78. Upon receipt, Mr. Mohamed tried to activate the card but the activation code did not work. He attempted to download the Bank of America phone application for activation, but was still not able to activate. He called the number on the back of the card, and heard from the automated system that the card had a zero dollar ($0) balance.

79. Mr. Mohamed reasonably believed that Bank of America still needed to set something up, and waited a business day to see if the funds would be deposited into his account. This belief was reasonable, given the widely publicized delays related to the administration of unemployment benefits in Maryland.

80. On or about December 7, 2020, Mr. Mohamed called the same customer service line and spoke with a female Bank representative. She advised that the funds from Mr. Mohamed's account had all been spent, and confirmed that the account balance was in fact zero dollars ($0).

81. According to the Bank representative, the full disbursement of $14,644.00 had been deposited into his Bank of America DUI Account, but all of the funds had been depleted.

82. When Mr. Mohamed explained that he had just received the DUI Debit Card for the first time on December 5, 2020 and had neither used, nor had access to any of the funds, the Bank representative transferred him to a Claims Department.

83. The Bank representative proceeded to ask Mr. Mohamed questions about whether he ever shared his personal DUI Account or Card information. He answered that he had not.

84. During the telephone call with the Claims Department, a Bank representative read each transaction aloud to Mr. Mohamed and asked him to verify whether he had made any of the charges. He responded, one-by-one, that he had not made nor authorized any of the charges.

85. The Bank representative advised Mr. Mohamed that the card was used between August 20, 2020 and October 1, 2020. During that period of time, the unauthorized user purchased merchandise and made withdrawals against the $14,644.00 cash balance.

86. During this call, Mr. Mohamed wrote down the list of the unauthorized transactions. The charges occurred in a wide range of locations throughout the United States, from as nearby as Towson, Maryland to an ATM transaction within a hotel in California, and a separate transaction in Hollywood, California.

87. Mr. Mohamed confirmed that he did not authorize any of the transactions that transpired between August 20, 2020 and October 1, 2020. He did not know who had used his DUI Debit Card.

88. The Bank representative provided Mr. Mohamed with a Claim Number, 201208301077.

89. The Bank representative advised that Mr. Mohamed must file a police report with his local authorities.

90. On December 8, 2020, Mr. Mohamed went to the Baltimore City Police Department and filed a police report for false pretenses. (Report # 4201202126).

91. While at the Police Department on December 8, 2020, Mr. Mohamed called the Bank Claims Department and verified with the representative that he had provided all required information. The Claims representative instructed him to fax the paperwork to the Bank at 1-877-233-8011.

92. The Claims representative advised that he would receive a letter from the Bank regarding his claim within forty-five (45) days.

93. According to the police report, the officer noted, "Upon further investigation, Bank of America advised Mr. Mohamed that they will do a follow up on who received the card."

94. On December 16, 2020, Mr. Mohamed faxed the police report information with his claim number and a copy of his Maryland driver's license to 1-877-233-8011. His fax service automatically generated a cover sheet and recorded that the fax was received.

95. On or about December 23, 2020, Mr. Mohamed called Bank of America to ask about the status of his claim.

96. Between December and January, Mr. Mohamed called Bank of America every week in hopes of receiving information about his claim. The representatives regularly advised Mr. Mohamed to call back for the outcome of his claim.

97. Mr. Mohamed also began calling the DUI office every day, and each time, he received a message stating that the office was too busy to accept his call.

98. Without any financial resources, Mr. Mohamed relied on credit cards to survive. He began to max out his business and personal credit and incurred late fees. His credit score plummeted from 750 to 500. Mr. Mohamed also fell behind in his monthly payments.

99. During this time, he struggled with depression, experienced long nights of sleeplessness, and began vomiting due to stress.

100. On December 27, 2020, Mr. Mohamed suffered from a panic attack that was exacerbated by exhaustion and dehydration. He went to Patient First - Bayview Urgent Care at 5100 Eastern Avenue, Baltimore, MD 21224-2772, where he received medication and an intravenous drip for hydration.

101. On or about January 5, 2021, Mr. Mohamed received a letter from Bank of America. *See* **Exhibit 3, "Freeze Letter."** Upon information and belief, this is a form letter that Bank of America generated and sent to Maryland DUI recipients who filed fraud claims.

102. The Freeze Letter was entitled, "Important Notice About Your Prepaid Debit Card For State Unemployment Benefits Or Other Benefits/Payments." The Freeze Letter explained, "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result, and in accordance with the card account agreement, a freeze (or hold) has been placed on your account." Id.

103. The Freeze Letter further explained that Mr. Mohamed would not be able to use the prepaid debit card or access any money in his account. It stated that "if a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and  your balance will become available in accordance with the terms of the card account agreement and state agency guidelines." Id.

104. In January, Mr. Mohamed logged into his DUI account and saw a new identification verification requirement had appeared. He followed the steps to make sure his identification was verified with DUI.

105. On or about February 3, 2021, Mr. Mohamed received an email notification from the Bank stating that his Account had a deposit of $1,050.

106. On February 3, 2021, Plaintiff called the Bank and learned from a representative that he was to use the same DUI Debit Card to access the Account. Mr. Mohamed changed the PIN for this card in hopes that no more unauthorized charges would be made.

107. Upon receiving access to his account on February 3, 2021, Mr. Mohamed was able to see an incomplete list of prior transactions in the compromised Account records online. He observed that between October 2, 2020 and October 13, 2020, an unauthorized user had unsuccessfully tried to make ten transactions. This coincided with when Mr. Mohamed had temporarily stopped filing claims for his monthly benefits.

108. The Bank representative confirmed that she could see the older information in his account. She stated that the Bank had stopped processing his claim because DUI had frozen his account. She explained that the Bank could reopen his claim now that the DUI account was open.

109. Upon information and belief, the Bank was the only party who could freeze or unfreeze Mr. Mohamed's access to his account.

110. Upon information and belief, the Bank's representatives often provided erroneous information to Plaintiff and Class Members regarding the source of their Account freezes. Class Members have been told that the Bank has no control over the freeze, that DUI is the entity responsible for the freeze, and that only DUI has the power to unfreeze their DUI Debit Card Accounts. But when Class Members call DUI, DUI informs them that it has no control over their DUI Debit Card Accounts and that the freeze is entirely within the Bank's control.

111. During the telephone conversation on February 3, 2021, Mr. Mohamed asked if there was any other status update on his claim. The Bank representative read his file and said it did not state why the claim was denied, but the representative said that his fax from December 16, 2020 "looked blurry," which might affect the claim. She advised him to resend the information.

112. On February 17, 2021, Mr. Mohamed scanned and sent a clearer copy of the police report information with another copy of his Maryland license.

113. Mr. Mohamed called the Bank every day for an update. When he called, he regularly experienced long hold times and was transferred to different representatives.

114. When Plaintiff and Class Members did reach a customer service representative, those representatives were unable to offer any meaningful assistance, often conveying false information or contradicting one another.

115. For example, on or about February 28, 2021, a Bank representative stated that his claim was denied. Mr. Mohamed asked why, but the Bank representative could not tell him why and instead advised that he would receive a letter in the mail with the explanation. Mr. Mohamed never received this letter. Mr. Mohamed asked to speak with a supervisor, who again stated that he had to wait for the denial letter and would be able to request reconsideration.

116. On or about March 3, 2021, the Bank sent Mr. Mohamed a second letter entitled "Important Notices About Your Prepaid Debit Card For State Unemployment Benefits or Other Benefits/Payments." ***See* Exhibit 4, "Update Letter."** The Update Letter stated that while there may have been "irregular, unauthorized, or unlawful activities on your card account" that had led to a freeze, the Bank was "pleased to inform" that "they have removed the freeze and your card is now active again."

117. Upon receipt of the Update Letter, Mr. Mohamed called the Bank and asked whether this letter meant that he could file for reconsideration of his claim. Between March and April of 2021, he spoke with multiple representatives who did not consistently advise him. One Bank representative advised that Mr. Mohamed could not seek reconsideration because he had received two denials of his claim. This was contrary to prior Bank representative's statement that his first claim had merely been reopened, rather than denied.

118. Also in March, Mr. Mohamed spoke with a separate Bank representative, who advised him that he still needed to wait for the alleged denial letter before he could appeal anything. Mr. Mohamed heard from additional Bank representatives that he needed to wait for the letter and that the letter was supposedly being re-sent. When he specifically asked about the status of his claim and why it had been denied, the Bank representatives repeated that they could not give him a reason for the denial.

119. As of the date of this filing, Mr. Mohamed has not received a written or oral statement for the denial of his claim.

120. At all times relevant to this dispute, Mr. Mohamed had to use the compromised Account Number and Debit Card, and the Bank did not provide any replacement card or enhanced security options for his compromised account.

121. Mr. Mohamed has never received a either a provisional or permanent credit of his lost UI funds, totaling $14,644.

122. On or about April 12, 2021, Mr. Mohamed received a 1099-G notice from the State of Maryland requiring him to pay income taxes on the full amount of his unemployment benefits.

123. Bank of America's inadequate response to DUI Debit Cardholders' issues with fraud on their Cards and Accounts results from the Bank's failure to adequately staff its customer-service and fraud-investigation departments, and from Bank procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct Cardholders' efforts to submit their claims and obtain reimbursement under the EFTA and the Bank's "Zero Liability" policy.

124. As a result of the conduct and omissions alleged herein, and despite the Bank's "Zero Liability" policy, Plaintiff and Class Members have been deprived of UI and pandemic relief, to which they are entitled by law, causing them great, immediate, and irreparable harm.

## CLASS ACTION ALLEGATIONS

125. Plaintiff brings this lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking damages on behalf of a class defined as follows (the "Class"):

> All Maryland residents who were issued or who used a Bank of America debit card for the purpose of accessing DUI benefits deposited into a Bank of America account, at any time within three years prior to the filing of this Complaint through the present ("Class Period").

126. Plaintiff reserves the right under Rule 23 to amend or modify the class descriptions and/or add one or more subclasses based on information obtained after the filing of this Complaint.

127. All Class Members have suffered or were threatened with imminent injury during the Class Period, caused by Defendant's wrongful acts and omissions, as alleged herein.

128. This action has been brought and may properly be maintained as a class action against Bank of America pursuant to the following provisions of Rule 23.

129. **Numerosity (Rule 23(a)(1)):** The members of the Class are so numerous that their individual joinder is impracticable. The Bank provided thousands of DUI benefits recipients with DUI Debit Cards that used outdated magnetic stripe technology and subjected these individuals to an undue risk of being subjected to fraudulent transactions on those cards. The identities of, and contact information for, those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. The Bank was contractually required to keep and provide this data to DUI.

130. **Commonality and Predominance (Rule 23(a)(2) and 23(b)(3))**: Many questions of law and fact are common to the Class. These questions predominate over any questions affecting only individual Class Members. These common legal and factual issues include, but are not limited to:

    a. Whether the Bank had or has a policy and/or practice of denying fraud claims without investigation or explanation.

    b. Whether the Bank had or has a policy and/or practice of automatically freezing the DUI Debit Card Accounts of Cardholders who report unauthorized transactions.

    c. Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the tools or authority to assist DUI Debit Cardholders who call seeking assistance in resolving their fraud claims or unfreezing their Accounts.

    d. Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of denying fraud claims without providing the DUI Debit Cardholder a written explanation of the Bank's findings.

    e. Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of denying DUI Debit Cardholders' fraud claims without conducting a good-faith investigation of the alleged

fraud and without having a reasonable basis for believing that no fraud occurred.

f.  Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of not issuing provisional credit within the first ten (10) business days of a DUI Debit Cardholder reporting fraud despite having no intent of completing a good-faith investigation of the Cardholder's fraud claim within 10 business days.

g.  Whether the Bank owed a duty of care to Plaintiff and Class Members, including by nature of the fiduciary relationship between the Bank and its DUI Debit Cardholders, under the DUI-Bank Contract, under the Cardholder Agreement, or under any other contract between the Bank and Plaintiff or Class Members.

h.  Whether Plaintiff and Class Members are third-party beneficiaries of the contract between the Bank and DUI.

i.  Whether the Bank breached its duties to Plaintiff and Class Members, including by using outdated fraud-protection technology on its DUI Debit Cards, not adequately monitoring DUI Debit Cards and Accounts for suspicious activity, not conducting appropriate follow-up or investigation when fraud claims were made, failing to comply with the EFTA and its own "Zero Liability" policy, and otherwise failing to make Plaintiff and Class Members whole for unauthorized transactions.

j.  Whether the Bank should pay damages and interest or provide restitution, reimbursement, and/or other relief to Plaintiff and Class Members.

131. **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the members of the putative Class. Plaintiff, like all other members of the putative Class,

sustained economic and other damages as a result of the Bank's wrongful acts and omissions as alleged herein. The representative Plaintiff and all members of the putative Class were and are similarly or identically harmed by the Bank's same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

132. **Adequacy of Representation (Rule 23(a)(4))**: The representative Plaintiff will fairly and adequately represent and protect the interests of the putative Class Members and has retained competent and qualified counsel with extensive experience in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the putative Class that would make class certification inappropriate. Counsel for the putative Class will vigorously prosecute the claims of all putative Class Members.

133. This action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

134. **Class Action Status (Rule 23(b)(1))**: Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class Members would create a risk of establishing incompatible standards of conduct for the Bank and inconsistent results for Class Members.

135. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by putative Class Members would create a risk of adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action or would substantially impair or impede their ability to protect their interests.

136. **Declaratory Relief (Rule 23(b)(2))**: Certification under Rule 23(b)(2) is appropriate because the Bank acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate declaratory or other appropriate equitable relief with respect to the putative Class as a whole.

137. **Predominance and Superiority (Rule 23(b)(3))**: Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to putative Class Members predominate over any questions affecting only individual members, and because class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

138. The Class is ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same or similar fashion.

**CAUSES OF ACTION**

**COUNT ONE**
**VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT**
**(15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et  seq.)**

139. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

140. Plaintiff brings this cause of action pursuant to the United States Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§1693 et seq., and 12 C.F.R. §§1005.1–1005.20 (Regulation E of the EFTA).

141. The Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 1693a(6) of the EFTA.

142. Plaintiff and Class Members maintained a debit card account, which is an "account" as defined by the 15 U.S.C. § 1693a(2) of the EFTA.

143. Defendant is a "financial institution" as defined in 15 U.S.C. § 1693a(9) of the EFTA.

144. Plaintiff and Class Members provided notice to Bank of America within 60 days after receiving notice of an unauthorized transaction (which is an "error" under

Regulation E), thereby triggering the error resolution requirements of 15 U.S.C. §1693f and 12 C.F.R. §1005.11.

145. Bank of America violated 15 U.S.C. §1693f and Regulation E, 12 C.F.R. §1005.11, including but not limited to through its implementation of each of the following policies and/or practices:

    a. Adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiff's and Class Members' efforts to submit fraud claims and by denying fraud claims without investigation;

    b. Failing to provide provisional credit to Plaintiff and Class Members relating to investigation that could not be resolved within 10 business days;

    c. Not issuing provisional credit within the first 10 business days of a DUI Debit Cardholder reporting fraud despite having no intention of completing a good-faith investigation of the Cardholder's fraud claim within 10 business days, and despite not completing a good-faith investigation of the Cardholder's fraud claim within 10 business days;

    d. Failing to conduct good-faith investigations into alleged errors or unauthorized transactions that were timely reported by Plaintiff and Class Members;

    e. Failing to conduct good-faith investigations into the alleged errors or unauthorized transactions that were timely reported by Plaintiff and Class Members, within 45 days of the date that the alleged error or unauthorized transaction was reported;

    f.   Denying Plaintiff's and Class Members' claims of error without having conducted a good-faith investigation and without providing an explanation of its findings;

    g.   Denying Plaintiff's and Class Members' claims of error without having a reasonable basis for concluding that their Accounts were not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

    h.   Failing to credit Plaintiff's and Class Members' DUI Debit Card Accounts with interest on the amounts of the fraudulent transactions for the period during which they were without access to those funds; and,

    i.   Freezing Plaintiff's and Class Members' DUI Debit Card Accounts in order to avoid the Bank's legal obligations and to prevent Plaintiff and Class Members from accessing their funds.

146. In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's and Class Members' DUI Debit Card Accounts, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiff and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

147. Bank of America knowingly and willfully concluded that Plaintiff's and Class Members' DUI Debit Card Accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to the Bank at the time of its investigation. Plaintiff and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

148. Bank of America violated EFTA and Regulation E by failing to limit Plaintiff's and Class Members' liability as required by 15 U.S.C. §1693m and 12 C.F.R. §1005.6(b).

149. Plaintiff provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in his DUI Debit Card Accounts.

150. Under 12 C.F.R. §1005.6(b)(1), Plaintiff's and Class Members' liability is capped at $50 in these circumstances. Bank of America has subjected Plaintiff and Class Members to far greater than $50 in liability through its wrongful conduct as alleged herein.

151. Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that may be imposed on an accountholder who does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction. Bank of America has subjected Plaintiff and Class Members to far greater than $500 in liability through its wrongful conduct as alleged herein.

152. Regarding any Class Members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. §1005.6(b)(5)(iii), of widespread unauthorized electronic fund transfers from DUI Debit Card Accounts since the beginning of the COVID-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from those Accounts. The volume of calls from DUI Debit Cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great, and the Bank's customer service department is so understaffed, that the Bank routinely causes DUI Debit Cardholders to wait on hold for multiple hours. The widespread fraud specifically targeting DUI Debit Cardholders has been widely reported in the media and has been the subject of significant attention from Maryland officials.

153. In no event should any Class Member be liable for over $500 of damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Marylanders.

154. As a direct and proximate result of Bank of America violations of Regulation E, Plaintiff and Class Members have lost money.

**COUNT TWO**
**VIOLATIONS OF THE MARYLAND PERSONAL INFORMATION PROTECTION ACT**
**Md. Code Ann., Com. Law § 14-3501, *et seq.***

155. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

156. Defendant is a "business," as defined by § 14-3501 (b)(2) of the Maryland Personal Information Protection Act ("MPIPA").

157. Plaintiff's account number and account history with Bank of America was "personal information," as defined by § 14-3501 (e)(1) of the MPIPA.

158. Bank of America directly or indirectly collected Plaintiff and Class Members' personal information, including but not limited to Plaintiff's and Class Members' first names or first initials, last names, and account numbers or debit card numbers, in combination with any required security codes, access codes, or passwords that would permit access to Plaintiff's and Class Members' financial accounts.

159. Pursuant to § 14-3503 of the MPIPA, Bank of America was required to implement and maintain reasonable security procedures and practices to protect Plaintiff's personal information from unauthorized access.

160. Upon information and belief, Bank of America collected, stored, and/or transmitted Plaintiff's and Class Members' personal information in nonencrypted and

nonredacted form or in some other way that permitted unauthorized third parties to access that information in violation of the MPIPA.

161. Bank of America violated § 14-3503 when it (1) used magnetic stripe technology; and (2) collected, stored, and transmitted information in an unsafe manner.

162. Bank of America failed to implement and maintain reasonable security measures by transferring information regarding Plaintiff's and Class Members' Debit Cards to, and storing it on, unsecured or inadequately secured data storage devices.

163. Bank of America actions enabled unauthorized third parties to breach the security system to access Plaintiff and Class Members' personal data and account information. This violated § 14-3504 of the MPIPA.

164. Pursuant to § 14-3501 of the MPIPA, a violation of the MPIPA is an unfair and deceptive trade practice within the meaning of the Maryland Consumer Protection Act.

**COUNT THREE**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Ann., Com. Law § 13-101, *et seq.***

165. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

166. The Plaintiff and Class Members are "consumers" as defined in § 13-101 (c) of the Maryland Consumer Protection Act ("MCPA").

167. Defendant is a "merchant" as defined in § 13-101 (g) of the MCPA.

168. The Defendant is subject to all of the consumer protections mandated by the MCPA which, among other things, prohibits unfair or deceptive practices in the consumer services.  MCPA, Com. Law §§ 13-303(1).

169. Pursuant to § 13-301 (2)(i) of the MCPA, a business may not make a representation that a consumer service has a characteristic, use, benefit that it does not have.

170. Pursuant to § 13-301 (2)(iv) of the MCPA, a business may not make a representation that consumer services are of a particular standard, quality, grade, style, or model which they are not.

171. Defendant violated § 13-301 (2)(i) by representing that Plaintiff's and Class Members' DUI Debit Card was private and secure, when it was not.

172. Defendant violated § 13-301 (2)(iv) by failing to adhere to the standards set forth in the EFTA and the MPIPA when Plaintiff and putative Class Members notified it of the account errors.

173. Defendant violated the MCPA by failing to adhere to the terms of the Cardholder Agreement, especially the Zero Liability Policy.

174. Defendant violated the MCPA by failing to adhere to the terms of the Contract.

175. Defendant engaged in unfair or deceptive practices in violation of the MCPA by failing to use reasonable measures to protect Plaintiff's personal information.

176. Defendant also violated the MCPA by violating the MPIPA.

177. Plaintiff and Class Members relied on Defendant to protect their accounts and private financial information.

178. Plaintiff suffered actual damages as a direct result of his reliance, including emotional distress, and Plaintiff and Class Members lost their UI funds.

## COUNT FOUR
### BREACH OF CONTRACT

179. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

180. Plaintiff and the Class Members entered into a Cardholder Agreement with the Bank that requires the Bank to administer DUI benefits to them through prepaid debit cards.

181. Plaintiff and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

182. Bank of America breached its promises to Plaintiff and Class Members in its Cardholder Agreement by, among other things: (a) failing to timely investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeded 10 business days; (d) failing to limit their liability for unauthorized transactions; (e) freezing their DUI Debit Card Accounts beyond the length of time necessary for a reasonable investigation; (f) freezing their DUI Debit Card Accounts for reasons other than those specified in the Cardholder Agreement; (g) failing to make funds available to them for their use on the day the Bank had been instructed by the DUI to fund their Accounts; and (h) and otherwise failing to make funds available to them in accordance with DUI's instructions.

183. Plaintiff and Class Members were harmed by Bank of America's conduct and have suffered actual damages.

### COUNT FIVE
#### BREACH OF CONTRACT

184. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

185. Bank of America and the State of Maryland entered into the Contract, which is a valid and legally enforceable contract that requires Bank of America to administer DUI benefits to Plaintiff and Class Members through DUI Debit Cards and Accounts.

186. As DUI benefits recipients, DUI Debit Cardholders, and DUI Debit Card Account holders, Plaintiff and Class Members are intended third-party beneficiaries of the Contract. Plaintiff and Class Members would benefit from performance of the Contract, providing that benefit was a motivating purpose of the contracting parties entering into the Contract and permitting Plaintiff and Class Members to pursue a claim for breach of the Contract seeking specific performance is consistent with the Contract's objectives and the reasonable expectations of the contracting parties at the time of contracting.

187. Plaintiff, Class Members, and the DUI performed all or substantially all of the material conditions imposed on them by the Contract and fulfilled any and all conditions precedent to Bank of America's performance.

188. Bank of America failed to perform as promised in the Contract by, among other things: (a) failing to take adequate steps to prevent fraud on DUI Debit Cards and Accounts, including but not limited to failing to adequately monitor for fraudulent and suspected fraudulent transactions, failing to adequately detect fraudulent and suspected fraudulent transactions, failing to deploy reasonable and adequate technologies and

human resources to monitor for and detect fraudulent and suspected fraudulent transactions, failing to promptly notify Plaintiff and Class Members of Bank-detected fraudulent or suspected fraudulent transactions, and failing to issue DUI Debit Cards that incorporate EMV chip technology; (b) failing to timely perform good-faith investigations of unauthorized transactions involving DUI Debit Cards and Accounts; (c) failing to timely resolve claims of unauthorized transactions involving DUI Debit Cards and Accounts, including failing to have a reasonable basis for its determinations that challenged transactions were in fact authorized by the relevant DUI Debit Cardholder; (d) failing to timely reimburse Plaintiff and Class Members for unauthorized transactions on their DUI Debit Cards and Accounts; (e) failing to timely provide provisional credit to Plaintiff and Class Members when the Bank's investigation of fraud claims exceeds 10 business days; (f) failing to provide DUI Debit Cardholders with the kinds, levels, amount, and quality of customer service specified in the Contract; and (g) failing to make commercially reasonable efforts in the context of the COVID-19 pandemic to provide the kinds, levels, amount, and quality of customer service to DUI Debit Cardholders that reasonably should have been provided to them in the context of the COVID-19 pandemic.

189. Plaintiff and Class Members were harmed by Bank of America's conduct in breaching Contract and have suffered actual damages.

## COUNT SIX
### NEGLIGENCE

190. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

191. At all times relevant hereto, Plaintiff and Class Members were "customers" of Bank of America. Md. Code Ann., Com. Law § 4-104(a)(5).

192. In Maryland, the Bank has an implied-in-fact contractual relationship with its customers.

193. Under this implied contract, the Bank owes a duty of ordinary care to its customers.

194. Defendant owed Plaintiff and Class Members a duty of ordinary care for the protection of the Plaintiff's financial records and personal information.

195. Defendant owed Plaintiff and Class Members a duty not to allow unauthorized access by non-account holders.

196. Defendant owed Plaintiff and Class Members a further duty not to allow unauthorized transfers from their personal accounts.

197. Defendant breached the contractual duty of care by allowing unauthorized access to Plaintiff's and Class Members' accounts.

198. Defendant further breached the contractual duty of care by failing to apply security measures and fraud protection that it normally affords its regular customers to Maryland DUI Accounts.

199. Defendant breached the contractual duty of care by failing to protect Plaintiff's and Class Members' information from misuse by an unauthorized user.

200. Plaintiff and Class Members incurred actual loss or damage resulting from the conduct or failure to act of the Defendant.

201. Plaintiff's and Class Members' damages resulted from the Defendant's breach of its duty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for the following relief:

a.  For an order certifying the Classes as defined above, appointing Plaintiff as representative for the Classes, and appointing Plaintiff's counsel as counsel for the Classes;

b.  For declaratory relief, including but not limited to ordering the Bank to take each of the following corrective actions:

1)  Reopen the fraud claim of any Class Member whose claim was closed at any time prior to the Class Period and who has not been permanently credited for the amount of the reported fraud;

2)  Provide an effective means, such as a secure request form on the Bank's website and an email address by which Class Members may easily initiate or reopen a fraud claim regarding unauthorized transactions in the Class Member's DUI Debit Card Account (the "Claim Submission Form");

3)  Provide email, mail, and publication Notice to Class Members of the availability of the Claim Submission Form;

4)  Conduct a reasonable and good-faith investigation into each reopened, pending, or new fraud claim reported by a Class Member, which shall be completed within not more than 45 days after the initiation or reopening of the fraud claim, or in the case of fraud claims pending at the time of the Court's order, within not more than 45 days of the Court's order;

5)  Within one day after completing its investigation of a Class Member's fraud claim, permanently credit the Class Member's DUI Debit Card Account for the full amount of the claim, plus interest,

unless the Bank has affirmative evidence establishing there was no unauthorized transaction and provides documentation of that evidence to the Class Member;

6) For any investigation that is not completed within 10 days after initiation or reopening of the fraud claim, provisionally credit the Class Member's DUI Debit Card Account for the full claim amount pending the Bank's reasonable and good-faith investigation of the claim.

c. For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class Members were deprived of funds in their DUI Debit Card Accounts due to unauthorized transactions;

d. For an award of punitive damages pursuant to applicable law;

e. For reasonable attorney's fees and costs;

f. For pre- and post-judgment interest as allowed by law; and

g. For any other relief the Court deems just.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Yagoub Mohamed, an individual, on behalf of himself and all others similarly situated, pursuant to Rule 38(b), Federal Rules of Civil Procedure, demands a trial by jury of all issues so triable.

Dated: May 24, 2021.

/s/Kathleen P. Hyland
KATHLEEN P. HYLAND (Bar No. 30075)
HYLAND LAW FIRM, LLC
222 Severn Avenue, Suite 17
Annapolis, Maryland 21403
(410) 777-5396 (Tel.)
(410) 777-8237 (Fax)
kat@lawhyland.com
*Counsel for Plaintiff*

AND

ROBERT W. MURPHY
1212 S.E. 2nd Avenue
Ft. Lauderdale, FL 33316
(954) 763-8660 (Tel.)
(954) 763-8607 (Fax)
rwmurphy@lawfirmmurphy.com
*Counsel for the Plaintiff*
*To be admitted pro hac vice*