```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF MARYLAND
2                            NORTHERN DIVISION

3       YAGOUB M. MOHAMED,        )
             Plaintiff,           )
4            vs.                  )   CRIMINAL CASE NO.
                                  )   CCB-21-01283
5       BANK OF AMERICA, N.A.,    )
             Defendant.           )
6       _____)

7                         TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE CATHERINE C. BLAKE
8                      UNITED STATES DISTRICT JUDGE
                         THURSDAY, JUNE 9, 2022
9                          BALTIMORE, MARYLAND

10

11

12           For the Plaintiff:

             Robert Murphy, Esq.
13
             Tara Keller, Esq.
14

15
             For the Defendant:
16
             Thomas Hefferon, Esq.
17
             Virginia Selden McCorkle, Esq.
18

19

20           _____

21                         Reported by:

22
                      Melissa L. Clark, RPR
23            Federal Official Court Reporter
              101 W. Lombard Street, 4th Floor
24               Baltimore, Maryland  21201

25
```

```
 1                    P R O C E E D I N G S.

 2         (2:21 p.m.)

 3              THE COURT:  Good afternoon.  You can all be seated.

 4    Do you want to call the case?

 5              THE CLERK:  The matter pending before in court is

 6    Civil Number CCB-21-01283, Mohamed vs. Bank of America, N.A.

 7         The matter now comes before this Court for the purpose of

 8    a motions hearing.

 9         Counsel for the record starting with the Plaintiff.

10              MR. MURPHY:  Good afternoon, Your Honor.  Attorney

11    Robert Murphy on behalf of the Plaintiff.

12              MS. KELLER:  Tara Keller on behalf of the Plaintiff.

13              MR. HEFFERON:  Your Honor, Thomas Hefferon on behalf

14    of the Defendant.

15              MS. McCORKLE:  Your Honor, Virginia Selden McCorkle

16    on behalf of the Defendant.

17              THE COURT:  Okay.  All right.  And let me just

18    indicate our current COVID protocol.  If you are fully

19    vaccinated and you are speaking and you would like to remove

20    your mask, you may, which I'm about to do.

21         You don't have to if you are not fully vaccinated or not

22    speaking.  While you're not speaking, please leave your mask

23    on.  And thank you all for being here.  I do appreciate, sort

24    of, in-person chance to talk to you all about the issues.  I

25    am -- I regret, I gather, Mr. Murphy had some difficulties.
```

1          **MR. MURPHY:**  Your Honor, it's fine.  I actually got

2     here with two minutes to spare.

3          **THE COURT:**  Well, I hope you were not breaking any

4     speed laws.

5          **MR. MURPHY:**  I wasn't.  It's hard to do that around

6     D.C.

7          **THE COURT:**  Yeah.  Yeah.  Well, anyway, thank you

8     all for being here.  There are a number of issues.  I'll have

9     some questions as we go along, but I thought it also would be

10     -- I would benefit from a chance from hearing you present your

11     cases.

12          Obviously, I'll start on the defense side.  Let me

13     preliminarily just ask a question, obviously, one of the

14     things that I've been provided at some point, some rulings in

15     the Yick case in California, and I believe there is an -- I

16     gather an MDL pending.  And I'm curious as to what's going on

17     with any California cases.  Are the issues similar, identical?

18     Well, obviously, California law might be different from

19     Maryland, but just what's the status of that case as a

20     preliminary matter if you want to tell me your information,

21     Mr. Hefferon?

22          **MR. HEFFERON:**  Of course, Your Honor.  Thomas

23     Hefferon for the Defendant.  The California case when -- first

24     started with Yick being a case up in the Northern District.

25     The preliminary injunction that was issued was before the

1    matter then became an MDL.  I think if memory serves it was a

2    pending petition, but in any event the case has now been MDL'd

3    and it's down in the Southern District down in front of Judge

4    Burns.

5          THE COURT:  Right.

6          MR. HEFFERON:  And the parties have briefed a motion

7    to dismiss and we had argument that was then cancelled at the

8    last minute and it hasn't been reset.  So that's where we are.

9          THE COURT:  Okay.  I was wondering.  I saw that it

10   hadn't been ruled on.  Of course, I hadn't ruled on mine

11   either, but it's just pending.  There is nothing, sort of,

12   else going on at the moment.

13         MR. HEFFERON:  That's correct, Your Honor.  And it's

14   California only.

15         THE COURT:  Okay.

16         MR. HEFFERON:  And my client was the prepaid debit

17   provider for 12 states.  And so that is -- there are a number

18   of constituent cases that are -- and their individual cases

19   that have continued to be added, again, in the MDL in

20   California.

21         THE COURT:  But they're all California.  It's an MDL

22   but it's all California MDL.

23         MR. HEFFERON:  That's correct.  That's correct.

24   There are some cases pending like this one in some different

25   jurisdictions, but there is only the single MDL that's

1   California.

2          THE COURT:  And do you know -- and we'll hear more

3   about this in this case, whether those are just the pandemic

4   relief unemployment or are they general unemployment insurance

5   benefits.

6          MR. HEFFERON:  That's all forms of unemployment.

7          THE COURT:  All forms.

8          MR. HEFFERON:  Yes, Your Honor.  And also includes

9   disability benefits, which in California, and it was -- each

10  state is different, in California disability benefits were

11  loaded on the same cards as unemployment.

12         THE COURT:  I see.  Okay.  All right.  Thank you.

13     Before I hear further from you, let me just see if there

14  is anything that Plaintiff's counsel would -- do you have any

15  additional information?

16         MR. MURPHY:  No, Your Honor.  The review of the

17  docket this morning confirmed what counsel said.  It was taken

18  off the oral argument calendar in January and it's been

19  sitting there gathering dust, weeds.  And I think the only

20  other thing was that they did go to mediation, that's correct.

21  We did mediate it.

22         THE COURT:  That was at the preliminary injunction

23  stage, right?

24         MR. HEFFERON:  No, Your Honor.  Actually, in the

25  Southern District of California, they have an early mutual

```
 1    evaluation process.

 2              THE COURT:  I see.

 3              MR. HEFFERON:  So we had a discussion pursuant to

 4    that process.  You have it with the magistrate with no

 5    involvement of the district judge.

 6              THE COURT:  Okay.  All right.

 7         Well, thank you all.  Then I'll go ahead and start.  We

 8    have our case here, our Maryland case and I'll be happy to

 9    hear from you on your motion to dismiss.

10              MR. HEFFERON:  Yes, Your Honor.  I thought it might

11    be helpful just to give a little context to make sure that --

12    to avoid any confusion.

13              THE COURT:  Sure.

14              MR. HEFFERON:  But just about how the program

15    worked.  And at some levels some of these details don't matter

16    legally, but I think it's a little helpful to put in some

17    context, and to the extent they are, they are based on what

18    was alleged.

19              THE COURT:  And I'm just going to ask you to keep

20    your voice up.  The end of the sentence is --

21              MR. HEFFERON:  That's usually not a problem for me.

22              THE COURT:  Oh, that's better.  Okay.  Thank you.

23              MR. HEFFERON:  So I'll have no trouble complying

24    with that request, Your Honor.

25              THE COURT:  All right.  Thank you.
```

1          **MR. HEFFERON:**  So the Maryland Department of Labor,

2     Division of Unemployment Insurance obviously assesses citizens

3     for unemployment insurance.  And at this time, at the time

4     these events occurred, it had two methods to distribute those

5     benefits.  One was through paper check, and the other one was

6     to load the money on a Bank of America debit card.

7          The debit card was what Mr. Mohamed chose and when one

8     chose the debit card, then Bank of America would mail the

9     debit card to that individual.  Prior to the choice by the

10    individual recipient, the bank would have no contact with the

11    recipient, that was all done through the DUI.  DUI arranged

12    for the benefits and said, how would you like to get it?

13    Would you like to get a check, or would you like to get a

14    debit card, and Mr. Mohamed selected a debit card and those

15    who did then the bank would mail a package with the card to

16    the recipient.

17          **THE COURT:**  So DUI had the initial communication

18    with Mr. Mohamed, do you want a check or do you want a debit

19    card?

20          **MR. HEFFERON:**  That's correct.

21          **THE COURT:**  And if the answer came back debit card,

22    it gets referred to the bank.

23          **MR. HEFFERON:**  Yeah, actually, the way it works is

24    the DUI just provides a data file over to Bank of America, and

25    said, here's today's list of people who have selected a debit

1    card who don't already have an account, therefore, don't

2    already have a card.

3        As sometimes you already have a card, Mr. Mohamed is an

4    example, sometimes during this period you're unemployed and

5    then you get a new job and then you lose the job again.  So

6    only for people who have not received unemployment if they

7    select a debit card, then they're mailed a debit card by Bank

8    of America.

9        The debit card comes with an account agreement just

10   like, you know, all of us have account agreements with our

11   credit card companies or debit card companies, so the debit

12   card comes along with the account agreement.  The account

13   agreement is attached to the complaint, that's the correct

14   version of the account agreement.

15        **THE COURT:**  Okay.

16        **MR. HEFFERON:**  And that governs the terms and

17   conditions under which the bank and the debit cardholder have

18   their contractural relation.

19        Separately, of course, as you would expect, Bank of

20   America has a contract with DUI, with the State of Maryland

21   for the -- you know, providing debit cards to people who are

22   referred to it by DUI.  The form of contract is attached to

23   the complaint, but it's blank and unsigned, but it does

24   reflect on the front that the contract actually isn't just

25   that document, it includes the RFP and the RFP response which,

 1    Your Honor -- I mean, that's not an uncommon way that

 2    government contracts are done, so that the government doesn't

 3    spend a lot of time rewriting all of the terms in order to get

 4    the contract, they'll attach the RFP and the RFP response.

 5         And so that contract is separate from -- it's between the

 6    bank and the state, and it's separate from the contract, the

 7    account agreement between the bank and the debit cardholder.

 8              **THE COURT:**  Now, the RFP here was initially entered

 9    into in 2013?

10              **MR. HEFFERON:**  Yes, Your Honor.

11              **THE COURT:**  And has it changed?  Does it get

12    updated?  Does it get -- what happens to it?

13              **MR. HEFFERON:**  The original term of the contract, I

14    believe was until 2017, and it was subject to two two-year

15    renewals, which were exercised, and the contract has now

16    concluded.

17         The last that -- Maryland has now gone to provide an

18    option for paper checks or direct deposit.  No more debit

19    cards.

20              **THE COURT:**  Yeah, and I think that might not have

21    actually happened as of the time of the briefing, but that's

22    done now?

23              **MR. HEFFERON:**  It's done, yes, Your Honor.  I

24    checked the website yesterday just to confirm, but I also had

25    talked to my client.  And the last loading of the debit card

1   was May of 2021, and the debit cards themselves were

2   deactivated in February of this year.

3           THE COURT:  Okay.  And going back to the two-year

4   renewals, I mean, I guess one of the things that you've raised

5   is that the contract between the bank and the state did not

6   require the chip technology?

7       In the course of the renewals, in the course of the state

8   looking at this contract that had been formed by accepting the

9   RFP, I guess, were there any changes that you can think of

10   that are significant to this, or is it simply the same

11   identical contract that was renewed every couple of years?

12          MR. HEFFERON:  Your Honor, I --

13          THE COURT:  If you know.

14          MR. HEFFERON:  Yeah, I don't have complete knowledge

15   of that, but I do know that when the extensions were put in

16   place, they are a single amendment that just says, the parties

17   hereby agree to go forward with the extension.

18          THE COURT:  Okay.

19          MR. HEFFERON:  And, of course, the existing

20   agreement that is in effect, you know, at the time of the

21   events in question would be, you know, the original form that

22   was attached to the complaint, the RFP, the RFP responses and

23   the amendments.

24          THE COURT:  Okay.

25          MR. HEFFERON:  So --

```
 1            THE COURT:  Which are the exercise of the renewals?

 2            MR. HEFFERON:  Yes, plus whatever, if there were

 3    other amendments, I'm not aware of any, but...

 4            THE COURT:  Okay.  All right.

 5       Probably therefore not relevant at all but just a

 6    question.

 7            MR. HEFFERON:  Yeah, and I was trying to give

 8    context.  I was -- recognized -- I know when I got involved in

 9    this in similar matters, it was a learning curve about how the

10    process works like most things as Your Honor deals with in

11    cases, it's helpful to understand the background.

12        Two other items of context.  One is the account

13    agreement contains several terms that relate, as they're

14    discussed in the brief, relate to the possibility that someone

15    who has been issued a debit card will experience an

16    unauthorized transaction.  Similar to the kind of protection

17    that, again, probably we all have on our credit cards or debit

18    card.

19       This particular debit card, the bank agreed to a zero

20    liability policy, which meant that if a cardholder experienced

21    an unauthorized transaction, that the bank would make the

22    cardholder whole, which is actually better than federal law if

23    it applied, which has the $50 liability limit.

24       The bank zero liability policy actually makes the person

25    whole, but it does limit consequential damages.  The second
```

1    item of context is, there is discussion, obviously, in the

2    briefs and the complaint about Regulation E.

3         Regulation E is the general provision of federal law.

4    It is the regulation that enacts the Electronic Funds Transfer

5    Act, and administered at this point by the Consumer Financial

6    Protection Bureau.  And it provides the rules of the road for

7    Electronic Funds Transfers.  And now since amendments added

8    this several years ago, prepaid cards.

9         And so it provides, among other things, certain rules

10   about how you make a claim about an unauthorized transaction,

11   so there is a parallel there between the contract and the

12   Regulation E, in any event.

13        So those are the other two items of context if Your Honor

14   doesn't have any other questions or background.

15            **THE COURT:**  No, that's fine.

16        **MR. HEFFERON:**  Your Honor, our perspective as

17   reflected in the briefs is that, you know, the main claim in

18   this case is the claim that Mr. Mohamed made in Count 4 that

19   there was a breach of the account agreement.  That he had a

20   debit card, that there were 14-plus thousand dollars worth of

21   unauthorized transactions, that he had asked the bank to

22   reimburse those transactions, and the bank had not done so and

23   so he brought the lawsuit included among the claims, a claim

24   that he should have been paid that $14,000.

25        As we show in our briefs, and we do include a

1    declaration which is uncontested, after the lawsuit was filed,

2    the -- Mr. Mohamed was made good on that amount, the 14,500,

3    whatever the number was.  And so we argue that his contract

4    claim, his contracts count for breach of the account agreement

5    is moot.  And so there -- that's really the -- it's not the

6    only piece of the contract claim admittedly, but that's what

7    we saw as a central issue in the case.

8         Now, the Plaintiffs do express a worry at the time that,

9    perhaps, well, perhaps something else would happen that was

10   bad or there was a threat of recurrence.  And whatever the

11   legitimacy of that, I'm not going to contest the legitimacy of

12   it, nothing else did happen and the cards are now deactivated.

13   And so that is not a basis for avoiding the mootness.

14        There is another related claim in contract, which was

15   the contention that, well, the bank also breached the contract

16   because it froze his cards.  Under the account agreement, the

17   bank has the contractual right to freeze a card if it

18   suspects, you know, not to say the language, but if it

19   suspects fraudulent activity is occurring in the card.  The

20   language is irregular, unauthorized, or unlawful activities

21   may be involved.  And as the facts -- and we don't believe

22   there is a breach there, because as the facts are laid out by

23   Mr. Mohamed himself, the card was frozen, he was informed of

24   the freeze.  He communicated with the DUI and reauthenticated

25   his identity, confirmed, in fact, he was the right person, and

1     the card was unfrozen.

2          And so, you know, the -- and there is no contention other

3     than -- based on any facts anyway that the freeze, you know,

4     was out of line with what the contract permitted the bank to

5     do.

6          And then the last issue that the contract issue and this

7     is the account agreement contract issue, the last issue that

8     was raised was funds availability.  The bank receives money

9     from the state and makes those funds available.  And the

10    contention is that the bank had not made the funds available

11    because it froze the account.  I'm not quite sure that's an

12    account agreement claim, as opposed to a third-party

13    beneficiary claim.  But in any event, you know, in their

14    opposition, the Plaintiff said that they just don't know

15    whether what the bank did breached the funds availability

16    factually and they wanted discovery.  And we, again, don't

17    think that's the proper role of discovery.

18          THE COURT:  Let me go back for a second to the

19    aspect of the contract claim focus on the fact that the

20    account was frozen.  So the breach of contract requires you

21    got to show the contract, you got to show the breach.

22    Hypothetically, if there were some breach on that aspect of

23    it, that the account was wrongfully frozen in some way or in

24    violation of the contract, what, if any damages do you

25    understand to be at issue or what position would you take

1    regarding damages?

2        **MR. HEFFERON:**  At a minimum, the damages would have

3    to be those made damages traceable to the freeze, which would

4    require the Plaintiff to allege for that one-month window what

5    consequences arose due solely to the freeze and having been

6    deprived of access to whatever funds were on that account at

7    that time.

8        If there were no funds on that account at that time or a

9    small amount, obviously, that would be quite different than if

10   there were a large amount on the account, presumably.

11       But if the breach froze an account that Mr. Mohamed

12   wasn't using or that had a zero balance, then our position

13   would be there would be no damages and therefore no cause of

14   action.  And the allegations certainly are not specific enough

15   to be that precise, and onto damages and even though

16   Mr. Mohamed, as he alleges, knows the exact window in time

17   that we're talking about.

18       **THE COURT:**  Okay.

19       **MR. HEFFERON:**  So, Your Honor, that's how -- that,

20   sort of, again what we saw as the central claim, and related

21   to that is, of course, Regulation E, which is the Count 1,

22   because there is a lot of overlap.  The allegation in both,

23   that animates both accounts is that you didn't properly assess

24   my claim and pay the $14,000.  And we admit that if Regulation

25   E applies, and if he proves that the bank did not properly

1    assess and pay the claim timely, then there would be, at

2    least, a statutory penalty violation in play for EFTA.  That

3    is for Regulation E.  That is mootness of having ultimately

4    paid cures the contract claim, but if Regulation E applies, we

5    can see it doesn't cure the statutory claim, assuming all of

6    the elements are met, because there is a statutory damage

7    provision there, right.

8         But as we walk the Court through in the complaint, that's

9    going to be in the motion, we believe Regulation E does not

10   apply to the unique -- or the unusual circumstances we have

11   here.  And the circumstances primarily came up because

12   Mr. Mohamed, we believe, and the Plaintiffs don't contest, was

13   a recipient of pandemic unemployment assistance, which was, as

14   Your Honor is probably familiar, a unique program that

15   Congress put in by the CARES Act of late March of 2020, which

16   for the first time provided federal federally-financed

17   unemployment benefits to someone who was not an employee,

18   included an owner of a business like Mr. Mohamed, gig workers,

19   people who were independent contractors, Uber drivers and the

20   like.

21             **THE COURT:**  Let me ask you, and obviously we'll hear

22   from Plaintiff's counsel, but there was a suggestion in the

23   Plaintiff's opposition that Mr. Mohamed might have received

24   regular unemployment benefits, but he was trying to verify

25   that or something with the Department of Labor.

1    Have you, Mr. Hefferon, heard anything to show that these

2    were regular unemployment -- I'm just saying regular, but

3    regular unemployment benefits.

4         **MR. HEFFERON:**  That's actually what people call it,

5    Your Honor, so...

6         **THE COURT:**  Okay.

7         **MR. HEFFERON:**  No, we don't have any indication that

8    he did.  And from his factual allegations, as we pointed out

9    under the Maryland statute, he would, in fact, not be

10   eligible.

11        **THE COURT:**  If they were regular unemployment

12   benefits in that case, you would think that EFTA Regulation E

13   does apply.

14        **MR. HEFFERON:**  I would have to go back and correct

15   the books probably a little bit, Your Honor, on that, but I

16   think that -- I believe the answer and I'll -- subject to

17   check, I guesses, I believe the answer is, yes.  But because

18   the CARES Act was a disaster relief payment, and it was loaded

19   onto a card for Mr. Mohamed, it falls within the exception to

20   the definition of what is a covered account for purposes of

21   Regulation E.

22        **THE COURT:**  Right.  And your position is it does not

23   qualify as a government benefit account?

24        **MR. HEFFERON:**  Yes, Your Honor because the account

25   was not established by the government.  In the definition of

1      government benefits for the account, which is contained in

2      Regulation E, 12 CFR §1005.15 a2 says, a government benefit

3      account means an account, quote, established by a government

4      agency.  And the account was not established by a government

5      agency.

6                 **THE COURT:**  Okay.

7                 **MR. HEFFERON:**  And, I mean, at one level, Your

8      Honor, it's sort of one of the things that are the Plaintiffs

9      pointed out I wanted to respond to, sort of, generally to.

10     They point out that there was another program that FEMA ran

11     for disaster unemployment.

12          They point out that, you know, disasters are typically

13     short-term events.  And the only observation, I think, that's

14     very important to keep in mind is Congress, when it decided to

15     enact the CARES Act and decided to create this new program,

16     did not decide to append it to the FEMA run pandemic, it's

17     going to be disaster unemployment program, they just created a

18     new program.

19          And so therefore, you know, the congressional choice to

20     do that separately, you know, doesn't -- you know, it means

21     that whatever you can say about the disaster unemployment

22     assistance program that previously existed, that that's

23     irrelevant in our view.  Furthermore, it's irrelevant that

24     many, most in some ways gladly disasters are short-term

25     events.  This one happened to be long, but it must say that in

```
 1    March of 2020 when PUA was invented, there were, most of us,
 2    all of us, hoping it was going to be quite a short event.
 3    Benefit of hindsight, it obviously was not, is not.  But, you
 4    know, again, there is no distinction there between long-term
 5    short-term, it's a straightforward application of a
 6    definition.  And again, we walked the Court through it and
 7    believed that that's why PUA, loaded by itself onto a debit
 8    card in this circumstance is not covered by Regulation E
 9         Now, again, many of the protections of Regulation E are
10    provided through the account agreement.  And so in a sense,
11    the two claims are, sort of, parallel as I indicated.  And
12    Mr. Mohamed has been made whole and received his $14,400.  So
13    in that sense, you know, although Regulation E does not apply,
14    he received, you know, many of the benefits, at least, that he
15    is claiming under Regulation E.
16         THE COURT:  What about the argument, again,
17    Plaintiffs wanting to distinguish this from qualified disaster
18    payments, that it appears to have been treated similarly to
19    regular unemployment benefits, at least in the sense of being
20    subject to taxation by the internal revenue service.
21         MR. HEFFERON:  Again, the decision as to whether
22    to -- whether to tax these benefits or not is different from
23    what matters under the definition of account.  Under the
24    definition of account, the question is whether it's a
25    qualified disaster payment, and it was a qualified disaster
```

1    payment.  And whether Congress, you know, deliberately or in

2    the rush didn't think about what to do about taxability of

3    these particular benefits.  The question here is whether they

4    fall within the within this regulatory definition, and they

5    clearly are disaster benefits.  The president declared the

6    disaster on March 10th.  He declared the disaster for Maryland

7    on March 25th of 2020, and so the payments made under the

8    CARES Act qualify and whether they're taxable and not taxable,

9    we, again, think is not relevant because it's not a

10   distinguishing factor under the regulation.

11        And it would not be, you know, surprising that it was

12   thought of and determined that PUA was going to be quite a

13   significant benefit and was, in many instances, going to

14   people who, you know, owned their own businesses or, you know,

15   were independent contractors and perhaps their -- the thought

16   was that taxability was important to preserve.  It's hard to

17   know.  There is, of course, nothing in the congressional

18   records to tell you those kinds of things.

19             **THE COURT:**  Okay.

20             **MR. HEFFERON:**  So, Your Honor, the -- I think the

21   two claims that, beyond those, that I wanted to focus on, at

22   least briefly, was the third-party beneficiary claim, and the

23   tort claim.

24             **THE COURT:**  Okay.  I think there is a Maryland

25   public information section.

1          **MR. HEFFERON:**  There is.  There is.  I do want to

2     mention that as well as the Maryland Consumer Protection Act

3     claim.  But let me turn to the third-party beneficiary claim.

4     And that's a claim as Your Honor knows, that asserts that

5     Mr. Mohamed can bring a lawsuit as a third-party beneficiary

6     as a contract with the state.

7          And the -- again, first, I would point out and we --

8     that the Court does not have that contract before it.  And so

9     therefore, to the extent Plaintiff even would have some

10     standing to bring such a claim, they haven't stated it because

11     they can't point to the terms of the contract.  They don't,

12     you know, have it and haven't given it to the Court.  But we

13     think the Count 5 -- we think Count 5 dies before we get to

14     that point because there is no plausible theory we believe in

15     which an intent can be found that the state of Maryland and

16     Bank of America intended that every unemployment recipient who

17     received a debit card, would have the right to enforce that

18     state contract.

19          It's a very exacting standard, and the -- essentially as

20     the case is, we cite a number of them, Jaffee, William

21     Burnett.  But the idea is, that in order to support

22     third-party beneficiary status for purposes of bringing a

23     case, the Plaintiff has to show an intent that the promises

24     being made in that contract were actually being made to the

25     third party and both parties agreed the third party could --

1    intended that the third party could sue to enforce them.  You

2    need to show both, and we contend neither had shown.

3         There is nothing here that they pointed to that shows an

4    intent to make any promises to the third party.

5         **THE COURT:**  Let me just back up a little bit because

6    I might have misunderstood some -- let me see.

7         You said the contract is not in front of the Court, the

8    contract being the bank --

9         **MR. HEFFERON:**  Yes, Your Honor.  The account

10   agreement which is the contract is exhibit -- the second

11   exhibit to the complaint, but the state bank contract is not

12   before the Court.

13        **THE COURT:**  So Exhibit 1 contract?

14        **MR. HEFFERON:**  Exhibit 1, that's correct, Your

15   Honor.

16        Exhibit 1 is the form of contract.  You'll notice it's

17   blank, not signed.  The form of contract was included in the

18   RFP when the RFP was issued.  And the -- as you see from the

19   Article 1.1, Article 1, Section 1.1.  It states that the

20   contract shall be this form, plus the RFP, plus the RFP

21   responses, plus ancillary agreements.  And, of course, we also

22   talked about plus amendments.

23        And what the Plaintiff has submitted is the blank form

24   of the base contract.  Has not submitted the RFP, though the

25   Plaintiff has talked about it in the opposition, and has not

1   submitted the RFP response.  And so if the Plaintiff had the

2   ability to sue as a third-party beneficiary of the contract,

3   then in orders to show a breach, the Plaintiff would have to

4   explain what the term of the contract is, but would have to

5   show the Court, and hasn't at this point, because it only put

6   before the Court the blank form of the base contract.

7           **THE COURT:**  Let's assume that they had those other

8   documents, you still are making your argument?

9           **MR. HEFFERON:**  Absolutely, Your Honor.  There is no

10  basis for third-party beneficiary.  Again, the standard

11  requires the Plaintiff to show that Bank of America and the

12  state of Maryland intended that promises in that contract were

13  being made to him or to beneficiaries, cardholders.  And that

14  they intended that cardholders could sue to enforce that state

15  contract.

16          The purpose of the state contract, of course, was to

17  enable the State of Maryland to deliver benefits, to use this

18  as a mechanism.  It wasn't to determine how benefits were

19  awarded, and it wasn't to determine the contractual agreement

20  with -- once the card was issued that, of course, the latter

21  was governed by the account agreement, which is attached.

22          The last point, again, I think it's important to keep in

23  mind is that the cases say this, the third party who is trying

24  to sue as a third-party beneficiary, has to be the primary

25  party in interest.  And we think that's impossible to meet in

1     the case of a government contract.

2         Courts are extremely reluctant as well, to ensure a

3     third-party beneficiary when you're talking about a government

4     contract.  Government contracts are inherently, there is some

5     kind of public policy there, whether it be a zoning board that

6     needs to enforce its own laws for the public good, or in this

7     case, the state of Maryland, which needs to make sure that

8     their distribution of benefits works so that the state, you

9     know -- the state generally benefits and public welfare

10    generally benefits by a free flow of unemployment benefits

11    being paid.

12        The last -- the other point I'd make is what the

13    Plaintiffs are arguing their opposition is that there were

14    provisions in the contract, the state contract which benefited

15    them, and they point to a couple.

16        One provision that talked about security, card security,

17    information security.  Another was customer service, number of

18    hours, you know, when you're open, things like that.  That's

19    not the test for third-party beneficiary, because if that was

20    the test, then anybody who wanted to bring a third-party

21    beneficiary claim would be able to say, well, this

22    subparagraph benefits me, so therefore, I can bring it.

23        The test is whether the parties to the original contract

24    thought the whole contract constituted a promise to the third

25    party, and that's not the case here.

1    The separate point I wanted to make about negligence is

2    something that, again, is sort of those relatively well

3    spelled out in the case law.  The assertion is made that the

4    bank owed a tort duty to Mr. Mohamed to, among other things,

5    protect his financial records and not allow unauthorized

6    transactions.

7    As Your Honor knows, and I saw the Ensor versus Wells

8    Fargo case that Your Honor had in February of this year,

9    courts have been, I think the phrasing is, exceedingly

10   reluctant to add tort claims in a contract.  In the Jacques

11   case, spelled out, J-a-c-q-u-e-s, spelled out the standard

12   which is, there needs to be both a contract and something

13   more.  Some sort of additional circumstances showing an intent

14   of the parties to do more, have a different relationship than

15   just the contract.  The only other allegation here of what the

16   something more is, is that the Plaintiff, Mr. Mohamed and

17   others, who received debit cards, were necessitous.  And

18   surely that's the case, we're not contesting that.  Obviously,

19   it's an unemployment program, but that doesn't provide

20   something more, some special circumstances.

21   Again, if that were the case, then Ensor and lots of

22   other mortgage modification cases would come out different,

23   too.  Because those mortgage -- modification cases, and there

24   is a number of them here in this district that show no tort

25   duty to be inferred, are situations where the person is

1    necessitous.

2         So we don't think there is really any support for the

3    idea that there is a negligent claim, because all that's being

4    alleged is that there is a contractual relationship.

5         Furthermore, there is no plausible theory that even if

6    there was a claim, a tort duty to protect financial records or

7    protect the debit cardholder, there is no causation alleged.

8    The allegation here, Your Honor, is that Mr. Mohamed applied

9    for the card -- excuse me, applied for benefits, chose the

10   card, and Bank of America mailed the card to him, to his

11   residential address, and it didn't arrive or apparently was

12   stolen, either from the box or from somebody who had access to

13   the mail because somebody used it.  It was used during that

14   period of time.  And Mr. Mohamed says it wasn't him, and as

15   soon as Mr. Mohamed called Bank of America, they shut that

16   card down and sent him a new one to that address and sure

17   enough it got there.  They overnighted it actually and it got

18   there the next day.

19        So to the extent that Mr. Mohamed suffered damages, it

20   was like those cases where the allegation of negligence

21   suffers from a break in the chain that they --

22            THE COURT:  Well, doesn't it come to -- you want to

23   talk more about your understanding of the difference between

24   the chip technology and the magnetic stripe technology?  I

25   mean, I think we don't exactly know what happened to the card.

1      It is certainly a reasonable inference that it may have been

2      taken from the mail.  Somebody got their hands on the card.

3      There were transactions, as I recall, from Maryland to

4      California.  Is it not correct that the magnetic stripe card

5      was more susceptible to that sort of misuse than the chip card

6      would have been, or are you saying it doesn't matter what was

7      in the mail, either card, whether it's the magnetic stripe or

8      the chip, could just as easily have been misused?

9          **MR. HEFFERON:**  It's the latter, Your Honor.  And I

10     think -- I mean, there is the burden of proof -- a burden of

11     pleading issue here as well, let's start there.

12         The Plaintiff alleges that a magnetic stripe card is

13     inadequate as compared to a chip card because a magnetic

14     stripe card can be skimmed.  And so that if you use it, for

15     example, in the ATM, somebody can pick up the PIN you're

16     entering and, therefore, you know, then create a new card with

17     the same account number, and having skimmed your PIN, go off

18     and, you know, sort of use this cloned card.

19          There is no allegation that the magnetic stripe card is

20     less secure than a chip card when you're talking about someone

21     who intercepts the mail and is an imposter at that point.  The

22     information -- excuse me, the card is delivered to a location

23     and the person grabs it, and to everyone in the world, other

24     than Mr. Mohamed, they think Mr. Mohamed has the card.

25         You know, he's -- you know, he goes and he uses it and

1    it's accepted.  And, you know, Mr. Mohamed hasn't established

2    a PIN, because Mr. Mohamed never got the card.  And so the

3    risk of skimming, that's the only allegation that's made as to

4    what is problematic about these cards, the risk of skimming

5    wouldn't arise.

6        Now, if Mr. Mohamed wants to allege facts, why it was

7    inadequate for the bank to send a magnetic stripe card because

8    if it gets lost in the -- you know, lost in the mailbox, that

9    that was less secure then he could attempt to allege that --

10   he hasn't alleged that.  His concern about chips really has to

11   do with situations where the individual in this case,

12   Mr. Mohamed it would be, but it's not the facts where the

13   individual obtains the card and uses the card in the ATM, then

14   it gets skimmed.  That would be the only factual situation

15   that would put him in a place where he could argue if there

16   was a tort duty, or he could argue that there was causation.

17       And so in our primary argument on this count, which is

18   Count 6, I guess.

19            **THE COURT:**  Uh-huh.

20        **MR. HEFFERON:**  Our primary argument is that there is

21   no duty, and we think that is very compelling in light of the

22   cases.  But the causation argument, we just point out as well.

23       I'll touch on the Consumer Protection Act claim and then

24   talk about the Privacy claim if, Your Honor, would indulge me

25   to do it that way?

1          **THE COURT:**  Sure.

2          **MR. HEFFERON:**  The Consumer Protection Act claim is

3    Count 3.  And there is an overlap with security, but their

4    first claim is that there were misrepresentations made about

5    the product, which I assume was just the card.  And in the

6    complaint, their allegation is that Bank of America made a

7    misrepresentation that the card was private and secure, and it

8    wasn't because it had no chip.

9          There is no allegation made that Bank of America

10   actually said anything to Mr. Mohamed about that, and that

11   makes sense, of course, because DUI is talking to Mr. Mohamed,

12   not Bank of America, about the card.

13         So there is no allegation of that affirmative

14   misrepresentation.  And so there is a discussion about

15   affirmative misrepresentations in the opposition that arises

16   out of the contact between Mr. Mohamed and Bank of America in

17   connection with the claim, the back and forth about the

18   various letters as Your Honor knows and recalls.

19         **THE COURT:**  Yes.

20         **MR. HEFFERON:**  That's not in the complaint.  That's

21   not an allegation in which the CPA claims rests.  And it's not

22   surprising, of course, because that is a consumer class

23   action, and that would never be certifiable.  But in any

24   event, that's not in the complaint.  And so we have some

25   responses to the assertion, but regarding whether those things

1  were misrepresentations, but it's beyond the scope of the

2  complaint which really talked about affirmative

3  representations.

4      Also beyond the scope of the complaint is the assertion

5  made in the opposition that there was an omission.  The bank

6  omitted to tell Mr. Mohamed that the card was unsafe and

7  insecure.

8      Again, not pled in the complaint.  And in any event,

9  there is no causation that was alleged in the complaint that

10  would support a claim for an omission, because there is no

11  contact alleged between Bank of America and Mr. Mohamed until

12  after he already chose the card and has the card.

13      So if the bank -- in order to show causation for an

14  omission, one has to show, as Your Honor knows, that it's

15  likely the person would have made a different choice had they

16  known the information omitted.

17      Again, outside of the scope of the complaint because the

18  omission is not alleged, but there is no allegation that the

19  Plaintiff would have done something differently because by the

20  time he did talk to Bank of America, he already had signed up

21  for the debit card.

22      And he -- and so -- and of course, it is also the issue

23  that we raised in our MPA discussion.  There are no damages

24  that are caused by, again, the omission of insecurity because

25  the card was stolen, not misused.  And then, of course, there

1    is an aspect of the CPA claim that overlaps the Personal

2    Information Protection Act claim.

3        And partly because factually they are arguing the same

4    thing.  One is an unfair deceptive practice and one is a

5    violation of PIPA.  And also a violation of PIPA is

6    enforceable as an unfair practice.

7                **THE COURT:**  Right.

8                **MR. HEFFERON:**  Under the MCPA.  That's going to be

9    under the CPA.  The allegation -- there are two claims under

10   the PIPA count, which is Count 2, factual claims.  One has to

11   do with the use of magnetic stripes and not EMV chips.  The

12   second is the bank violated the act by collecting, storing,

13   and transmitting information in an insecure manner.  I'll talk

14   about that one first.

15       As we noted, that's an allegation made on information and

16   belief.  There is no assertion of fact that would support the

17   claim.  The best they do is the quotation paragraph 59A of an

18   unnamed Facebook post, a post by an unnamed person.  And so

19   there is really no basis for any recovery under the PIPA for

20   collecting, storing, and transmitting information, the general

21   comment.

22       So really, what it comes down to is the allegation that

23   the bank violated the PIPA by using magnetic stripes on the

24   cards and not EMV chips.

25           And again, I mean, this is essentially a, per se

1    allegation.  A per se using magnetic strips is a violation of

2    the act, because it is insecure.  And there is no -- there is

3    no support for that, there is no regulatory or other, you know

4    statute or any kind of order requirement that cards be used

5    with chips only, and not magnetic strips.

6        The timing the Plaintiffs allege while the bank uses

7    chips in other cards, but they date that to a period after the

8    Maryland contract already started.  And Maryland did not

9    specify that chips be included with the cards.  And in any

10   event, even if the PIPA claim could survive based upon

11   potential risk, again, there is no causation.

12       In order to have a PIPA claim, because it's enforceable

13   through the Consumer Protection Act, Mr. Mohamed would have to

14   show that the use of a magnetic stripe card, rather than a

15   chip card caused him injury.  And if the card was stolen, and

16   all he alleges is skimming is the risk that was introduced, he

17   can't show that the use of the card -- excuse me, the issuance

18   of the card with that technology was an actionable violation.

19            **THE COURT:**  Okay.

20            **MR. HEFFERON:**  Okay.  If there is nothing else, Your

21   Honor, I think I'll step back.

22            **THE COURT:**  That's absolutely fine for now.

23   Obviously, I'll hear from Mr. Murphy and let me just say we're

24   fine.  I may have to interrupt for a brief conference call at

25   4 o'clock if you're still talking.

1          **MR. MURPHY:**  Yes, Your Honor.

2          **THE COURT:**  But that's fine, I'm happy to hear from

3  --

4          **MR. MURPHY:**  May it please the Court, Judge, may I

5  sit down because I've got my laptop here?

6          **THE COURT:**  You may.  That's absolutely fine.

7          **MR. MURPHY:**  Again, I appreciate the Court's

8  understanding of my travel.  I didn't get a ticket, though.

9       Judge, Mr. Hefferon's account of -- he gave a very

10  detailed account, I guess, a backdrop of everything.  And I

11  don't really have an issue of much of what he said, but there

12  are some things that probably need to be brought to the

13  forefront.  And I wrote down that he discussed that the

14  benefits, there was a choice, between a paper check and the

15  Bank of America debit card.  Not really a choice for the

16  unbanked.

17       The unbanked being people like my client who don't

18  otherwise have access to banking facilities and the government

19  decided to partner up and contract with Bank of America with

20  the purpose of distributing public funds, and it's important

21  because for people who, of lower income folks, they don't have

22  access to banks.  So the choice was not one that my client

23  Mr. Mohamed and other people may have had a choice and it

24  wasn't really a choice.  I think the facts later on may

25  develop that we'll learn more about the choices that were

1    presented to Mr. Mohamed and other people similarly situated.

2    That was my only real comment about that.

3        There was another comment, and I wrote it down because I

4    don't want it to be glossed over.

5            THE COURT:  Let me just interrupt for a second then.

6    If he didn't have a choice, how does that interact with

7    your --

8            MR. MURPHY:  Contract claim?

9            THE COURT:  -- reliance on --

10           MR. MURPHY:  Oh, Judge, it's present there and I

11   know it.  And this is one of these cases that I think one of

12   the reasons why the Court in California and perhaps, Your

13   Honor, I don't want to put myself into your position, is

14   struggling with this is that there is a sense that there is a

15   harm to both Mr. Mohamed and the other people similarly

16   situated by the facts that are presented in the complaint.

17   And in this case, and I value an opportunity to have oral

18   argument in any case in Federal Court, because it's an

19   opportunity for me to look at the Court and tell the Court

20   what our views are.  And also counsel, they did an excellent

21   job in the brief.  When I read the brief, I felt like I was --

22   I felt like myself and my co-counsel, Kat Highland just really

23   missed the boat, and -- but we didn't.  And I'll explain why,

24   because everything hinges on the Electronic Funds Transfer

25   Act.  But I got interrupted -- Judge you --

1          **THE COURT:**  You had another point.

2          **MR. MURPHY:**  It was a great point and the great

3     point was this, is that several years ago the banks got

4     together and they realized that they wanted to limit exposure

5     for unauthorized electronic funds transfers.  And, you know,

6     counsel uses the EMV.  The EMV liability shift occurred

7     several years ago, so that any merchant taking a card that

8     just has a mag strip is liable if it's unauthorized use.  And

9     this is not just the mag strip, it's the information that's

10    contained if you've got the -- if you got a chip.  And it's

11    also verification, validation, calling in to activate it, the

12    PIN number, all of this goes into protecting the person whose

13    money is in that stored value card.

14         And, you know, I've done other unauthorized Electronic

15    Funds Transfer Act cases, one in particular involving public

16    funds for veterans, specifically Vietnam veterans that got

17    money that didn't get money on their cards.

18          So this is important.  And so Judge, I want to get right

19    to the thing that is bringing us to this Court, and we weren't

20    here under CAFA for the Class Action Fairness Act.  We're here

21    because we had a federal claim and the federal claim is under

22    Electronic Funds Transfer Act.  And I can summarize my

23    client's view on this is that, the argument of Bank of America

24    conflates the executive power to declare it of urgency, and

25    the right of Congress to enact rights to benefits because of

1    an emergency.

2         And I'm going to track the statute.  I'm going to track

3    the regs.  I'm going to track the staff interpretation, which

4    we're going to have Chevron deference to.  And the inevitable

5    conclusion is the CARES Act benefits are separate from

6    anything that the president at that time, President Trump

7    declared.  They're related both temporarily, that is at the

8    same time, we all remember that time period.  And it's related

9    also in the fact that there was a definite need to get

10   benefits to people and rapidly.

11        And counsel said something to the effect, and I'm going

12   to paraphrase Mr. Hefferon.  I believe what he said was that

13   they've rushed to do the Act, and they didn't address the tax

14   consequences.

15        We don't have -- the Court doesn't have the role of

16   making interpretations, except what the statute says, and the

17   statute is clear we don't go beyond that.  And I think the

18   statute when we go through it together, we're going to see

19   that the statute supports Electronic Funds Transfer Act claim.

20   And Judge, I'm going to sit down now.

21             **THE COURT:**  Sure.

22             **MR. MURPHY:**  So we start off with the definitions

23   that are contained in the regs.  That's 12 CFR §1005.2.  And I

24   apologize to the court reporter that I sometimes get excited

25   and I speak quickly.  I'm going to ask my co-counsel to kick

 1    me if I go too quickly.

 2         So there is a carve-out, and this is something that

 3    we're here today on this.  Is this carve-out for disaster --

 4    qualified disaster relief payments, kick Mr. Mohamed and the

 5    class out of the federal claim?

 6         The definition is an account that is directly or

 7    indirectly established through a third party and loaded with

 8    qualified disaster relief payments.  And everything in -- has

 9    a definition and an interpretation.

10         The official interpretations or Reg E, and we'll get a

11    Chevron deference to this, is that -- and it's under

12    Paragraph 2b3ii.

13              THE COURT:  Okay.  I hate to be lost already, but

14    where -- I've got the Reg 105.6 and -- no, wait a minute.

15    Okay.  1005.2, are we still there?

16              MR. MURPHY:  Yes, ma'am.  We're under 2B account and

17    it's --

18              THE COURT:  Okay.  Fine.

19              MR. MURPHY:  And it's giving us guidance on the

20    definition of the count.

21              THE COURT:  All right.

22              MR. MURPHY:  And it says under subsection --

23    paragraph 2B3ii2.  Excluded disaster relief funds for purposes

24    of Section 1005.2, Subsection B3iiB.

25         Quotation, qualified disaster relief funds means funds

1      made available through a qualified disaster relief program as

2      defined under 29 U.S.C. §139 Subsection B.  And in our brief,

3      we talked about the Internal Revenue Code, and all good things

4      come out of the Internal Revenue Code, apparently.

5          We go to the Internal Revenue Code to Section 139 and the

6      subsection is B.  And this is in their brief, in our brief,

7      too, but it wasn't nearly, you know -- when you go look at

8      qualified disaster relief payment defined, it has to be a

9      qualified disaster.  And I just lost my place -- it says, a

10     qualified disaster relief payment defined for purposes of the

11     section, the term qualified disaster relief payment means, and

12     then any payments to the various people below.

13         However, you have to get a definition of qualified

14     disaster relief payment, and it needs to go to qualified

15     disaster and it has to be defined, and that's under Subsection

16     C.  Qualified disaster relief defined.  And under Subsection

17     C2, it's defined -- the term qualified disaster means, under

18     Subsection 2, a federally declared disaster as defined by

19     Section 165i5A.  And that leads us to the definition under

20     26 U.S.C. §165, that's losses.  And it says, a federally

21     declared disaster for purposes of the subsection means, the

22     federally declared disaster means any disaster subsequently

23     determined by the president of the United States to warrant

24     assistance by the federal government under Robert T. Stafford

25     Disaster Relief and Emergency Assistance Act.

1    So I think we're all in agreement that these are the

2    things that control the definition and the exceptions, the

3    carve-outs.  However, if you look at the CARES Act, the

4    enactment of the CARES Act is not connected to the declaration

5    of the federally declared disaster by President Trump.  The

6    words "federally declared disaster" are wholly missing from

7    the CARES Act.  Nowhere is there a definition that -- or even

8    those words.  And this was, in my view, purposeful.  And I

9    don't even need to -- I'll address what I think the purpose is

10   at the end of my argument.  Instead, Congress chose to use the

11   words COVID Public Health Emergency, and that's under

12   subsection -- I pulled it out of the CARES Act.  And it

13   defines what the thing is that we're talking about, why there

14   is money being -- flowing to people like Mr. Mohamed and other

15   similarly situated is because of a COVID-19 public health

16   emergency, and it's defined as the term COVID-19 public health

17   emergency means a public health emergency declared by the

18   secretary of health and human services on January 27, 2022,

19   with respect to the 2019 novel Coronavirus, that is not --

20   that is not the declaration by the president.  It is not

21   connected to it in any way.  And I can go through the balance

22   of this.  My client is a covered person under the CARES Act.

23   There was some discussion in the briefs about whether or

24   not Mr. Mohamed is to be treated the same as an employed

25   person.  He's a self-employed person, and under the Act, a

1    self-employed person is treated as an employed individual.

2        The other thing in the CARES Act that shows that it

3    doesn't have to do anything with declaration is that the PUA

4    period of assistance is not tethered to the declaration.  The

5    dec -- and this was purposeful, I believe, on the part of

6    Congress.  And, again, I think, they just looked at the

7    statute itself.  But the purpose for the CARES Act not being

8    connected to President Trump's declaration is probably very

9    political.  And being that, the determination of when the PUA

10   period of assistance, it's set forth under C and it says --

11   its sentence provided for in Paragraph 2, the assistance

12   authorizes subsection B shall be available to a covered

13   individual, and it gives the time periods from beginning on or

14   after January 27, 2020.  Ending on or before September 6,

15   2021.

16       And below that it says, the limitation, duration

17   assistance.  And they have a termination date unconnected with

18   whatever the declaration that President Trump or whatever

19   president was in office could have made a determination there

20   is no more COVID problem.  And from a -- Congress knew this,

21   and they knew this because they purposely clarified that they

22   meant to separate the CARES Act with anything the president

23   did, and that's shown in Subsection H, which is in relation

24   between pandemic unemployment assistance and disaster

25   employment assistance, and they purposely substituted words,

1    and they substituted COVID public health emergency for major

2    disaster, pandemic for disaster.

3        And this is why the Electronic Funds Transfer Act

4    carve-out that is proffered as being the thing that destroys

5    this federal claim on behalf of Mr. Mohamed and everyone

6    similarly situated, doesn't work.

7        It is very good drafting of an argument, but the

8    argument when you look at it carefully, and we must look at

9    the statute the way it's drafted.  And if Congress meant to

10   tie the benefits to that declaration, it would have done so.

11   It did not.  And I believe that the -- we have to read the

12   statute as it's written, and also give deference to the

13   interpretation of Reg E, and it really is not much to it.

14       On my review of the case law, there is nothing out there.

15   And I'm not even sure that this is a position being argued

16   that strenuously in the other cases.  Counsel can inform the

17   Court as to it.

18       So our view on this is that Electronic Funds Transfer Act

19   applies on its very face, and that we have stated a cause of

20   action for Count 1 not subject to the carve-out.  Your Honor,

21   I don't have any further argument with respect to Count 1.

22           THE COURT:  Oh, well, all right.  Let me clarify.  I

23   understand or I'm beginning to understand you have a statutory

24   argument.  You are not relying on an argument that this is a

25   government benefit card, or are you -- a government benefit

1    account?

2            **MR. MURPHY:**  It is a government benefit account,

3    but, you know, it's Bank of America's view that they are the

4    ones that established it.  It's -- I don't think it makes as

5    much a difference in determination whether the EFTA applies.

6    And, you know, look if -- I'm going to hammer this in one more

7    time.  If Congress meant to do that, they would have had the

8    word "declaration" in the statute, and they didn't.

9            They made -- Congress made its own determination about an

10   emergency.  There was an emergency, everyone in this room

11   knows there was an emergency, but we have to follow what the

12   -- the statute.  And there were strong political forces as to

13   why they weren't going to tie it to a declaration by the

14   president.

15           And I can't get behind -- judge the legislative history,

16   I can tell you this, it was a mess.  But it wasn't enough

17   where I could bring it to the Court's attention arguing

18   anything because it didn't make -- it wouldn't add anything to

19   this.

20           **THE COURT:**  Okay.  Go ahead, Count 1.

21           **MR. MURPHY:**  That's the extent of my argument on

22   Count 1.  Judge, there was so much stuff that was presented by

23   counsel, does it -- both sides, but the EFTA thing is

24   important.  I don't want anything to be lost in the rebuttal.

25   Would the Court consider having the rebuttal now in my

```
1    argument so we can move onto the other claims?
2      If Mr. Hefferon wants to respond to anything at this
3    particular moment, he may.  Otherwise, we'll...
4            MR. HEFFERON:  Your Honor, maybe -- and I don't have
5    any problem with what counsel would suggest, but maybe it
6    actually is good for me to do it on this one in real time
7    because we're talking about sub sub subsections of various
8    provisions.
9        And so our response, and I think we address this in the
10   reply, is that what the Plaintiff's position misses, is that a
11   definition of account, that's what we're talking about is --
12   triggers on whether it is -- there are funds that are quote,
13   loaded exclusively with qualified disaster relief payments.
14       Okay.  So the question -- and it points you to the same
15   section, obviously, that my brother cited, Section 139 of the
16   Internal Revenue Code which defines, qualified disaster relief
17   payments.  And it's defined, and we point this out.  It means,
18   any amount paid to or for the benefit of an individual, and it
19   has four possibilities.  And the fourth one is, if such amount
20   is paid by a federal, state, or local government or agency or
21   instrumentality thereof in connection with a qualified
22   disaster in order to promote the general welfare.
23       So the question is then -- well, the amounts, the PUA
24   amounts, amounts that were paid by a federal or state
25   government, yes.  Were they paid in connection with a
```

1    qualified disaster?  Yes.  And we'll come back to what's the

2    definition of that.  And were they to promote the general

3    welfare?  Clearly, yes.

4        To go back to the qualified disaster, which is the third

5    element of this is, well, jeez, is qualified disaster defined?

6    Yes, indeed it is, immediately below, Section 139C a qualified

7    disaster is defined to mean, among other things, a Federally

8    declared disaster as defined by Section 165, which runs you to

9    a Section 165, which tells you that among the things that

10   qualified as a disaster is any disaster subsequently

11   determined by the president to warrant assistance by the

12   federal government under the Stafford Disaster Relief Act.

13       So we think that it, therefore, means that since these

14   funds were paid by a federal government in connection with a

15   qualified disaster to promote the general welfare, and

16   therefore, it qualifies as a qualified disaster relief payment

17   and that triggers the exception of the statute.

18             **THE COURT:**  I think I hear Mr. Murphy saying that

19   this is not a disaster determined by the president, that it's

20   independently a public health emergency determined -- as

21   determined by Congress.

22             **MR. MURPHY:**  Yes, Your Honor.

23             **MR. HEFFERON:**  Yes, Your Honor.  The problem with

24   that, Your Honor, is that definition of qualified disaster,

25   which is in the code, refers you to the presidential

1    declaration.  And so that's the problem with the argument.

2    And there is no question that this was a presidential

3    declaration, a disaster as determined by the president and,

4    therefore, is a qualified disaster.  And no question that

5    there was money appropriated and paid onto cards to promote

6    the general welfare in connection with that disaster.

7         So I see at some level, perhaps, the theoretical issue

8    that's being raised here.  But the problem is, the definition

9    do, in fact, trigger off the presidential declaration.  And so

10   the -- whether the CARES Act said, we're appropriating this

11   money because of the presidential declaration or because of

12   the DHS declaration or some other declaration, the health

13   emergency declaration, the fact of the matter is that the

14   definition that tells us whether Reg E applies says, as long

15   as it's tied to a presidential declaration, that triggers the

16   exception.

17        And as long as it's money, it doesn't say money

18   appropriated to -- you know, because of that iteration.  It

19   just says it's any money paid by a federal agency or state

20   agency in connection with the disaster to promote the general

21   welfare.

22             **THE COURT:**  But isn't theoretically the argument

23   then, if it doesn't trigger the exclusion, because it doesn't

24   meet this definition, then it is a prepaid account then it's

25   not excluded, and it's covered under Regulation E?

1    **MR. HEFFERON:**  Which is -- and our argument is it

2    does, because as you walk through each of these it triggers

3    back to ultimately to the Stafford Act declaration by the

4    president.

5        And so therefore it is within the definition of -- within

6    the exclusion, because clearly the money is paid by the

7    government for the general welfare.  And it's in connection

8    with a qualified disaster and it was declared by the

9    president.

10       **THE COURT:**  What does the -- I'm very glad we're

11   having this discussion because I'm not -- so the CARES Act,

12   what does the CARES Act rely on as its authority?

13       What did Congress say we're relying on to make these

14   benefits available?

15       **MR. HEFFERON:**  They created a new provision of the

16   CARES Act -- I mean, of the statutes, the United States

17   statute that says that, you know, we are going to appropriate,

18   you know, $300 million to pay people --

19       **THE COURT:**  Right.

20       **MR. HEFFERON:**  -- unemployment even though they, you

21   know, are self-employed or a gig worker and the like.  So, I

22   mean they're exercising their authority as the legislature to

23   appropriate money, and then they are directing it to -- you

24   know, to the Department of Labor, Federal Department of Labor

25   to distribute it to the states which then did.

1           **MR. MURPHY:**  May I offer just a surrebuttal on that

2    just a tiny bit?

3           **THE COURT:**  Yes.

4           **MR. MURPHY:**  And it was in our brief and my

5    co-counsel gave me a note, and I agree with her view on this.

6    And just as an aside, I'm a Floridian, originally, moved to

7    Charlottesville, and we always got emergency relief after

8    every hurricane and tornado.

9           That pot of money is separate and discrete from the money

10   that was established by Congress from its role as the guardian

11   of the purse of this country, a totally different fund, and

12   Congress did not mention anything about the declaration, this

13   goes back to my comment about the politics.

14           It is beyond the compelling force of reason to assume

15   that Congress wanted to, basically, spend what we spent

16   tightening World War II, times five, based on a declaration by

17   the president.  It's beyond force of reason.  And Congress

18   meant to restrict this to what they determined to be the

19   emergency, and the views of Congress as the Court should

20   recall from just being in America at this time, is that there

21   was a view that there wasn't a problem from the executive

22   branch, a different view from the legislative branch, and the

23   extent and duration of that was determined by Congress and its

24   wisdom and its view and the duration of the CARES Act isn't

25   determined on how long the president of the United States

1    determined that the COVID problems was going to exist, it

2    would go away by the end of the spring, it did not.

3         And so that's why Congress didn't connect it in any way,

4    shape, or form to the president's declaration.  Now, I'm being

5    emphatic about this as much as counsel is, and I appreciate

6    his argument, but it's not what the statute says.

7              **THE COURT:**  Okay.  All right.  So that's your

8    Count 1 argument, and I guess we're somewhat in agreement in

9    the sense that if EFTA does apply, if the regulation does

10   apply, then there is, at least, the possibility of a statutory

11   remedy for what you're mostly complaining about in Count 1,

12   which is this whole good faith investigation, reasonable

13   basis.

14             **MR. MURPHY:**  Yes, Your Honor.  And not rendered moot

15   by the tender of money after the filing of a lawsuit, the

16   tender of money did not make my client whole to create

17   mootness.

18        He has claims under the EFTA as well as the other class

19   members with statutory claims.  And additionally, the money

20   tendered wasn't the amount of money that would compensate him

21   on a terribly -- for his loss, the financial loss.

22        Count 2, violation of Maryland Personal Information

23   Protection Act.  This Court has had lots of cases under that

24   statute, because the Maryland statute is unique.  Well, it was

25   unique when it was enacted, not so much anymore.  And like I

1   mentioned, this is, I guess, a case for modernity.  We're

2   dealing with issues related to electronic funds transfer,

3   security of information, and public benefits being distributed

4   by private companies, which was not a thing when I got out of

5   law school.

6        Judge, we allege that personal information was lost and

7   given to third parties in that card magnetic strip.  And we

8   believe it included the account number, Mr. Mohamed's name,

9   his Social Security information, the amount of his benefits,

10  and possibly other things that are coming out with that

11  magnetic stripe -- strip.  And that is, under the Maryland

12  Act, what personal information is.

13       They cannot say that this was the equivalent of a cash

14  or -- you know, it's not like it's a $10 bill that was mailed,

15  although in practice it ended up being that way because of the

16  way they didn't protect it, and protect the ability for people

17  to access it, it was just like cash.  And I think that's what

18  I heard.  But the loss of information gives the client, my

19  client, and other similarly situated a claim.  And the recent

20  case, In Re:  Marriott International supports that.  We

21  gave -- we posed the clarity that they used non-secure

22  magnetic stripe, and the technology was unfair and deceptive,

23  and there was a -- and based on the EMV shift liability policy

24  adopted by Bank of America against its own merchants, I think

25  that their position really is hollow.

1       We have stated a cause of action, and the case is out

2   there, and there is a -- the Maryland case cited in our

3   materials In Re:  Rutter's case, Rutter's Incorporated data

4   security breach case, it touched upon the use of magnetic

5   stripes.  So this is a little bit more than that, and perhaps

6   we should go back and replead this.  I view this as being

7   sufficiently pled that their -- the way they handled the data

8   caused a breach of the act.  You know, I --

9       **THE COURT:**  If you could elaborate on that a little

10  bit more because --

11      **MR. MURPHY:**  Well, I started thinking about it,

12  Judge, from preparation for both the briefing and today,

13  potentially we could have added that they didn't have

14  protections that now banks do that protect people from having

15  people pick up something from the mail.  And by the way, I

16  need to bring this point out.  There is -- we don't know what

17  happened to      Mr. Mohamed's card.  We don't know if it was

18  stolen.  We don't know if someone at Bank of America took it,

19  or some vendor that they employed to send it out took it, or

20  they just took the data.

21      All we know is that he and others were harmed by it, and,

22  perhaps, we could replead it, add additional facts with

23  respect to what we believe and contend lead to the problem,

24  and that includes the theft of the verification system.  I

25  mean, how would someone -- is this the equivalent of having a

1    $20 bill mailed to someone in the mail, that's what it sounds

2    like.

3            THE COURT:  Well, and what's the difference between

4    the magnetic stripe and the chip in that regard --

5            MR. MURPHY:  In that regard --

6            THE COURT:  -- what I'm hearing is you can take

7    either one of them into --

8            MR. MURPHY:  That's correct.

9            THE COURT:  -- your bank or your sale place, your

10   store, wherever and use it?

11           MR. MURPHY:  Your Honor, that's true.  But in both

12   instances, there would had to have been verification.  Like

13   you get a credit card in the mail now from Bank of America.  I

14   have one in my wallet, I pull it out.  It's got the chip in

15   it, but in order for me to use it, I got to verify who I am.

16   And this goes back to the unbanked people, how do they verify

17   who they are with Bank of America?

18           THE COURT:  They call up.  I mean, there is a number

19   on the card.

20           MR. MURPHY:  Right.  And they have to have the data

21   to match it.  They have to have the data to match it that my

22   client is Mr. Mohamed, what is your Social Security Number,

23   where do you live?  What's your date of birth?

24       Do you call in?  There is no real relationship between

25   these people.  This is why this is important.

1          **THE COURT:**  Well, again, we're getting way outside

2     of anything that's pled in the complaint, I suppose.  But I

3     get a credit card in the mail, it has a number for me to call,

4     I call.  They say, you're authorized.  That's great.  I mean,

5     I don't remember being asked for my Social Security Number.

6          **MR. MURPHY:**  Your Honor, that's true.  They

7     typically will pair that with your phone.  They typically will

8     pair with your cell phone or your landline, whatever they

9     associate with you, they can identify who you are by this, and

10    that's why in instances of people who are unbanked, and they

11    also use throwaway phones.  I'm very familiar with the

12    problems of the people in the lower income groups, and that's

13    why they expose Mr. Mohamed and others to harm by having this

14    data go out.  And the data also included what my client is

15    owed, his money.  That money is data.  The amount that he is

16    -- the money on that credit card is data.  And if they had

17    done the things that they needed to do to protect it, we would

18    not be here today.

19         And so our view is that we pled, and, perhaps, I need to

20    add additional facts to it, Judge, I'm not perfect.  Judge,

21    with respect to Count 3, which is the American Consumer

22    Protection Act --

23         **THE COURT:**  Yes.

24         **MR. MURPHY:**  -- what happened here to Mr. Mohamed

25    and others similarly situated is something that our friends

 1    CAFA novel in terms of being unable to actually get an answer

 2    to the question about, where is my money.  And then when they

 3    get the answer, oh, it's not fraudulent, but they don't get

 4    their money, and there is no way for them to get their money.

 5    And it took a lawsuit, I think we're all in agreement, to get

 6    the money.  That is the basis of our claim under the Maryland

 7    Consumer Protection Act.

 8              THE COURT:  Where is that alleged in the complaint?

 9              MR. MURPHY:  Oh, Judge, it's --

10              THE COURT:  I mean, I've got Count 3.  I read that

11    as essentially coming back to a representation that the card

12    was private and secure when it was not.

13              MR. MURPHY:  Judge, in all candor, when we were

14    working on the response to, we considered filing an amended

15    complaint, and we did not.  Our view is that we needed to

16    address the federal claim and get it done with, because we

17    would not be in this federal court without that federal claim.

18         Judge, it may be necessary for us to replead it, if we

19    can and --

20              THE COURT:  Okay.

21              MR. MURPHY:  Judge, the breach of contract claims,

22    counsel provided a very good argument with respect to Count 4,

23    the two counts that are separate.  One is direct contract

24    under the cardholder agreement, and the second is under the

25    contract with the state.  Our view is that under a breach of

contract claim, I think, most of the argument is that our
claim is moot because they gave us some money.

To the extent that that is their argument, our view is
that it is not moot because they didn't pay the full amount of
what he's owed, they tendered what they considered to be what
he is owed.  And secondly, we're connecting, obviously, the
Electronic Funds Transfer Act claim, by virtue of the fact
that the contract talked about that they were going to comply
with the reg, and they did not.

And with respect to the breach of contract claim --

THE COURT:  Before you leave Count 4, what is the
source of your argument that he would be entitled to more than
the full amount of benefits that was on the card?

MR. MURPHY:  Well, Judge, in all candor, it relates
to the consequential damages and the view that he's entitled
to money for not having the ability to pay his rent, to pay
things like his car payment, to pay for his children's food.
And I am -- I see your face, Judge, and I -- I don't want to
be the spear catcher in this one, but in all candor if their
argument that those are consequential damages don't flow from
breach of contract claim, they have a valid point, perhaps.

I don't want to use my currency on claims I don't feel
that strongly about, Judge.

THE COURT:  Okay.

MR. MURPHY:  I think from the hearing yesterday, I

1    try to be as transparent as glass.  Our view of this case, is

2    it's going to be, if it goes forward as a class action, it's

3    going to go forward on the statutory claims, perhaps under the

4    negligence claim, Judge.  And the negligence claim is that

5    there is a duty to protect people's loss of money.  And at the

6    pleading stage, I think we stated a cause of action on behalf

7    of the class members.

8         I did want to just go back to the third-party

9    beneficiary.  I jumped ahead there.  And I wrote down what

10   counsel said, that there are no cases that deal with the

11   ability for a person receiving public benefits or benefits

12   from the government, to rely upon the contract between the

13   government entity and the business.  And there is not much

14   there, and the reason is, is that this entry of businesses

15   into handing out money and holding money and distributing

16   money into as recent as the last two decades, and they

17   outsource it to businesses, and these businesses, in this

18   case, Bank of America, didn't do a very good job on it.

19        And our view is that we -- our client, and those like

20   him, were the beneficiaries of this contract because they did

21   talk about what they were to be expecting in terms of the

22   guaranteed multilingual toll free customer services from their

23   own contract.  And the account freeze practices.

24        Counsel made an issue that we don't have the contract

25   attached to the complaint, well, that's true, that was the

1   best we could get.  But my view is that the public was

2   supposed to be the beneficiary of the contract, and they

3   didn't get the benefit of the contract.

4        Judge, I don't really have a lot more argument.  The

5   common law claims, in all candor, are there because there will

6   not be relief to the class.  There won't be relief to

7   Mr. Mohamed to make him whole, if his Electronic Funds

8   Transfer Act fails.  And there has to be a remedy.  The courts

9   were made to give remedies to persons like Mr. Mohamed and

10  others similarly situated.  And our view is that that's under

11  the statutory claims, and this -- these additional claims are

12  to, kind of, emphasize how the common law didn't protect

13  people.

14       And Judge, that's the extent of my argument.  And counsel

15  did an excellent job with presenting the bank's case, but I

16  think that the EFTA claim is strong and should survive this

17  motion.

18            **THE COURT:**  Okay.  I appreciate it, I certainly

19  agree that it seems, kind of, fundamental the first thing to

20  decide is this EFTA and whether the Regulation E applies or

21  does not.  And then we may or may not get to an issue of

22  pleading, repleading and some counts surviving and some counts

23  not, but the statutory interpretation in Count 1 certainly

24  seems fundamental.

25            Mr. Hefferon?

 1          **MR. HEFFERON:**  Your Honor, if I may.  We certainly

 2     agree that's an important claim, and all of them are

 3     important.  I would make one observation -- two observations.

 4     The first is, as indicated, the contract does not -- you know,

 5     the contract is, sort of, in parallel with Regulation E.  It

 6     says, it will do these things that are, in fact, consistent

 7     with Regulation E.  That, of course, doesn't mean you could

 8     sue under Regulation E for breach of the contract, but that

 9     also means that it's not -- you know, we would definitely take

10     issue with the concept that, you know, people will not get a

11     remedy if the statutory claim does not survive because of that

12     parallel between the contract and the --

13          **THE COURT:**  It's just a more limited remedy in

14     Mr. Murphy's case?

15          **MR. HEFFERON:**  It's a more limited remedy, that's

16     true.  I mean, undeniably, I know consequential damages is an

17     element of that and not the only element.

18          Given the fact that I responded on that count, I won't

19     say anything more.  And generally, I would just -- in response

20     to my brother's comments, I just make one observation and

21     that's really -- I think you've heard plenty today and the

22     briefs, I think, on both sides are pretty well done.

23          The idea, though, I can't let go about negligence that

24     the assertion somehow is that the negligence claim might

25     survive because the bank has a duty to protect people's money.

```
1    And, you know, I understand -- you know, I understand that,
2    you know, reaction or that hope, but that would, obviously, do
3    quite a lot of violence to the precedence, as well as to the
4    contractual relationship between banks and depositors, or
5    banks and those who they work with in the debit card or credit
6    card relationship or whatever.
7         The contract is -- the account agreement is pretty long
8    actually, and it says what the bank will and won't do.  It
9    provides certain restrictions, some of which are undeniably
10   for the protection of people like Mr. Mohamed.  Like the
11   ability to freeze cards.  And we all experience, and this
12   happens with debit cards as well that, you know, there is a
13   suspicious transaction, and your card gets blocked, and you
14   call up and say, okay, I just want to make sure it's you,
15   because you don't normally, you know, spend this kind of money
16   at Home Depot or, you know, in Newport News, because you --
17   every other expenditure has been within ten miles of where you
18   live.
19        So, you know, there is a lot of protection that the bank
20   has agreed to and that, you know, does benefit consumers.  But
21   we would strongly urge the Court, I don't even think those are
22   the allegations, but strongly urge the Court not to find the
23   bank has some kind of generalized duty to protect money on --
24   in deposit accounts or, obviously, in this case on a debit
25   card.
```

```
1              Thank you.
2              THE COURT:  Thank you.  I guess one last question,
3      and this is down the road, if at all.
4              In terms of the class that you see your client
5      representing, are you talking about folks that got the
6      pandemic unemployment benefits?
7              Are you talking about anybody that got an unemployment --
8      including regular unemployment -- debit card from the Bank of
9      America through the state of Maryland wanting to give them
10     unemployment?
11             MR. MURPHY:  Your Honor, --
12             THE COURT:  You don't have to answer that if you're
13     not ready to --
14             MR. MURPHY:  -- I actually have thought about that,
15     because my view is that once you get over this -- the
16     carve-out, the pandemic carve-out, the disaster carve-out was
17     something that we saw when they presented it to us.  The way
18     we define the class is basically anyone who has had their
19     benefits taken.  And I think that's the definition in the
20     complaint, and they chose to challenge it based on the
21     carve-out.
22             And this is going to be a fairly -- Judge, if the court
23     denies the motion as to the EFTA claim, this is going to be a
24     very straightforward case, not a lot of moving parts in my
25     view and experience on it.  And my view is that we'll probably
```

1   get a fairly good size class of people who have had their

2   stored value cards, prepaid cards, whatever you want to call

3   it, taken and impaired.

4      I know I'm not very ambitious in my cases, Judge.  I try

5   to view these things for what they are, and this is one where

6   I feel very strongly about the harm to the class.  So I think

7   the definition in what we have in the complaint is what we're

8   going to go on now, I don't anticipate changing it, although I

9   do have new co-counsel who has stronger views on things.

10      Judge, I apologize, we were supposed to have my other

11   co-counsels here, too, they were also unable to attend, and I

12   was the closest with a car, so...

13          **THE COURT:**  All right.  Excuse me, well, thank you,

14   again, just in case Mr. Hefferon was wondering.  You referred

15   to a hearing yesterday, that one was a conference call by

16   phone in an unrelated consumer case.

17          **MR. HEFFERON:**  That didn't worry me, Your Honor.

18          **THE COURT:**  No, no, no, just as a matter of

19   interest, so two arguments, so to speak, in two days.

20          **MR. MURPHY:**  I have not had two hearings with the

21   same federal judge in two days in quite some time.

22          **THE COURT:**  Well, thank you all.  I really do

23   appreciate the time and the effort to come here and to be here

24   in person, and do let me know if the Court in California

25   decides anything in the next couple of weeks.  I won't wait

```
 1    for them.
 2                MR. MURPHY:  Thank you, Your Honor.
 3                MR. HEFFERON:  Thank you, Your Honor.
 4            THE COURT:  Thank you.
 5            THE CLERK:  All rise.  Court stands adjourned.
 6         (At 3:53 p.m., the hearing concluded.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## $

**$10** [1] - 49:14
**$14,000** [2] - 12:24, 15:24
**$14,400** [1] - 19:12
**$20** [1] - 51:1
**$300** [1] - 46:18
**$50** [1] - 11:23

## 1

**1** [12] - 15:21, 22:13, 22:14, 22:16, 22:19, 41:20, 41:21, 42:20, 42:22, 48:8, 48:11, 56:23
**1.1** [2] - 22:19
**1005.2** [2] - 37:15, 37:24
**101** [1] - 1:23
**105.6** [1] - 37:14
**10th** [1] - 20:6
**12** [3] - 4:17, 18:2, 36:23
**139** [2] - 38:5, 43:15
**139C** [1] - 44:6
**14,500** [1] - 13:2
**14-plus** [1] - 12:20
**165** [2] - 44:8, 44:9
**165i5A** [1] - 38:19

## 2

**2** [4] - 31:10, 38:18, 40:11, 48:22
**2013** [1] - 9:9
**2017** [1] - 9:14
**2019** [1] - 39:19
**2020** [4] - 16:15, 19:1, 20:7, 40:14
**2021** [2] - 10:1, 40:15
**2022** [2] - 1:8, 39:18
**21201** [1] - 1:24
**25th** [1] - 20:7
**26** [1] - 38:20
**27** [2] - 39:18, 40:14
**29** [1] - 38:2
**2:21** [1] - 2:2
**2B** [1] - 37:16
**2b3ii** [1] - 37:12
**2B3ii2** [1] - 37:23

## 3

**3** [3] - 29:3, 52:21, 53:10
**3:53** [1] - 61:6

## 4

**4** [4] - 12:18, 32:25, 53:22, 54:11
**4th** [1] - 1:23

## 5

**5** [2] - 21:13
**59A** [1] - 31:17

## 6

**6** [2] - 28:18, 40:14

## 9

**9** [1] - 1:8

## A

**a2** [1] - 18:2
**ability** [5] - 23:2, 49:16, 54:16, 55:11, 58:11
**able** [1] - 24:21
**absolutely** [3] - 23:9, 32:22, 33:6
**accepted** [1] - 28:1
**accepting** [1] - 10:8
**access** [5] - 15:6, 26:12, 33:18, 33:22, 49:17
**account** [44] - 8:1, 8:9, 8:10, 8:12, 8:14, 9:7, 11:12, 12:19, 13:4, 13:16, 14:7, 14:11, 14:12, 14:20, 14:23, 15:6, 15:8, 15:10, 15:11, 17:20, 17:23, 17:24, 18:1, 18:3, 18:4, 19:10, 19:23, 19:24, 22:9, 23:21, 27:17, 33:9, 33:10, 37:6, 37:16, 42:1, 42:2, 43:11, 45:24, 49:8, 55:23, 58:7
**accounts** [2] - 15:23, 58:24
**Act** [42] - 12:5, 16:15, 17:18, 18:15, 20:8, 21:2, 28:23, 29:2, 31:2, 32:13, 34:25, 36:5, 36:13, 36:19, 38:25, 39:3, 39:4, 39:7, 39:12, 39:22, 39:25, 40:2, 40:7, 40:22, 41:3, 41:18, 44:12, 45:10, 46:3,

46:11, 46:12, 46:16, 47:24, 48:23, 49:12, 52:22, 53:7, 54:7, 56:8
**act** [3] - 31:12, 32:2, 50:8
**Action** [1] - 35:20
**action** [6] - 15:14, 29:23, 41:20, 50:1, 55:2, 55:6
**actionable** [2] - 32:18
**activate** [1] - 35:11
**activities** [1] - 13:20
**activity** [1] - 13:19
**add** [4] - 25:10, 42:18, 50:22, 52:20
**added** [3] - 4:19, 12:7, 50:13
**additional** [5] - 5:15, 25:13, 50:22, 52:20, 56:11
**additionally** [1] - 48:19
**address** [6] - 26:11, 26:16, 36:13, 39:9, 43:9, 53:16
**adjourned** [1] - 61:5
**administered** [1] - 12:5
**admit** [1] - 15:24
**admittedly** [1] - 13:6
**adopted** [1] - 49:24
**afternoon** [2] - 2:3, 2:10
**agency** [5] - 18:4, 18:5, 43:20, 45:19, 45:20
**ago** [3] - 12:8, 35:3, 35:7
**agree** [4] - 10:17, 47:5, 56:19, 57:2
**agreed** [2] - 11:19, 21:25, 58:20
**agreement** [21] - 8:9, 8:12, 8:13, 8:14, 9:7, 10:20, 11:13, 12:19, 13:4, 13:16, 14:7, 14:12, 19:10, 22:10, 23:19, 23:21, 39:1, 48:8, 53:5, 53:24, 58:7
**agreements** [2] - 8:10, 22:21
**ahead** [3] - 6:7, 42:20, 55:9
**allegation** [15] - 15:22, 25:15, 26:8, 26:20, 27:19, 28:3, 29:6, 29:9, 29:13, 29:21, 30:18, 31:9, 31:15,

31:22, 32:1
**allegations** [3] - 15:14, 17:8, 58:22
**allege** [5] - 15:4, 28:6, 28:9, 32:6, 49:6
**alleged** [8] - 6:18, 26:4, 26:7, 28:10, 30:9, 30:11, 30:18, 53:8
**alleges** [3] - 15:16, 27:12, 32:16
**allow** [1] - 25:5
**ambitious** [1] - 60:4
**amended** [1] - 53:14
**amendment** [1] - 10:16
**amendments** [4] - 10:23, 11:3, 12:7, 22:22
**AMERICA** [1] - 1:5
**America** [26] - 2:6, 7:6, 7:8, 7:24, 8:8, 8:20, 21:16, 23:11, 26:10, 26:15, 29:6, 29:9, 29:12, 29:16, 30:11, 30:20, 33:15, 33:19, 35:23, 47:20, 49:24, 50:18, 51:13, 51:17, 55:18, 59:9
**America's** [1] - 42:3
**American** [1] - 52:21
**amount** [10] - 13:2, 15:9, 15:10, 43:18, 43:19, 48:20, 49:9, 52:15, 54:4, 54:13
**amounts** [3] - 43:23, 43:24
**ancillary** [1] - 22:21
**animates** [1] - 15:23
**answer** [6] - 7:21, 17:16, 17:17, 53:1, 53:3, 59:12
**anticipate** [1] - 60:8
**anyway** [2] - 3:7, 14:3
**apologize** [1] - 36:24, 60:10
**append** [1] - 18:16
**application** [1] - 19:5
**applied** [3] - 11:23, 26:8, 26:9
**applies** [6] - 15:25, 16:4, 41:19, 42:5, 45:14, 56:20
**apply** [5] - 16:10, 17:13, 19:13, 48:9, 48:10
**appreciate** [5] - 2:23, 33:7, 48:5, 56:18, 60:23
**appropriate** [2] -

46:17, 46:23
**appropriated** [2] - 45:5, 45:18
**appropriating** [1] - 45:10
**argue** [3] - 13:3, 28:15, 28:16
**argued** [1] - 41:15
**arguing** [3] - 24:13, 31:3, 42:17
**argument** [29] - 4:7, 5:18, 19:16, 23:8, 28:17, 28:20, 28:22, 34:18, 35:23, 39:10, 41:7, 41:8, 41:21, 41:24, 42:21, 43:1, 45:1, 45:22, 46:1, 48:6, 48:8, 53:22, 54:1, 54:3, 54:12, 54:20, 56:4, 56:14
**arguments** [1] - 60:19
**arise** [1] - 28:5
**arises** [1] - 29:15
**arose** [1] - 15:5
**arranged** [1] - 7:11
**arrive** [1] - 26:11
**Article** [2] - 22:19
**aside** [1] - 47:6
**aspect** [3] - 14:19, 14:22, 31:1
**assertion** [5] - 25:3, 29:25, 30:4, 31:16, 57:24
**asserts** [1] - 21:4
**assess** [2] - 15:23, 16:1
**assesses** [1] - 7:2
**Assistance** [1] - 38:25
**assistance** [10] - 16:13, 18:22, 38:24, 40:4, 40:10, 40:11, 40:17, 40:24, 40:25, 44:11
**associate** [1] - 52:9
**assume** [3] - 23:7, 29:5, 47:14
**assuming** [1] - 16:5
**ATM** [2] - 27:15, 28:13
**attach** [1] - 9:4
**attached** [5] - 8:13, 8:22, 10:22, 23:21, 55:25
**attempt** [1] - 28:9
**attend** [1] - 60:11
**attention** [1] - 42:17
**attorney** [1] - 2:10
**authority** [2] - 46:12, 46:22
**authorized** [1] - 52:4
**authorizes** [1] - 40:12

**availability** [2] - 14:8, 14:15
**available** [5] - 14:9, 14:10, 38:1, 40:12, 46:14
**avoid** [1] - 6:12
**avoiding** [1] - 13:13
**awarded** [1] - 23:19
**aware** [1] - 11:3

**B**

**B3iiB** [1] - 37:24
**backdrop** [1] - 33:10
**background** [2] - 11:11, 12:14
**bad** [1] - 13:10
**balance** [2] - 15:12, 39:21
**BALTIMORE** [1] - 1:9
**Baltimore** [1] - 1:24
**Bank** [26] - 2:6, 7:6, 7:8, 7:24, 8:7, 8:19, 21:16, 23:11, 26:10, 26:15, 29:6, 29:9, 29:12, 29:16, 30:11, 30:20, 33:15, 33:19, 35:23, 42:3, 49:24, 50:18, 51:13, 51:17, 55:18, 59:8
**BANK** [1] - 1:5
**bank** [33] - 7:10, 7:15, 7:22, 8:17, 9:6, 9:7, 10:5, 11:19, 11:21, 11:24, 12:21, 12:22, 13:15, 13:17, 14:4, 14:8, 14:10, 14:15, 15:25, 22:8, 22:11, 25:4, 28:7, 30:5, 30:13, 31:12, 31:23, 32:6, 51:9, 57:25, 58:8, 58:19, 58:23
**bank's** [1] - 56:15
**banking** [1] - 33:18
**banks** [5] - 33:22, 35:3, 50:14, 58:4, 58:5
**base** [2] - 22:24, 23:6
**based** [6] - 6:17, 14:3, 32:10, 47:16, 49:23, 59:20
**basis** [5] - 13:13, 23:10, 31:19, 48:13, 53:6
**became** [1] - 4:1
**BEFORE** [1] - 1:7
**beginning** [2] - 40:13, 41:23
**behalf** [6] - 2:11, 2:12, 2:13, 2:16, 41:5,

55:6
**behind** [1] - 42:15
**belief** [1] - 31:16
**below** [3] - 38:12, 40:16, 44:6
**beneficiaries** [2] - 23:13, 55:20
**beneficiary** [13] - 14:13, 20:22, 21:3, 21:5, 21:22, 23:2, 23:10, 23:24, 24:3, 24:19, 24:21, 55:9, 56:2
**benefit** [11] - 3:10, 17:23, 18:2, 19:3, 20:13, 41:25, 42:2, 43:18, 56:3, 58:20
**benefited** [1] - 24:14
**benefits** [36] - 5:5, 5:9, 5:10, 7:5, 7:12, 16:17, 16:24, 17:3, 17:12, 18:1, 19:14, 19:19, 19:22, 20:3, 20:5, 23:17, 23:18, 24:8, 24:9, 24:10, 24:22, 26:9, 33:14, 35:25, 36:5, 36:10, 41:10, 46:14, 49:3, 49:9, 54:13, 55:11, 59:6, 59:19
**best** [2] - 31:17, 56:1
**better** [2] - 6:22, 11:22
**between** [15] - 9:5, 9:7, 10:5, 12:11, 19:4, 26:23, 29:16, 30:11, 33:14, 40:24, 51:3, 51:24, 55:12, 57:12, 58:4
**beyond** [6] - 20:21, 30:1, 30:4, 36:17, 47:14, 47:17
**bill** [2] - 49:14, 51:1
**birth** [1] - 51:23
**bit** [5] - 17:15, 22:5, 47:2, 50:5, 50:10
**BLAKE** [1] - 1:7
**blank** [4] - 8:23, 22:17, 22:23, 23:6
**blocked** [1] - 58:13
**board** [1] - 24:5
**boat** [1] - 34:23
**books** [1] - 17:15
**box** [1] - 26:12
**branch** [1] - 47:22
**breach** [15] - 12:19, 13:4, 13:22, 14:20, 14:21, 14:22, 15:11, 23:3, 50:4, 50:8, 53:21, 53:25, 54:10, 54:21, 57:8

**breached** [2] - 13:15, 14:15
**break** [1] - 26:21
**breaking** [1] - 3:3
**brief** [8] - 11:14, 32:24, 34:21, 38:2, 38:6, 47:4
**briefed** [1] - 4:6
**briefing** [2] - 9:21, 50:12
**briefly** [1] - 20:22
**briefs** [5] - 12:2, 12:17, 12:25, 39:23, 57:22
**bring** [6] - 21:5, 21:10, 24:20, 24:22, 42:17, 50:16
**bringing** [2] - 21:22, 35:19
**brother** [1] - 43:15
**brother's** [1] - 57:20
**brought** [2] - 12:23, 33:12
**burden** [2] - 27:10
**Bureau** [1] - 12:6
**Burnett** [1] - 21:21
**Burns** [1] - 4:4
**business** [2] - 16:18, 55:13
**businesses** [4] - 20:14, 55:14, 55:17
**but..** [1] - 11:3

**C**

**C2** [1] - 38:17
**CAFA** [2] - 35:20, 53:1
**calendar** [1] - 5:18
**California** [15] - 3:15, 3:17, 3:18, 3:23, 4:14, 4:20, 4:21, 4:22, 5:1, 5:9, 5:10, 5:25, 27:4, 34:12, 60:24
**cancelled** [1] - 4:7
**candor** [4] - 53:13, 54:14, 54:19, 56:5
**cannot** [1] - 49:13
**car** [2] - 54:17, 60:12
**card** [84] - 7:6, 7:7, 7:8, 7:9, 7:14, 7:15, 7:19, 7:21, 8:1, 8:2, 8:3, 8:7, 8:9, 8:11, 8:12, 9:25, 11:15, 11:18, 11:19, 12:20, 13:17, 13:19, 13:23, 14:1, 17:19, 19:8, 21:17, 23:20, 24:16, 26:9, 26:10, 26:16, 26:25, 27:2, 27:4,

27:5, 27:7, 27:12, 27:13, 27:14, 27:16, 27:18, 27:19, 27:20, 27:22, 27:24, 28:2, 28:7, 28:13, 29:5, 29:7, 29:12, 30:6, 30:12, 30:21, 30:25, 32:14, 32:15, 32:17, 32:18, 33:15, 35:7, 35:13, 41:25, 49:7, 50:17, 51:13, 51:19, 52:3, 52:16, 53:11, 54:13, 58:5, 58:6, 58:13, 58:25, 59:8
**cardholder** [6] - 8:17, 9:7, 11:20, 11:22, 26:7, 53:24
**cardholders** [2] - 23:13, 23:14
**cards** [20] - 5:11, 8:21, 9:19, 10:1, 11:17, 12:8, 13:12, 13:16, 25:17, 28:4, 31:24, 32:4, 32:7, 32:9, 35:17, 45:5, 58:11, 58:12, 60:2
**carefully** [1] - 41:8
**CARES** [18] - 16:15, 17:18, 18:15, 20:8, 36:5, 39:3, 39:4, 39:7, 39:12, 39:22, 40:2, 40:7, 40:22, 45:10, 46:11, 46:12, 46:16, 47:24
**carve** [9] - 37:2, 37:3, 39:3, 41:4, 41:20, 59:16, 59:21
**carve-out** [8] - 37:2, 37:3, 41:4, 41:20, 59:16, 59:21
**carve-outs** [1] - 39:3
**case** [40] - 2:4, 3:15, 3:19, 3:23, 3:24, 4:2, 5:3, 6:8, 12:18, 13:7, 17:12, 21:20, 21:23, 24:1, 24:7, 24:25, 25:3, 25:8, 25:11, 25:18, 25:21, 28:11, 34:17, 34:18, 41:14, 49:1, 49:20, 50:1, 50:2, 50:3, 50:4, 55:1, 55:18, 56:15, 57:14, 58:24, 59:24, 60:14, 60:16
**CASE** [1] - 1:4
**cases** [17] - 3:11, 3:17, 4:18, 4:24, 11:11, 23:23, 25:22, 25:23, 26:20, 28:22, 34:11, 35:15, 41:16, 48:23,

55:10, 60:4
**cash** [2] - 49:13, 49:17
**catcher** [1] - 54:19
**CATHERINE** [1] - 1:7
**causation** [6] - 26:7, 28:16, 28:22, 30:9, 30:13, 32:11
**caused** [3] - 30:24, 32:15, 50:8
**CCB-21-01283** [2] - 1:4, 2:6
**cell** [1] - 52:8
**central** [2] - 13:7, 15:20
**certain** [2] - 12:9, 58:9
**certainly** [5] - 15:14, 27:1, 56:18, 56:23, 57:1
**certifiable** [1] - 29:23
**CFR** [2] - 18:2, 36:23
**chain** [1] - 26:21
**challenge** [1] - 59:20
**chance** [2] - 2:24, 3:10
**changed** [1] - 9:11
**changes** [1] - 10:9
**changing** [1] - 60:8
**Charlottesville** [1] - 47:7
**check** [5] - 7:5, 7:13, 7:18, 17:17, 33:14
**checked** [1] - 9:24
**checks** [1] - 9:18
**Chevron** [2] - 36:4, 37:11
**children's** [1] - 54:17
**chip** [11] - 10:6, 26:24, 27:5, 27:8, 27:13, 27:20, 29:8, 32:15, 35:10, 51:4, 51:14
**chips** [6] - 28:10, 31:11, 31:24, 32:5, 32:7, 32:9
**choice** [9] - 7:9, 18:19, 30:15, 33:14, 33:15, 33:22, 33:23, 33:24, 34:6
**choices** [1] - 33:25
**chose** [6] - 7:7, 7:8, 26:9, 30:12, 39:10, 59:20
**circumstance** [1] - 19:8
**circumstances** [4] - 16:10, 16:11, 25:13, 25:20
**cite** [1] - 21:20
**cited** [2] - 43:15, 50:2
**citizens** [1] - 7:2
**Civil** [1] - 2:6
**claim** [57] - 12:10,

12:17, 12:18, 12:23, 13:4, 13:6, 13:14, 14:12, 14:13, 14:19, 15:20, 15:24, 16:1, 16:4, 16:5, 20:22, 20:23, 21:3, 21:4, 21:10, 24:21, 26:3, 26:6, 28:23, 28:24, 29:2, 29:4, 29:17, 30:10, 31:1, 31:2, 31:17, 32:10, 32:12, 34:8, 35:21, 36:19, 37:5, 41:5, 49:19, 53:6, 53:16, 53:17, 54:1, 54:2, 54:7, 54:10, 54:21, 55:4, 56:16, 57:2, 57:11, 57:24, 59:23
**claiming** [1] - 19:15
**claims** [16] - 12:23, 19:11, 20:21, 25:10, 29:21, 31:9, 31:10, 43:1, 48:18, 48:19, 53:21, 54:22, 55:3, 56:5, 56:11
**clarified** [1] - 40:21
**clarify** [1] - 41:22
**clarity** [1] - 49:21
**Clark** [1] - 1:22
**class** [10] - 29:22, 37:5, 48:18, 55:2, 55:7, 56:6, 59:4, 59:18, 60:1, 60:6
**Class** [1] - 35:20
**clear** [1] - 36:17
**clearly** [3] - 20:5, 44:3, 46:6
**CLERK** [2] - 2:5, 61:5
**client** [12] - 4:16, 9:25, 33:17, 33:22, 39:22, 48:16, 49:18, 49:19, 51:22, 52:14, 55:19, 59:4
**client's** [1] - 35:23
**cloned** [1] - 27:18
**closest** [1] - 60:12
**co** [5] - 34:22, 36:25, 47:5, 60:9, 60:11
**co-counsel** [4] - 34:22, 36:25, 47:5, 60:9
**co-counsels** [1] - 60:11
**Code** [4] - 38:3, 38:4, 38:5, 43:16
**code** [1] - 44:25
**collecting** [2] - 31:12, 31:20
**coming** [2] - 49:10, 53:11

**comment** [4] - 31:21, 34:2, 34:3, 47:13
**comments** [1] - 57:20
**common** [2] - 56:5, 56:12
**communicated** [1] - 13:24
**communication** [1] - 7:17
**companies** [3] - 8:11, 49:4
**compared** [1] - 27:13
**compelling** [2] - 28:21, 47:14
**compensate** [1] - 48:20
**complaining** [1] - 48:11
**complaint** [21] - 8:13, 8:23, 10:22, 12:2, 16:8, 22:11, 29:6, 29:20, 29:24, 30:2, 30:4, 30:8, 30:9, 30:17, 34:16, 52:2, 53:8, 53:15, 55:25, 59:20, 60:7
**complete** [1] - 10:14
**comply** [1] - 54:8
**complying** [1] - 6:23
**concept** [1] - 57:10
**concern** [1] - 28:10
**concluded** [2] - 9:16, 61:6
**conclusion** [1] - 36:5
**conditions** [1] - 8:17
**conference** [2] - 32:24, 60:15
**confirm** [1] - 9:24
**confirmed** [2] - 5:17, 13:25
**conflates** [1] - 35:24
**confusion** [1] - 6:12
**Congress** [19] - 16:15, 18:14, 20:1, 35:25, 39:10, 40:6, 40:20, 41:9, 42:7, 42:9, 44:21, 46:13, 47:10, 47:12, 47:15, 47:17, 47:19, 47:23, 48:3
**congressional** [2] - 18:19, 20:17
**connect** [1] - 48:3
**connected** [3] - 39:4, 39:21, 40:8
**connecting** [1] - 54:6
**connection** [7] - 29:17, 43:21, 43:25, 44:14, 45:6, 45:20, 46:7
**consequences** [2] -

15:5, 36:14
**consequential** [4] - 11:25, 54:15, 54:20, 57:16
**consider** [1] - 42:25
**considered** [2] - 53:14, 54:5
**consistent** [1] - 57:6
**constituent** [1] - 4:18
**constituted** [1] - 24:24
**Consumer** [7] - 12:5, 21:2, 28:23, 29:2, 32:13, 52:21, 53:7
**consumer** [2] - 29:22, 60:16
**consumers** [1] - 58:20
**contact** [3] - 7:10, 29:16, 30:11
**contained** [3] - 18:1, 35:10, 36:23
**contains** [1] - 11:13
**contend** [2] - 22:2, 50:23
**contention** [3] - 13:15, 14:2, 14:10
**contest** [2] - 13:11, 16:12
**contesting** [1] - 25:18
**context** [6] - 6:11, 6:17, 11:8, 11:12, 12:1, 12:13
**continued** [1] - 4:19
**contract** [74] - 8:20, 8:22, 8:24, 9:4, 9:5, 9:6, 9:13, 9:15, 10:5, 10:8, 10:11, 12:11, 13:3, 13:6, 13:14, 13:15, 14:4, 14:6, 14:7, 14:19, 14:20, 14:21, 14:24, 16:4, 21:6, 21:8, 21:11, 21:18, 21:24, 22:7, 22:8, 22:10, 22:11, 22:13, 22:16, 22:17, 22:20, 22:24, 23:2, 23:4, 23:6, 23:12, 23:15, 23:16, 24:1, 24:4, 24:14, 24:23, 24:24, 25:10, 25:12, 25:15, 32:8, 33:19, 34:8, 53:21, 53:23, 53:25, 54:1, 54:8, 54:10, 54:21, 55:12, 55:20, 55:23, 55:24, 56:2, 56:3, 57:4, 57:5, 57:8, 57:12, 58:7
**contractors** [2] - 16:19, 20:15
**contracts** [3] - 9:2,

13:4, 24:4
**contractual** [4] - 13:17, 23:19, 26:4, 58:4
**contractural** [1] - 8:18
**control** [1] - 39:2
**Coronavirus** [1] - 39:19
**correct** [10] - 4:13, 4:23, 5:20, 7:20, 8:13, 17:14, 22:14, 27:4, 51:8
**Counsel** [1] - 55:24
**counsel** [18] - 2:9, 5:14, 5:17, 16:22, 34:20, 34:22, 35:6, 36:11, 36:25, 41:16, 42:23, 43:5, 47:5, 48:5, 53:22, 55:10, 56:14, 60:9
**counsels** [1] - 60:11
**Count** [19] - 12:18, 15:21, 21:13, 28:18, 29:3, 31:10, 41:20, 41:21, 42:20, 42:22, 48:8, 48:11, 48:22, 52:21, 53:10, 53:22, 54:11, 56:23
**count** [5] - 13:4, 28:17, 31:10, 37:20, 57:18
**country** [1] - 47:11
**counts** [3] - 53:23, 56:22
**couple** [3] - 10:11, 24:15, 60:25
**course** [16] - 3:22, 4:10, 8:19, 10:7, 10:19, 15:21, 20:17, 22:21, 23:16, 23:20, 29:11, 29:22, 30:22, 30:25, 57:7
**COURT** [89] - 1:1, 2:3, 2:17, 3:3, 3:7, 4:5, 4:9, 4:15, 4:21, 5:2, 5:7, 5:12, 5:22, 6:2, 6:6, 6:13, 6:19, 6:22, 6:25, 7:17, 7:21, 8:15, 9:8, 9:11, 9:20, 10:3, 10:13, 10:18, 10:24, 11:1, 11:4, 12:15, 14:18, 15:18, 16:21, 17:6, 17:11, 17:22, 18:6, 19:16, 20:19, 20:24, 22:5, 22:13, 23:7, 26:22, 28:19, 29:1, 29:19, 31:7, 32:19, 32:22, 33:2, 33:6, 34:5, 34:9, 35:1, 36:21,

37:13, 37:18, 37:21, 41:22, 42:20, 44:18, 45:22, 46:10, 46:19, 47:3, 48:7, 50:9, 51:3, 51:6, 51:9, 51:18, 52:1, 52:23, 53:8, 53:10, 53:20, 54:11, 54:24, 56:18, 57:13, 59:2, 59:12, 60:13, 60:18, 60:22, 61:4
**court** [4] - 2:5, 36:24, 53:17, 59:22
**Court** [25] - 1:23, 2:7, 16:8, 19:6, 21:8, 21:12, 22:7, 22:12, 23:5, 23:6, 33:4, 34:12, 34:18, 34:19, 35:19, 36:15, 41:17, 42:25, 47:19, 48:23, 58:21, 58:22, 60:24, 61:5
**Court's** [2] - 33:7, 42:17
**courts** [3] - 24:2, 25:9, 56:8
**covered** [5] - 17:20, 19:8, 39:22, 40:12, 45:25
**COVID** [5] - 2:18, 39:11, 40:20, 41:1, 48:1
**COVID-19** [2] - 39:15, 39:16
**CPA** [3] - 29:21, 31:1, 31:9
**create** [3] - 18:15, 27:16, 48:16
**created** [2] - 18:17, 46:15
**credit** [6] - 8:11, 11:17, 51:13, 52:3, 52:16, 58:5
**CRIMINAL** [1] - 1:4
**cure** [1] - 16:5
**cures** [1] - 16:4
**curious** [1] - 3:16
**currency** [1] - 54:22
**current** [1] - 2:18
**curve** [1] - 11:9
**customer** [2] - 24:17, 55:22

## D

**D.C** [1] - 3:6
**damage** [1] - 16:6
**damages** [12] - 11:25, 14:24, 15:1, 15:2, 15:3, 15:13, 15:15,

26:19, 30:23, 54:15, 54:20, 57:16
**data** [10] - 7:24, 50:3, 50:7, 50:20, 51:20, 51:21, 52:14, 52:15, 52:16
**date** [3] - 32:7, 40:17, 51:23
**days** [2] - 60:19, 60:21
**deactivated** [2] - 10:2, 13:12
**deal** [1] - 55:10
**dealing** [1] - 49:2
**deals** [1] - 11:10
**debit** [35] - 4:16, 7:6, 7:7, 7:8, 7:9, 7:14, 7:18, 7:21, 7:25, 8:7, 8:9, 8:11, 8:17, 8:21, 9:7, 9:18, 9:25, 10:1, 11:15, 11:17, 11:19, 12:20, 19:7, 21:17, 25:17, 26:7, 30:21, 33:15, 58:5, 58:12, 58:24, 59:8
**dec** [1] - 40:5
**decades** [1] - 55:16
**deceptive** [2] - 31:4, 49:22
**decide** [2] - 18:16, 56:20
**decided** [3] - 18:14, 18:15, 33:19
**decides** [1] - 60:25
**decision** [1] - 19:21
**declaration** [22] - 13:1, 39:4, 39:20, 40:3, 40:4, 40:8, 40:18, 41:10, 42:8, 42:13, 45:1, 45:3, 45:9, 45:11, 45:12, 45:13, 45:15, 46:3, 47:12, 47:16, 48:4
**declare** [1] - 35:24
**declared** [11] - 20:5, 20:6, 36:7, 38:18, 38:21, 38:22, 39:5, 39:6, 39:17, 44:8, 46:8
**Defendant** [5] - 1:5, 1:15, 2:14, 2:16, 3:23
**defense** [1] - 3:12
**deference** [3] - 36:4, 37:11, 41:12
**define** [1] - 59:18
**defined** [12] - 38:2, 38:8, 38:10, 38:15, 38:16, 38:17, 38:18, 39:16, 43:17, 44:5, 44:7, 44:8

**defines** [2] - 39:13, 43:16
**definite** [1] - 36:9
**definitely** [1] - 57:9
**definition** [22] - 17:20, 17:25, 19:6, 19:23, 19:24, 20:4, 37:6, 37:9, 37:20, 38:13, 38:19, 39:2, 39:7, 43:11, 44:2, 44:24, 45:8, 45:14, 45:24, 46:5, 59:19, 60:7
**definitions** [1] - 36:22
**deliberately** [1] - 20:1
**deliver** [1] - 23:17
**delivered** [1] - 27:22
**denies** [1] - 59:23
**Department** [4] - 7:1, 16:25, 46:24
**deposit** [2] - 9:18, 58:24
**depositors** [1] - 58:4
**Depot** [1] - 58:16
**deprived** [1] - 15:6
**destroys** [1] - 41:4
**detailed** [1] - 33:10
**details** [1] - 6:15
**determination** [4] - 40:9, 40:19, 42:5, 42:9
**determine** [2] - 23:18, 23:19
**determined** [11] - 20:12, 38:23, 44:11, 44:19, 44:20, 44:21, 45:3, 47:18, 47:23, 47:25, 48:1
**develop** [1] - 33:25
**DHS** [1] - 45:12
**dies** [1] - 21:13
**difference** [3] - 26:23, 42:5, 51:3
**different** [10] - 3:18, 4:24, 5:10, 15:9, 19:22, 25:14, 25:22, 30:15, 47:11, 47:22
**differently** [1] - 30:19
**difficulties** [1] - 2:25
**direct** [2] - 9:18, 53:23
**directing** [1] - 46:23
**directly** [1] - 37:6
**disability** [2] - 5:9, 5:10
**disaster** [53] - 17:18, 18:11, 18:17, 18:21, 19:17, 19:25, 20:5, 20:6, 37:3, 37:4, 37:8, 37:23, 37:25, 38:1, 38:8, 38:9, 38:10, 38:11, 38:14,

38:15, 38:16, 38:17, 38:18, 38:21, 38:22, 39:5, 39:6, 40:24, 41:2, 43:13, 43:16, 43:22, 44:1, 44:4, 44:5, 44:7, 44:8, 44:10, 44:15, 44:16, 44:19, 44:24, 45:3, 45:4, 45:6, 45:20, 46:8, 59:16
**Disaster** [2] - 38:25, 44:12
**disasters** [2] - 18:12, 18:24
**discovery** [2] - 14:16, 14:17
**discrete** [1] - 47:9
**discussed** [2] - 11:14, 33:13
**discussion** [6] - 6:3, 12:1, 29:14, 30:23, 39:23, 46:11
**dismiss** [4] - 4:7, 6:9
**distinction** [1] - 19:4
**distinguish** [1] - 19:17
**distinguishing** [1] - 20:10
**distribute** [2] - 7:4, 46:25
**distributed** [1] - 49:3
**distributing** [2] - 33:20, 55:15
**distribution** [1] - 24:8
**district** [2] - 6:5, 25:24
**DISTRICT** [3] - 1:1, 1:1, 1:8
**District** [3] - 3:24, 4:3, 3:25
**Division** [1] - 7:2
**DIVISION** [1] - 1:2
**docket** [1] - 5:17
**document** [1] - 8:25
**documents** [1] - 23:8
**dollars** [1] - 12:20
**done** [11] - 7:11, 9:2, 9:22, 9:23, 12:22, 20:19, 35:14, 41:10, 52:17, 53:16, 57:22
**down** [10] - 4:3, 26:16, 31:22, 33:5, 33:13, 34:3, 36:20, 55:9, 59:3
**drafted** [1] - 41:9
**drafting** [1] - 41:7
**drivers** [1] - 16:19
**due** [1] - 15:5
**DUI** [8] - 7:11, 7:17, 7:24, 8:20, 8:22, 13:24, 29:11
**duration** [3] - 40:16,

47:23, 47:24
**during** [2] - 8:4, 26:13
**dust** [1] - 5:19
**duty** [8] - 25:4, 25:25, 26:6, 28:16, 28:21, 55:5, 57:25, 58:23

---

# E

**early** [1] - 5:25
**easily** [1] - 27:8
**effect** [2] - 10:20, 36:11
**effort** [1] - 60:23
**EFTA** [9] - 16:2, 17:12, 42:5, 42:23, 48:9, 48:18, 56:16, 56:20, 59:23
**either** [4] - 4:11, 26:12, 27:7, 51:7
**elaborate** [1] - 27:8
**Electronic** [10] - 12:4, 12:7, 34:24, 35:14, 35:22, 36:19, 41:3, 41:18, 54:7, 56:7
**electronic** [2] - 35:5, 49:2
**element** [3] - 44:5, 57:17
**elements** [1] - 16:6
**eligible** [1] - 17:10
**Emergency** [2] - 38:25, 39:11
**emergency** [12] - 36:1, 39:16, 39:17, 41:1, 42:10, 42:11, 44:20, 45:13, 47:7, 47:19
**emphasize** [1] - 56:12
**emphatic** [1] - 48:5
**employed** [6] - 39:24, 39:25, 40:1, 46:21, 50:19
**employee** [1] - 16:17
**employment** [1] - 40:25
**EMV** [5] - 31:11, 31:24, 35:6, 49:23
**enable** [1] - 23:17
**enact** [2] - 18:15, 35:25
**enacted** [1] - 48:25
**enactment** [1] - 39:4
**enacts** [1] - 12:4
**end** [3] - 6:20, 39:10, 48:2
**ended** [1] - 49:15
**ending** [1] - 40:14
**enforce** [4] - 21:17, 22:1, 23:14, 24:6
**enforceable** [2] - 31:6,

32:12
**Ensor** [2] - 25:7, 25:21
**ensure** [1] - 24:2
**entered** [1] - 9:8
**entering** [1] - 27:16
**entitled** [2] - 54:12, 54:15
**entity** [1] - 55:13
**entry** [1] - 55:14
**equivalent** [2] - 49:13, 50:25
**Esq** [4] - 1:12, 1:13, 1:16, 1:17
**essentially** [3] - 21:19, 31:25, 53:11
**established** [7] - 17:25, 18:3, 18:4, 28:1, 37:7, 42:4, 47:10
**evaluation** [1] - 6:1
**event** [7] - 4:2, 12:12, 14:13, 19:2, 29:24, 30:8, 32:10
**events** [4] - 7:4, 10:21, 18:13, 18:25
**exact** [1] - 15:16
**exacting** [1] - 21:19
**exactly** [1] - 26:25
**example** [2] - 8:4, 27:15
**exceedingly** [1] - 25:9
**excellent** [2] - 34:20, 56:15
**except** [1] - 36:16
**exception** [3] - 17:19, 44:17, 45:16
**exceptions** [1] - 39:2
**excited** [1] - 36:24
**excluded** [2] - 37:23, 45:25
**exclusion** [2] - 45:23, 46:6
**exclusively** [1] - 43:13
**excuse** [4] - 26:9, 27:22, 32:17, 60:13
**executive** [2] - 35:24, 47:21
**exercise** [1] - 11:1
**exercised** [1] - 9:15
**exercising** [1] - 46:22
**exhibit** [2] - 22:10, 22:11
**Exhibit** [3] - 22:13, 22:14, 22:16
**exist** [1] - 48:1
**existed** [1] - 18:22
**existing** [1] - 10:19
**expect** [1] - 8:19
**expecting** [1] - 55:21
**expenditure** [1] -

58:17
**experience** [3] -
11:15, 58:11, 59:25
**experienced** [1] -
11:20
**explain** [2] - 23:4,
34:23
**expose** [1] - 52:13
**exposure** [1] - 35:4
**express** [1] - 13:8
**extension** [1] - 10:17
**extensions** [1] - 10:15
**extent** [7] - 6:17, 21:9,
26:19, 42:21, 47:23,
54:3, 56:14
**extremely** [1] - 24:2

## F

**face** [2] - 41:19, 54:18
**Facebook** [1] - 31:18
**facilities** [1] - 33:18
**fact** [10] - 13:25,
14:19, 17:9, 31:16,
36:9, 45:9, 45:13,
54:7, 57:6, 57:18
**factor** [1] - 20:10
**facts** [9] - 13:21,
13:22, 14:3, 28:6,
28:12, 33:24, 34:16,
50:22, 52:20
**factual** [3] - 17:8,
28:14, 31:10
**factually** [2] - 14:16,
31:3
**fails** [1] - 56:8
**fairly** [2] - 59:22, 60:1
**Fairness** [1] - 35:20
**faith** [1] - 48:12
**fall** [1] - 20:4
**falls** [1] - 17:19
**familiar** [2] - 16:14,
52:11
**Fargo** [1] - 25:8
**February** [2] - 10:2,
25:8
**Federal** [3] - 1:23,
34:18, 46:24
**federal** [17] - 11:22,
12:3, 16:16, 35:21,
37:5, 38:24, 41:5,
43:20, 43:24, 44:12,
44:14, 45:19, 53:16,
53:17, 60:21
**Federally** [1] - 44:7
**federally** [6] - 16:16,
38:18, 38:20, 38:22,
39:5, 39:6
**federally-financed** [1]
- 16:16

**felt** [2] - 34:21, 34:22
**FEMA** [2] - 18:10,
18:16
**file** [1] - 7:24
**filed** [1] - 13:1
**filing** [2] - 48:15,
53:14
**financed** [1] - 16:16
**financial** [3] - 25:5,
26:6, 48:21
**Financial** [1] - 12:5
**fine** [7] - 3:1, 12:15,
32:22, 32:24, 33:2,
33:6, 37:18
**first** [7] - 3:23, 16:16,
21:7, 29:4, 31:14,
56:19, 57:4
**five** [1] - 47:16
**Floor** [1] - 1:23
**Floridian** [1] - 47:6
**flow** [2] - 24:10, 54:20
**flowing** [1] - 39:14
**focus** [2] - 14:19,
20:21
**folks** [2] - 33:21, 59:5
**follow** [1] - 42:11
**food** [1] - 54:17
**FOR** [1] - 1:1
**force** [2] - 47:14,
47:17
**forces** [1] - 42:12
**forefront** [1] - 33:13
**form** [8] - 8:22, 10:21,
22:16, 22:17, 22:20,
22:23, 23:6, 48:4
**formed** [1] - 10:8
**forms** [2] - 5:6, 5:7
**forth** [2] - 29:17, 40:10
**forward** [3] - 10:17,
55:2, 55:3
**four** [1] - 43:19
**fourth** [1] - 43:19
**fraudulent** [2] - 13:19,
53:3
**free** [2] - 24:10, 55:22
**freeze** [7] - 13:17,
13:24, 14:3, 15:3,
15:5, 55:23, 58:11
**friends** [1] - 52:25
**front** [3] - 4:3, 8:24,
22:7
**froze** [3] - 13:16,
14:11, 15:11
**frozen** [3] - 13:23,
14:20, 14:23
**full** [2] - 54:4, 54:13
**fully** [2] - 2:18, 2:21
**fund** [1] - 47:11
**fundamental** [2] -

56:19, 56:24
**Funds** [10] - 12:4,
12:7, 34:24, 35:15,
35:22, 36:19, 41:3,
41:18, 54:7, 56:7
**funds** [15] - 14:8, 14:9,
14:10, 14:15, 15:6,
15:8, 33:20, 35:5,
35:16, 37:23, 37:25,
43:12, 44:14, 49:2
**furthermore** [2] -
18:23, 26:5

## G

**gather** [2] - 2:25, 3:16
**gathering** [1] - 5:19
**general** [5] - 5:4, 12:3,
31:20, 43:22, 44:2,
44:15, 45:6, 45:20,
46:7
**generalized** [1] -
58:23
**generally** [4] - 18:9,
24:9, 24:10, 57:19
**gig** [2] - 16:18, 46:21
**given** [3] - 21:12, 49:7,
57:18
**glad** [1] - 46:10
**gladly** [1] - 18:24
**glass** [1] - 55:1
**glossed** [1] - 34:4
**governed** [1] - 23:21
**government** [23] - 9:2,
17:23, 17:25, 18:1,
18:2, 18:3, 18:4,
24:1, 24:3, 24:4,
33:18, 38:24, 41:25,
42:2, 43:20, 43:25,
44:12, 44:14, 46:7,
55:12, 55:13
**governs** [1] - 8:16
**grabs** [1] - 27:23
**great** [3] - 35:2, 52:4
**groups** [1] - 52:12
**guaranteed** [1] - 55:22
**guardian** [1] - 47:10
**guess** [7] - 10:4, 10:9,
28:18, 33:10, 48:8,
49:1, 59:2
**guesses** [1] - 17:17
**guidance** [1] - 37:19

## H

**hammer** [1] - 42:6
**handing** [1] - 55:15
**handled** [1] - 50:7
**hands** [1] - 27:2
**happy** [2] - 6:8, 33:2

**hard** [2] - 3:5, 20:16
**harm** [3] - 34:15,
52:13, 60:6
**harmed** [1] - 50:21
**hate** [1] - 37:13
**Health** [1] - 39:11
**health** [7] - 39:15,
39:16, 39:17, 39:18,
41:1, 44:20, 45:12
**hear** [7] - 5:2, 5:13,
6:9, 16:21, 32:23,
33:2, 44:18
**heard** [3] - 17:1,
49:18, 57:21
**hearing** [6] - 2:8, 3:10,
51:6, 54:25, 60:15,
61:6
**hearings** [1] - 60:20
**HEFFERON** [56] -
2:13, 3:22, 4:6, 4:13,
4:16, 4:23, 5:6, 5:8,
5:24, 6:3, 6:10, 6:14,
6:21, 6:23, 7:1, 7:20,
7:23, 8:16, 9:10,
9:13, 9:23, 10:12,
10:14, 10:19, 10:25,
11:2, 11:7, 12:16,
15:2, 15:19, 17:4,
17:7, 17:14, 17:24,
18:7, 19:21, 20:20,
21:1, 22:9, 22:14,
23:9, 27:9, 28:20,
29:2, 29:20, 31:8,
32:20, 43:4, 44:23,
46:1, 46:15, 46:20,
57:1, 57:15, 60:17,
61:3
**Hefferon** [9] - 1:16,
2:13, 3:21, 3:23,
17:1, 36:12, 43:2,
56:25, 60:14
**Hefferon's** [1] - 33:9
**helpful** [2] - 6:11,
6:16, 11:11
**hereby** [1] - 10:17
**Highland** [1] - 34:22
**himself** [1] - 13:23
**hindsight** [1] - 19:3
**hinges** [1] - 34:24
**history** [1] - 42:15
**holding** [1] - 55:15
**hollow** [1] - 49:25
**Home** [1] - 58:16
**Honor** [52] - 2:10,
2:13, 2:15, 3:1, 3:22,
4:13, 5:8, 5:16, 5:24,
6:10, 6:24, 9:1, 9:10,
9:23, 10:12, 11:10,
12:13, 12:16, 15:19,
16:14, 17:5, 17:15,

17:24, 18:8, 20:20,
21:4, 22:9, 22:15,
23:9, 25:7, 25:8,
26:8, 27:9, 28:24,
29:18, 30:14, 32:21,
33:1, 34:13, 41:20,
43:4, 44:22, 44:23,
44:24, 48:14, 51:11,
52:6, 57:1, 59:11,
60:17, 61:2, 61:3
**HONORABLE** [1] - 1:7
**hope** [2] - 3:3, 58:2
**hoping** [1] - 19:2
**hours** [1] - 24:18
**human** [1] - 39:18
**hurricane** [1] - 47:8
**hypothetically** [1] -
14:22

## I

**idea** [3] - 21:21, 26:3,
57:23
**identical** [2] - 3:17,
10:11
**identify** [1] - 52:9
**identity** [1] - 13:25
**II** [1] - 47:16
**immediately** [1] - 44:6
**impaired** [1] - 60:3
**important** [9] - 18:14,
20:16, 23:22, 33:20,
35:18, 42:24, 51:25,
57:2, 57:3
**impossible** [1] - 23:25
**imposter** [1] - 27:21
**IN** [1] - 1:1
**in-person** [1] - 2:24
**inadequate** [2] -
27:13, 28:7
**include** [1] - 12:25
**included** [6] - 12:23,
16:18, 22:17, 32:9,
49:8, 52:14
**includes** [3] - 5:8,
8:25, 50:24
**including** [1] - 59:8
**income** [2] - 33:21,
52:12
**Incorporated** [1] -
50:3
**indeed** [1] - 44:6
**independent** [2] -
16:19, 20:15
**independently** [1] -
44:20
**indicate** [1] - 2:18
**indicated** [2] - 19:11,
57:4
**indication** [1] - 17:7

**indirectly** [1] - 37:7
**individual** [8] - 4:18, 7:9, 7:10, 28:11, 28:13, 40:1, 40:13, 43:18
**indulge** [1] - 28:24
**inevitable** [1] - 36:4
**inference** [1] - 27:1
**inferred** [1] - 25:25
**inform** [1] - 41:16
**information** [15] - 3:20, 5:15, 20:25, 24:17, 27:22, 30:16, 31:13, 31:15, 31:20, 35:9, 49:3, 49:6, 49:9, 49:12, 49:18
**Information** [2] - 31:2, 48:22
**informed** [1] - 13:23
**inherently** [1] - 24:4
**initial** [1] - 7:17
**injunction** [2] - 3:25, 5:22
**injury** [1] - 32:15
**insecure** [3] - 30:7, 31:13, 32:2
**insecurity** [1] - 30:24
**instances** [3] - 20:13, 51:12, 52:10
**instead** [1] - 39:10
**instrumentality** [1] - 43:21
**insurance** [2] - 5:4, 7:3
**Insurance** [1] - 7:2
**intended** [4] - 21:16, 22:1, 23:12, 23:14
**intent** [4] - 21:15, 21:23, 22:4, 25:13
**interact** [1] - 34:6
**intercepts** [2] - 27:21
**interest** [2] - 23:25, 60:19
**internal** [1] - 19:20
**Internal** [4] - 38:3, 38:4, 38:5, 43:16
**International** [1] - 49:20
**interpretation** [4] - 36:3, 37:9, 41:13, 56:23
**interpretations** [2] - 36:16, 37:10
**interrupt** [2] - 32:24, 34:5
**interrupted** [1] - 34:25
**introduced** [1] - 32:16
**invented** [1] - 19:1
**investigation** [1] - 48:12

**involved** [2] - 11:8, 13:21
**involvement** [1] - 6:5
**involving** [1] - 35:15
**irregular** [1] - 13:20
**irrelevant** [2] - 18:23
**issuance** [1] - 32:17
**issue** [13] - 13:7, 14:6, 14:7, 14:25, 27:11, 30:22, 33:11, 45:7, 55:24, 56:21, 57:10
**issued** [4] - 3:25, 11:15, 22:18, 23:20
**issues** [4] - 2:24, 3:8, 3:17, 49:2
**item** [1] - 12:1
**items** [3] - 11:12, 12:13
**iteration** [1] - 45:18
**itself** [2] - 19:7, 40:7

## J

**Jacques** [1] - 25:10
**JACQUES** [1] - 25:11
**Jaffee** [1] - 21:20
**January** [3] - 5:18, 39:18, 40:14
**jeez** [1] - 44:5
**job** [5] - 8:5, 34:21, 55:18, 56:15
**JUDGE** [1] - 1:8
**Judge** [17] - 4:3, 33:4, 34:10, 34:25, 35:18, 36:20, 50:12, 52:20, 53:9, 53:13, 54:14, 54:18, 54:23, 55:4, 56:14, 59:22, 60:4
**judge** [1] - 6:5, 33:9, 42:15, 42:22, 49:6, 52:20, 53:18, 53:21, 56:4, 60:10, 60:21
**jumped** [1] - 55:9
**JUNE** [1] - 1:8
**jurisdictions** [1] - 4:25

## K

**Kat** [1] - 34:22
**keep** [3] - 6:19, 18:14, 23:22
**Keller** [1] - 1:13, 2:12
**KELLER** [1] - 2:12
**kick** [2] - 36:25, 37:4
**kind** [7] - 11:16, 24:5, 32:4, 56:12, 56:19, 58:15, 58:23
**kinds** [1] - 20:18
**knowledge** [1] - 10:14
**known** [1] - 30:16

**knows** [6] - 15:16, 21:4, 25:7, 29:18, 30:14, 42:11

## L

**Labor** [4] - 7:1, 16:25, 46:24
**laid** [1] - 13:22
**landline** [1] - 52:8
**language** [2] - 13:18, 13:20
**laptop** [1] - 33:5
**large** [1] - 15:10
**last** [9] - 4:8, 9:17, 9:25, 14:6, 14:7, 23:22, 24:12, 55:16, 59:2
**late** [1] - 16:15
**latter** [2] - 23:20, 27:9
**law** [8] - 3:18, 11:22, 12:3, 25:3, 41:14, 49:5, 56:5, 56:12
**laws** [2] - 3:4, 24:6
**lawsuit** [5] - 12:23, 13:1, 21:5, 48:15, 53:5
**lead** [1] - 50:23
**leads** [1] - 38:19
**learn** [1] - 33:25
**learning** [1] - 11:9
**least** [5] - 16:2, 19:14, 19:19, 20:22, 48:10
**leave** [2] - 2:22, 54:11
**legally** [1] - 6:16
**legislative** [2] - 42:15, 47:22
**legislature** [1] - 46:22
**legitimacy** [2] - 13:11
**less** [2] - 27:20, 28:9
**letters** [1] - 31:13
**level** [2] - 18:7, 45:7
**levels** [1] - 6:15
**liability** [5] - 11:20, 11:23, 11:24, 35:6, 43:5
**liable** [1] - 35:8
**light** [1] - 28:21
**likely** [1] - 30:15
**limit** [3] - 11:23, 11:25, 35:4
**limitation** [1] - 40:16
**limited** [1] - 57:13, 57:15
**line** [1] - 14:4
**list** [1] - 7:25
**live** [2] - 51:23, 58:18
**load** [1] - 7:6
**loaded** [5] - 5:11, 17:18, 19:7, 37:7,

43:13
**loading** [1] - 9:25
**local** [1] - 43:20
**location** [1] - 27:22
**Lombard** [1] - 1:23
**long-term** [1] - 19:4
**look** [6] - 34:19, 38:7, 39:3, 41:8, 42:6
**looked** [1] - 40:6
**looking** [1] - 10:8
**lose** [1] - 8:5
**loss** [4] - 48:21, 49:18, 55:5
**losses** [1] - 38:20
**lost** [6] - 28:8, 37:13, 38:9, 42:24, 49:6
**lower** [2] - 33:21, 52:12

## M

**ma'am** [1] - 37:16
**mag** [2] - 35:8, 35:9
**magistrate** [1] - 6:4
**magnetic** [17] - 26:24, 27:4, 27:7, 27:12, 27:13, 27:19, 28:7, 31:11, 31:23, 32:1, 32:5, 32:14, 49:7, 49:11, 49:22, 50:4, 51:4
**mail** [10] - 7:8, 7:15, 26:13, 27:2, 27:7, 27:21, 50:15, 51:1, 51:13, 52:3
**mailbox** [1] - 28:8
**mailed** [4] - 8:7, 26:10, 49:14, 51:1
**main** [1] - 12:17
**major** [1] - 41:1
**manner** [1] - 31:13
**March** [4] - 16:15, 19:1, 20:6, 20:7
**Marriott** [1] - 49:20
**MARYLAND** [2] - 1:1, 1:9
**Maryland** [23] - 1:24, 3:19, 6:8, 7:1, 8:20, 9:17, 17:9, 20:6, 20:24, 21:2, 21:15, 23:12, 23:17, 24:7, 27:3, 32:8, 48:22, 48:24, 49:11, 50:2, 53:6, 59:9
**mask** [2] - 2:20, 2:22
**match** [1] - 51:21
**materials** [1] - 50:3
**matter** [8] - 2:5, 2:7, 3:20, 4:1, 6:15, 27:6, 45:13, 60:18

**matters** [2] - 11:9, 19:23
**McCorkle** [2] - 1:17, 2:15
**mcCORKLE** [1] - 2:15
**MCPA** [1] - 31:8
**MDL** [6] - 3:16, 4:1, 4:19, 4:21, 4:22, 4:25
**MDL'd** [1] - 4:2
**mean** [15] - 9:1, 10:4, 18:7, 26:25, 27:10, 31:25, 44:7, 46:16, 46:22, 50:25, 51:18, 52:4, 53:10, 57:7, 57:16
**means** [2] - 18:3, 18:20, 37:25, 38:11, 38:17, 38:21, 38:22, 39:17, 43:17, 44:13, 57:9
**meant** [5] - 11:20, 40:22, 41:9, 42:7, 47:18
**mechanism** [1] - 23:18
**mediate** [1] - 5:21
**mediation** [1] - 5:20
**meet** [2] - 23:25, 45:24
**melissa** [1] - 1:22
**members** [2] - 48:19, 55:7
**memory** [1] - 4:1
**mention** [2] - 21:2, 47:12
**mentioned** [1] - 49:1
**merchant** [1] - 35:7
**merchants** [1] - 49:24
**mess** [1] - 42:16
**met** [1] - 16:6
**methods** [1] - 7:4
**might** [6] - 3:18, 6:10, 9:20, 16:23, 22:6, 57:24
**miles** [1] - 58:17
**million** [1] - 46:18
**mind** [2] - 18:14, 23:23
**mine** [1] - 4:10
**minimum** [1] - 15:2
**minute** [2] - 4:8, 37:14
**minutes** [1] - 3:2
**misrepresentation** [2] - 29:7, 29:14
**misrepresentations** [3] - 29:4, 29:15, 30:1
**missed** [1] - 34:23
**misses** [1] - 43:10
**missing** [1] - 39:6
**misunderstood** [1] -

22:6
**misuse** [1] - 27:5
**misused** [2] - 27:8, 30:25
**modernity** [1] - 49:1
**modification** [2] - 25:22, 25:23
**Mohamed** [47] - 2:6, 7:7, 7:14, 7:18, 8:3, 12:18, 13:2, 13:23, 15:11, 15:16, 16:12, 16:18, 16:23, 17:19, 19:12, 21:5, 25:4, 25:16, 26:8, 26:14, 26:15, 26:19, 27:24, 28:1, 28:2, 28:6, 28:12, 29:10, 29:11, 29:16, 30:6, 30:11, 32:13, 33:23, 34:1, 34:15, 37:4, 39:14, 39:24, 41:5, 51:22, 52:13, 52:24, 56:7, 56:9, 58:10
**MOHAMED** [1] - 1:3
**Mohamed's** [2] - 49:8, 50:17
**moment** [2] - 4:12, 43:3
**money** [35] - 7:6, 14:8, 35:13, 35:17, 39:14, 45:5, 45:11, 45:17, 45:19, 46:6, 46:23, 47:9, 48:15, 48:16, 48:19, 48:20, 52:15, 52:16, 53:2, 53:4, 53:6, 54:2, 54:16, 55:5, 55:15, 55:16, 57:25, 58:15, 58:23
**month** [1] - 15:4
**moot** [4] - 13:5, 48:14, 54:2, 54:4
**mootness** [3] - 13:13, 16:3, 48:17
**morning** [1] - 5:17
**mortgage** [2] - 25:22, 25:23
**most** [4] - 11:10, 18:24, 19:1, 54:1
**mostly** [1] - 48:11
**motion** [5] - 4:6, 16:9, 16:9, 56:17, 59:23
**motions** [1] - 2:8
**move** [1] - 43:1
**moved** [1] - 47:6
**moving** [1] - 59:24
**MPA** [1] - 30:23
**MR** [91] - 2:10, 2:13, 3:1, 3:5, 3:22, 4:6, 4:13, 4:16, 4:23, 5:6, 5:8, 5:16, 5:24, 6:3,

6:10, 6:14, 6:21, 6:23, 7:1, 7:20, 7:23, 8:16, 9:10, 9:13, 9:23, 10:12, 10:14, 10:19, 10:25, 11:2, 11:7, 12:16, 15:2, 15:19, 17:4, 17:7, 17:14, 17:24, 18:7, 19:21, 20:20, 21:1, 22:9, 22:14, 23:9, 27:9, 28:20, 29:2, 29:20, 31:8, 32:20, 33:1, 33:4, 33:7, 34:8, 34:10, 35:2, 36:22, 37:16, 37:19, 37:22, 42:2, 42:21, 43:4, 44:22, 44:23, 46:1, 46:15, 46:20, 47:1, 47:4, 48:14, 50:11, 51:5, 51:8, 51:11, 51:20, 52:6, 52:24, 53:9, 53:13, 53:21, 54:14, 54:25, 57:1, 57:15, 59:14, 60:17, 60:20, 61:2, 61:3
**MS** [2] - 2:12, 2:15
**multilingual** [1] - 55:22
**Murphy** [5] - 1:12, 2:11, 2:25, 32:23, 44:18
**MURPHY** [36] - 2:10, 3:1, 3:5, 5:16, 33:1, 33:4, 33:7, 34:8, 34:10, 35:2, 36:22, 37:16, 37:19, 37:22, 42:2, 42:21, 44:22, 47:1, 47:4, 48:14, 50:11, 51:5, 51:8, 51:11, 51:20, 52:6, 52:24, 53:9, 53:13, 53:21, 54:14, 54:25, 59:11, 59:14, 60:20, 61:2
**Murphy's** [1] - 57:14
**must** [2] - 18:25, 41:8
**mutual** [1] - 5:25

## N

**N.A** [1] - 2:6
**name** [1] - 49:8
**nearly** [1] - 38:7
**necessary** [1] - 53:18
**necessitous** [2] - 25:17, 26:1
**need** [6] - 22:2, 33:12, 36:9, 39:9, 50:16, 52:19

**needed** [2] - 52:17, 53:15
**needs** [4] - 24:6, 24:7, 25:12, 38:14
**negligence** [6] - 25:1, 26:20, 55:4, 57:23, 57:24
**negligent** [1] - 26:3
**never** [2] - 28:2, 29:23
**new** [7] - 8:5, 18:15, 18:18, 26:16, 27:16, 46:15, 60:9
**Newport** [1] - 58:16
**News** [1] - 58:16
**next** [2] - 26:18, 60:25
**NO** [1] - 1:4
**non** [1] - 49:21
**non-secure** [1] - 49:21
**normally** [1] - 58:15
**Northern** [1] - 3:24
**NORTHERN** [1] - 1:2
**note** [1] - 47:5
**noted** [1] - 31:15
**nothing** [6] - 4:11, 13:12, 20:17, 22:3, 32:20, 41:14
**notice** [1] - 22:16
**novel** [2] - 39:19, 53:1
**nowhere** [1] - 39:7
**Number** [3] - 2:6, 51:22, 52:5
**number** [11] - 3:8, 4:17, 13:3, 21:20, 24:17, 25:24, 27:17, 35:12, 49:8, 51:18, 52:3

## O

**o'clock** [1] - 32:25
**observation** [3] - 18:13, 57:3, 57:20
**observations** [1] - 57:3
**obtains** [1] - 28:13
**obviously** [14] - 3:12, 3:13, 3:18, 7:2, 12:1, 15:9, 16:21, 19:3, 25:18, 32:23, 43:15, 54:6, 58:2, 58:24
**occurred** [2] - 7:4, 35:6
**occurring** [1] - 13:19
**OF** [3] - 1:1, 1:5, 1:7
**offer** [1] - 47:1
**office** [1] - 40:19
**official** [1] - 37:10
**Official** [1] - 1:23
**omission** [5] - 30:5, 30:10, 30:14, 30:18,

30:24
**omitted** [2] - 30:6, 30:16
**once** [2] - 23:20, 59:15
**one** [34] - 3:13, 4:24, 7:5, 7:7, 10:4, 11:12, 15:4, 18:7, 18:8, 18:25, 24:16, 26:16, 30:14, 31:4, 31:10, 31:14, 33:22, 34:11, 35:15, 42:6, 43:6, 43:19, 51:7, 51:14, 53:23, 54:19, 57:3, 57:20, 59:2, 60:5, 60:15
**one-month** [1] - 15:4
**ones** [1] - 42:4
**open** [1] - 24:18
**opportunity** [2] - 34:17, 34:19
**opposed** [1] - 14:12
**opposition** [6] - 14:14, 16:23, 22:25, 24:13, 29:15, 30:5
**option** [1] - 9:18
**oral** [2] - 5:18, 34:17
**order** [7] - 9:3, 21:21, 30:13, 32:4, 32:12, 43:22, 51:15
**orders** [1] - 23:3
**original** [3] - 9:13, 10:21, 24:23
**originally** [1] - 47:6
**otherwise** [2] - 33:18, 43:3
**outs** [1] - 39:3
**outside** [2] - 30:17, 52:1
**outsource** [1] - 55:17
**overlap** [2] - 15:22, 29:3
**overlaps** [1] - 31:1
**overnighted** [1] - 26:17
**owed** [4] - 25:4, 52:15, 54:5, 54:6
**own** [5] - 20:14, 24:6, 42:9, 49:24, 55:23
**owned** [1] - 20:14
**owner** [1] - 16:18

## P

**p.m** [2] - 2:2, 61:6
**package** [1] - 7:15
**paid** [12] - 12:24, 16:4, 24:11, 43:18, 43:20, 43:24, 43:25, 44:14, 45:5, 45:19, 46:6
**pair** [2] - 52:7, 52:8

**pandemic** [7] - 5:3, 16:13, 18:16, 40:24, 41:2, 59:6, 59:16
**paper** [3] - 7:5, 9:18, 33:14
**paragraph** [2] - 31:17, 37:23
**Paragraph** [2] - 37:12, 40:11
**parallel** [4] - 12:11, 19:11, 57:5, 57:12
**paraphrase** [1] - 36:12
**part** [1] - 40:5
**particular** [4] - 11:19, 20:3, 35:15, 43:3
**parties** [4] - 4:6, 10:16, 21:25, 24:23, 25:14, 49:7
**partly** [1] - 31:3
**partner** [1] - 33:19
**parts** [1] - 59:24
**party** [20] - 14:12, 20:22, 21:3, 21:5, 21:22, 21:25, 22:1, 22:4, 23:2, 23:10, 23:23, 23:24, 23:25, 24:3, 24:19, 24:20, 24:25, 37:7, 55:8
**pay** [7] - 15:24, 16:1, 46:18, 54:4, 54:16, 54:17
**payment** [9] - 17:18, 19:25, 20:1, 38:8, 38:10, 38:11, 38:14, 44:16, 54:17
**payments** [7] - 19:18, 20:7, 37:4, 37:8, 38:12, 43:13, 43:17
**penalty** [1] - 16:2
**pending** [5] - 2:5, 3:16, 4:2, 4:11, 4:24
**people** [26] - 7:25, 8:6, 8:21, 16:19, 17:4, 20:14, 33:17, 33:21, 33:23, 34:1, 34:15, 36:10, 38:12, 39:14, 46:18, 49:16, 50:14, 50:15, 51:16, 51:25, 52:10, 52:12, 56:13, 57:10, 58:10, 60:1
**people's** [2] - 55:5, 57:25
**per** [2] - 31:25, 32:1
**perfect** [1] - 52:20
**perhaps** [10] - 13:9, 20:15, 34:12, 45:7, 50:5, 50:22, 52:19, 54:21, 55:3
**period** [6] - 8:4, 26:14, 32:7, 36:8, 40:4,

40:10
**periods** [1] - 40:13
**permitted** [1] - 14:4
**person** [14] - 2:24,
11:24, 13:25, 25:25,
27:23, 30:15, 31:18,
35:12, 39:22, 39:25,
40:1, 55:11, 60:24
**Personal** [2] - 31:1,
48:22
**personal** [2] - 49:6,
49:12
**persons** [1] - 56:9
**perspective** [1] -
12:16
**petition** [1] - 4:2
**phone** [3] - 52:7, 52:8,
60:16
**phones** [1] - 52:11
**phrasing** [1] - 25:9
**pick** [2] - 27:15, 50:15
**piece** [1] - 13:6
**PIN** [4] - 27:15, 27:17,
28:2, 35:12
**PIPA** [7] - 31:5, 31:10,
31:19, 31:23, 32:10,
32:12
**place** [4] - 10:16,
28:15, 38:9, 51:9
**Plaintiff** [17] - 1:3,
1:11, 2:9, 2:11, 2:12,
14:14, 15:4, 21:9,
21:23, 22:23, 22:25,
23:1, 23:3, 23:11,
25:16, 27:12, 30:19
**Plaintiff's** [4] - 5:14,
16:22, 16:23, 43:10
**Plaintiffs** [6] - 13:8,
16:12, 18:8, 19:17,
24:13, 32:6
**plausible** [2] - 21:14,
26:5
**play** [1] - 16:2
**pleading** [3] - 27:11,
55:6, 56:22
**pled** [4] - 30:8, 50:7,
52:2, 52:19
**plenty** [1] - 57:21
**plus** [5] - 11:2, 22:20,
22:21, 22:22
**point** [20] - 3:14, 12:5,
18:10, 18:12, 21:7,
21:11, 21:14, 23:5,
23:22, 24:12, 24:15,
25:1, 27:21, 28:22,
35:1, 35:2, 35:3,
43:17, 50:16, 54:21
**pointed** [3] - 17:8,
18:9, 22:3
**points** [1] - 43:14

**policy** [4] - 11:20,
11:24, 24:5, 49:23
**political** [2] - 40:9,
42:12
**politics** [1] - 47:13
**posed** [1] - 49:21
**position** [7] - 14:25,
15:12, 17:22, 34:13,
41:15, 43:10, 49:25
**possibilities** [1] -
43:19
**possibility** [2] - 11:14,
48:10
**possibly** [1] - 49:10
**post** [2] - 31:18
**pot** [1] - 47:9
**potential** [1] - 32:11
**potentially** [1] - 50:13
**power** [1] - 35:24
**practice** [3] - 31:4,
31:6, 49:15
**practices** [1] - 55:23
**precedence** [1] - 58:3
**precise** [1] - 15:15
**preliminarily** [1] - 3:13
**preliminary** [3] - 3:20,
3:25, 5:22
**prepaid** [4] - 4:16,
12:8, 45:24, 60:2
**preparation** [1] -
50:12
**present** [2] - 3:10,
34:10
**presented** [4] - 34:1,
34:16, 42:22, 59:17
**presenting** [1] - 56:15
**preserve** [1] - 20:16
**President** [4] - 36:6,
39:5, 40:8, 40:18
**president** [14] - 20:5,
36:6, 38:23, 39:20,
40:19, 40:22, 42:14,
44:11, 44:19, 45:3,
46:4, 46:9, 47:17,
47:25
**president's** [1] - 48:4
**presidential** [5] -
44:25, 45:2, 45:9,
45:11, 45:15
**presumably** [1] -
15:10
**pretty** [2] - 57:22, 58:7
**previously** [1] - 18:22
**primarily** [1] - 16:11
**primary** [3] - 23:24,
28:17, 28:20
**Privacy** [1] - 28:24
**private** [3] - 29:7,
49:4, 53:12
**problem** [8] - 6:21,

40:20, 43:5, 44:23,
45:1, 45:8, 47:21,
50:23
**problematic** [1] - 28:4
**problems** [2] - 48:1,
52:12
**PROCEEDINGS** [1] -
1:7
**process** [3] - 6:1, 6:4,
11:10
**product** [1] - 29:5
**proffered** [1] - 41:4
**program** [9] - 6:14,
16:14, 18:10, 18:15,
18:17, 18:18, 18:22,
25:19, 38:1
**promise** [1] - 24:24
**promises** [3] - 21:23,
22:4, 23:12
**promote** [5] - 43:22,
44:2, 44:15, 45:5,
45:20
**proof** [1] - 27:10
**proper** [1] - 14:17
**properly** [2] - 15:23,
15:25
**protect** [11] - 25:5,
26:6, 26:7, 49:16,
50:14, 52:17, 55:5,
56:12, 57:25, 58:23
**protecting** [1] - 35:12
**protection** [3] - 11:16,
58:10, 58:19
**Protection** [9] - 12:6,
21:2, 28:23, 29:2,
31:2, 32:13, 48:23,
52:22, 53:7
**protections** [2] - 19:9,
50:14
**protocol** [1] - 2:18
**proves** [1] - 15:25
**provide** [2] - 9:17,
25:19
**provided** [5] - 3:14,
16:16, 19:10, 40:11,
53:22
**provider** [1] - 4:17
**provides** [4] - 7:24,
12:6, 12:9, 58:9
**providing** [1] - 8:21
**provision** [4] - 12:3,
16:7, 24:16, 46:15
**provisions** [2] - 24:14,
43:8
**PUA** [6] - 19:1, 19:7,
20:12, 40:3, 40:9,
43:23
**public** [14] - 20:25,
24:5, 24:6, 24:9,
33:20, 35:15, 39:15,

39:16, 39:17, 41:1,
44:20, 49:3, 55:11,
56:1
**Public** [1] - 39:11
**pull** [1] - 51:14
**pulled** [1] - 39:12
**purpose** [5] - 2:7,
23:16, 33:20, 39:9,
40:7
**purposeful** [2] - 39:8,
40:5
**purposely** [2] - 40:21,
40:25
**purposes** [5] - 17:20,
21:22, 37:23, 38:10,
38:21
**purse** [1] - 47:11
**pursuant** [1] - 6:3
**put** [6] - 6:16, 10:15,
16:15, 23:5, 28:15,
34:13

### Q

**qualified** [28] - 19:17,
19:25, 37:4, 37:8,
37:25, 38:1, 38:8,
38:9, 38:10, 38:11,
38:13, 38:14, 38:16,
38:17, 43:13, 43:16,
43:21, 44:1, 44:4,
44:5, 44:6, 44:10,
44:15, 44:16, 44:24,
45:4, 46:8
**qualifies** [1] - 44:16
**qualify** [2] - 17:23,
20:8
**questions** [2] - 3:9,
12:14
**quickly** [2] - 36:25,
37:1
**quite** [6] - 14:11, 15:9,
19:2, 20:12, 58:3,
60:21
**quotation** [2] - 31:17,
37:25
**quote** [2] - 18:3, 43:12

### R

**raised** [4] - 10:4, 14:8,
30:23, 45:8
**ran** [1] - 18:10
**rapidly** [1] - 36:10
**rather** [1] - 32:14
**Re** [2] - 49:20, 50:3
**reaction** [1] - 58:2
**read** [3] - 34:21,
41:11, 53:10
**ready** [1] - 59:13

**real** [3] - 34:2, 43:6,
51:24
**realized** [1] - 35:4
**really** [15] - 13:5, 26:2,
28:10, 30:2, 31:19,
31:22, 33:11, 33:15,
33:24, 34:22, 41:13,
49:25, 56:4, 57:21,
60:22
**reason** [3] - 47:14,
47:17, 55:14
**reasonable** [2] - 27:1,
48:12
**reasons** [1] - 34:12
**reauthenticated** [1] -
13:24
**rebuttal** [2] - 42:24,
42:25
**received** [6] - 8:6,
16:23, 19:12, 19:14,
21:17, 25:17
**receives** [1] - 14:8
**receiving** [1] - 55:11
**recent** [2] - 49:19,
55:16
**recipient** [5] - 7:10,
7:11, 7:16, 16:13,
21:16
**recognized** [1] - 11:8
**record** [1] - 2:9
**records** [3] - 20:18,
25:5, 26:6
**recovery** [1] - 31:19
**recurrence** [1] - 13:10
**referred** [3] - 7:22,
8:22, 60:14
**refers** [1] - 44:25
**reflect** [1] - 8:24
**reflected** [1] - 12:17
**Reg** [4] - 37:10, 37:14,
41:13, 45:14
**reg** [1] - 54:9
**regard** [2] - 51:4, 51:5
**regarding** [2] - 15:1,
29:25
**regret** [1] - 2:25
**regs** [2] - 36:3, 36:23
**regular** [7] - 16:24,
17:2, 17:3, 17:11,
19:19, 59:8
**Regulation** [20] - 12:2,
12:3, 12:12, 15:21,
15:24, 16:3, 16:4,
16:9, 17:12, 17:21,
18:2, 19:8, 19:9,
19:13, 19:15, 45:25,
56:20, 57:5, 57:7,
57:8
**regulation** [3] - 12:4,
20:10, 48:9

**regulatory** [2] - 20:4, 32:3
**reimburse** [1] - 12:22
**relate** [2] - 11:13, 11:14
**related** [5] - 13:14, 15:20, 36:7, 36:8, 49:2
**relates** [1] - 54:14
**relation** [2] - 8:18, 40:23
**relationship** [5] - 25:14, 26:4, 51:24, 58:4, 58:6
**relatively** [1] - 25:2
**relevant** [2] - 11:5, 20:9
**reliance** [1] - 34:9
**relief** [18] - 5:4, 17:18, 37:4, 37:8, 37:23, 37:25, 38:1, 38:8, 38:10, 38:11, 38:14, 38:16, 43:13, 43:16, 44:16, 47:7, 56:6
**Relief** [2] - 38:25, 44:12
**reluctant** [2] - 24:2, 25:10
**rely** [2] - 46:12, 55:12
**relying** [2] - 41:24, 46:13
**remedies** [1] - 56:9
**remedy** [5] - 48:11, 56:8, 57:11, 57:13, 57:15
**remember** [2] - 36:8, 52:5
**remove** [1] - 2:19
**rendered** [1] - 48:14
**renewals** [4] - 9:15, 10:4, 10:7, 11:1
**renewed** [1] - 10:11
**rent** [1] - 54:16
**replead** [3] - 50:6, 50:22, 53:18
**repleading** [1] - 56:22
**reply** [1] - 43:10
**Reported** [1] - 1:21
**reporter** [1] - 36:24
**Reporter** [1] - 1:23
**representation** [1] - 53:11
**representations** [1] - 30:3
**representing** [1] - 59:5
**request** [1] - 6:24
**require** [2] - 10:6, 15:4
**requirement** [1] - 32:4
**requires** [2] - 14:20,

23:11
**reset** [1] - 4:8
**residential** [1] - 26:11
**respect** [6] - 39:19, 41:21, 50:23, 52:21, 53:22, 54:10
**respond** [2] - 18:9, 43:2
**responded** [1] - 57:18
**response** [6] - 8:25, 9:4, 23:1, 43:9, 53:14, 57:19
**responses** [3] - 10:22, 22:21, 29:25
**restrict** [1] - 47:18
**restrictions** [1] - 58:9
**rests** [1] - 29:21
**Revenue** [4] - 38:3, 38:4, 38:5, 43:16
**revenue** [1] - 19:20
**review** [2] - 5:16, 41:14
**rewriting** [1] - 9:3
**RFP** [14] - 8:25, 9:4, 9:8, 10:9, 10:22, 22:18, 22:20, 22:24, 23:1
**rights** [1] - 35:25
**rise** [1] - 61:5
**risk** [4] - 28:3, 28:4, 32:11, 32:16
**road** [2] - 12:6, 59:3
**Robert** [3] - 1:12, 2:11, 38:24
**role** [3] - 14:17, 36:15, 47:10
**room** [1] - 42:10
**RPR** [1] - 1:22
**ruled** [2] - 4:10
**rules** [2] - 12:6, 12:9
**rulings** [1] - 3:14
**run** [1] - 18:16
**runs** [1] - 44:8
**rush** [1] - 20:2
**rushed** [1] - 36:13
**Rutter's** [2] - 50:3

## S

**sale** [1] - 51:9
**saw** [5] - 4:9, 13:7, 15:20, 25:7, 59:17
**school** [1] - 49:5
**scope** [3] - 30:1, 30:4, 30:17
**se** [2] - 31:25, 32:1
**seated** [1] - 2:3
**second** [6] - 11:25, 14:18, 22:10, 31:12, 34:5, 53:24

**secondly** [1] - 54:6
**secretary** [1] - 39:18
**section** [3] - 20:25, 38:11, 43:15
**Section** [8] - 22:19, 37:24, 38:5, 38:19, 43:15, 44:6, 44:8, 44:9
**secure** [5] - 27:20, 28:9, 29:7, 49:21, 53:12
**Security** [3] - 49:9, 51:22, 52:5
**security** [6] - 24:16, 24:17, 29:3, 49:3, 50:4
**see** [10] - 5:12, 5:13, 6:2, 16:5, 22:6, 22:18, 36:18, 45:7, 54:18, 59:4
**Selden** [2] - 1:17, 2:15
**select** [1] - 8:7
**selected** [2] - 7:14, 7:25
**self** [3] - 39:25, 40:1, 46:21
**self-employed** [3] - 39:25, 40:1, 46:21
**send** [2] - 28:7, 50:19
**sense** [6] - 19:10, 19:13, 19:19, 29:11, 34:14, 48:9
**sent** [1] - 26:16
**sentence** [2] - 6:20, 40:11
**separate** [7] - 9:5, 9:6, 25:1, 36:5, 40:22, 47:9, 53:23
**separately** [2] - 8:19, 18:20
**September** [1] - 40:14
**serves** [1] - 4:1
**service** [2] - 19:20, 24:17
**services** [2] - 39:18, 55:22
**set** [1] - 40:10
**several** [4] - 11:13, 12:8, 35:3, 35:7
**shall** [2] - 22:20, 40:12
**shape** [1] - 48:4
**shift** [2] - 35:6, 49:23
**short** [4] - 18:13, 18:24, 19:2, 19:5
**short-term** [3] - 18:13, 18:24, 19:5
**show** [14] - 12:25, 14:21, 17:1, 21:23, 22:2, 23:3, 23:5, 23:11, 25:24, 30:13,

30:14, 32:14, 32:17
**showing** [1] - 25:13
**shown** [2] - 22:2, 40:23
**shows** [2] - 22:3, 40:2
**shut** [1] - 26:15
**side** [1] - 3:12
**sides** [2] - 42:23, 57:22
**signed** [2] - 22:17, 30:20
**significant** [2] - 10:10, 20:13
**similar** [3] - 3:17, 11:9, 11:16
**similarly** [8] - 19:18, 34:1, 34:15, 39:15, 41:6, 49:19, 52:25, 56:10
**simply** [1] - 10:10
**single** [2] - 4:25, 10:16
**sit** [2] - 33:5, 36:20
**sitting** [1] - 5:19
**situated** [5] - 34:1, 34:16, 39:15, 41:6, 49:19, 52:25, 56:10
**situation** [1] - 28:14
**situations** [2] - 25:25, 28:11
**size** [1] - 60:1
**skimmed** [3] - 27:14, 27:17, 28:14
**skimming** [3] - 28:3, 28:4, 32:16
**small** [1] - 15:9
**so..** [2] - 17:5, 60:12
**Social** [3] - 49:9, 51:22, 52:5
**solely** [1] - 15:5
**someone** [6] - 11:14, 16:17, 27:20, 50:18, 50:25, 51:1
**sometimes** [4] - 8:3, 8:4, 36:24
**somewhat** [1] - 48:8
**soon** [1] - 26:15
**sort** [11] - 2:23, 4:11, 15:20, 18:8, 18:9, 19:11, 25:2, 25:13, 27:5, 27:18, 57:5
**sounds** [1] - 51:1
**source** [1] - 54:12
**Southern** [2] - 4:3, 5:25
**spare** [1] - 3:2
**speaking** [3] - 2:19, 2:22
**spear** [1] - 54:19
**special** [1] - 25:20
**specific** [1] - 15:14

**specifically** [1] - 35:16
**specify** [1] - 32:9
**speed** [1] - 3:4
**spelled** [3] - 25:3, 25:11
**spend** [3] - 9:3, 47:15, 58:15
**spent** [1] - 47:15
**spring** [1] - 48:2
**staff** [1] - 36:3
**stafford** [1] - 38:24
**Stafford** [2] - 44:12, 46:3
**stage** [2] - 5:23, 55:6
**standard** [3] - 21:19, 23:10, 25:11
**standing** [1] - 21:10
**stands** [1] - 61:5
**start** [4] - 3:12, 6:7, 27:11, 36:22
**started** [3] - 3:24, 32:8, 50:11
**starting** [1] - 2:9
**State** [2] - 8:20, 23:17
**state** [21] - 5:10, 9:6, 10:5, 10:7, 14:9, 21:6, 21:15, 21:18, 22:11, 23:12, 23:14, 23:16, 24:7, 24:8, 24:9, 24:14, 43:20, 43:24, 45:19, 53:25, 59:9
**States** [3] - 38:23, 46:16, 47:25
**states** [3] - 4:17, 22:19, 46:25
**STATES** [2] - 1:1, 1:8
**status** [2] - 3:19, 21:22
**statute** [17] - 17:9, 32:4, 36:2, 36:16, 36:17, 36:18, 36:19, 40:7, 41:9, 41:12, 42:8, 42:12, 44:17, 46:17, 48:6, 48:24
**statutes** [1] - 46:16
**statutory** [10] - 16:2, 16:5, 16:6, 41:23, 48:10, 48:19, 55:3, 56:11, 56:23, 57:11
**step** [1] - 32:21
**still** [3] - 23:8, 32:25, 37:15
**stolen** [4] - 26:12, 30:25, 32:15, 50:18
**store** [1] - 51:10
**stored** [2] - 35:13, 60:2
**storing** [2] - 31:12, 31:20

**straightforward** [2] - 19:5, 59:24
**Street** [1] - 1:23
**strenuously** [1] - 41:16
**strip** [4] - 35:8, 35:9, 49:7, 49:11
**stripe** [11] - 26:24, 27:4, 27:7, 27:12, 27:14, 27:19, 28:7, 32:14, 49:11, 49:22, 51:4
**stripes** [3] - 31:11, 31:23, 50:5
**strips** [2] - 32:1, 32:5
**strong** [2] - 42:12, 56:16
**stronger** [1] - 60:9
**strongly** [4] - 54:23, 58:21, 58:22, 60:6
**struggling** [1] - 34:14
**stuff** [1] - 42:22
**sub** [2] - 43:7
**subject** [4] - 9:14, 17:16, 19:20, 41:20
**submitted** [3] - 22:23, 22:24, 23:1
**subparagraph** [1] - 24:22
**subsection** [5] - 37:22, 38:6, 38:21, 39:12, 40:12
**Subsection** [6] - 37:24, 38:2, 38:15, 38:16, 38:18, 40:23
**subsections** [1] - 43:7
**subsequently** [2] - 38:22, 44:10
**substituted** [2] - 40:25, 41:1
**sue** [5] - 22:1, 23:2, 23:14, 23:24, 57:8
**suffered** [1] - 26:19
**suffers** [1] - 26:21
**sufficiently** [1] - 50:7
**suggest** [1] - 43:5
**suggestion** [1] - 16:22
**summarize** [1] - 35:22
**support** [5] - 21:21, 26:2, 30:10, 31:16, 32:3
**supports** [2] - 36:19, 49:20
**suppose** [1] - 52:2
**supposed** [2] - 56:2, 60:10
**surely** [1] - 25:18
**surprising** [2] - 20:11, 29:22
**surrebuttal** [1] - 47:1

**survive** [4] - 32:10, 56:16, 57:11, 57:25
**surviving** [1] - 56:22
**susceptible** [1] - 27:5
**suspects** [2] - 13:18, 13:19
**suspicious** [1] - 58:13
**system** [1] - 50:24

## T

**Tara** [2] - 1:13, 2:12
**tax** [2] - 19:22, 36:13
**taxability** [2] - 20:2, 20:16
**taxable** [2] - 20:8
**taxation** [1] - 19:20
**technology** [5] - 10:6, 26:24, 32:18, 49:22
**temporarily** [1] - 36:7
**ten** [1] - 58:17
**tender** [2] - 48:15, 48:16
**tendered** [2] - 48:20, 54:5
**term** [9] - 9:13, 18:13, 18:24, 19:4, 19:5, 23:4, 38:11, 38:17, 39:16
**termination** [1] - 40:17
**terms** [7] - 8:16, 9:3, 11:13, 21:11, 53:1, 55:21, 59:4
**terribly** [1] - 48:21
**test** [3] - 24:19, 24:20, 24:23
**tethered** [1] - 40:4
**THE** [93] - 1:1, 1:1, 1:7, 2:3, 2:5, 2:17, 3:3, 3:7, 4:5, 4:9, 4:15, 4:21, 5:2, 5:7, 5:12, 5:22, 6:2, 6:6, 6:13, 6:19, 6:22, 6:25, 7:17, 7:21, 8:15, 9:8, 9:11, 9:20, 10:3, 10:13, 10:18, 10:24, 11:1, 11:4, 12:15, 14:18, 15:18, 16:21, 17:6, 17:11, 17:22, 18:6, 19:16, 20:19, 20:24, 22:5, 22:13, 23:7, 26:22, 28:19, 29:1, 29:19, 31:7, 32:19, 32:22, 33:2, 33:6, 34:5, 34:9, 35:1, 36:21, 37:13, 37:18, 37:21, 41:22, 42:20, 44:18, 45:22, 46:10, 46:19,

47:3, 48:7, 50:9, 51:3, 51:6, 51:9, 51:18, 52:1, 52:23, 53:8, 53:10, 53:20, 54:11, 54:24, 56:18, 57:13, 59:2, 59:12, 60:13, 60:18, 60:22, 61:4, 61:5
**theft** [1] - 50:24
**themselves** [1] - 10:1
**theoretical** [1] - 45:7
**theoretically** [1] - 45:22
**theory** [2] - 21:14, 26:5
**therefore** [11] - 8:1, 11:5, 15:13, 18:19, 21:9, 24:22, 27:16, 44:13, 44:16, 45:4, 46:5
**thereof** [1] - 43:21
**they've** [1] - 36:13
**thinking** [1] - 50:11
**third** [21] - 14:12, 20:22, 21:3, 21:5, 21:22, 21:25, 22:1, 22:4, 23:2, 23:10, 23:23, 23:24, 24:3, 24:19, 24:20, 24:24, 37:7, 44:4, 49:7, 55:8
**third-party** [12] - 14:12, 20:22, 21:3, 21:5, 21:22, 23:2, 23:10, 23:24, 24:3, 24:19, 24:20, 55:8
**Thomas** [3] - 1:16, 2:13, 3:22
**thousand** [1] - 12:20
**threat** [1] - 13:10
**throwaway** [1] - 52:11
**THURSDAY** [1] - 1:8
**ticket** [1] - 33:8
**tie** [2] - 41:10, 42:13
**tied** [1] - 45:15
**tightening** [1] - 47:16
**timely** [1] - 16:1
**timing** [1] - 32:6
**tiny** [1] - 47:2
**today** [4] - 37:3, 50:12, 52:18, 57:21
**today's** [1] - 7:25
**together** [2] - 35:4, 36:18
**toll** [1] - 55:22
**took** [4] - 50:18, 50:19, 50:20, 53:5
**tornado** [1] - 47:8
**tort** [6] - 20:23, 25:4, 25:10, 25:24, 26:6,

28:16
**totally** [1] - 47:11
**touch** [1] - 28:23
**touched** [1] - 50:4
**traceable** [1] - 15:3
**track** [2] - 36:2, 36:3
**transaction** [4] - 11:16, 11:21, 12:10, 58:13
**transactions** [4] - 12:21, 12:22, 25:6, 27:3
**TRANSCRIPT** [1] - 1:7
**transfer** [1] - 49:2
**Transfer** [9] - 12:4, 34:24, 35:15, 35:22, 36:19, 41:3, 41:18, 54:7, 56:8
**transfers** [1] - 35:5
**Transfers** [1] - 12:7
**transmitting** [2] - 31:13, 31:20
**transparent** [1] - 55:1
**travel** [1] - 33:8
**treated** [3] - 19:18, 39:24, 40:1
**trigger** [2] - 45:9, 45:23
**triggers** [4] - 43:12, 44:17, 45:15, 46:2
**trouble** [1] - 6:23
**true** [4] - 51:11, 52:6, 55:25, 57:16
**Trump** [3] - 36:6, 39:5, 40:18
**Trump's** [1] - 40:8
**try** [2] - 55:1, 60:4
**trying** [3] - 11:7, 16:24, 23:23
**turn** [1] - 21:3
**two** [17] - 3:2, 7:4, 9:14, 10:3, 11:12, 12:13, 19:11, 20:21, 31:9, 53:23, 55:16, 57:3, 60:19, 60:20, 60:21
**two-year** [2] - 9:14, 10:3
**typically** [3] - 18:12, 52:7

## U

**U.S.C** [2] - 38:2, 38:20
**Uber** [1] - 16:19
**ultimately** [2] - 16:3, 46:3
**unable** [2] - 53:1, 60:11
**unauthorized** [9] -

11:16, 11:21, 12:10, 12:21, 13:20, 25:5, 35:5, 35:8, 35:14
**unbanked** [4] - 33:16, 33:17, 51:16, 52:10
**uncommon** [1] - 9:1
**unconnected** [1] - 40:17
**uncontested** [1] - 13:1
**undeniably** [2] - 57:16, 58:9
**under** [39] - 8:17, 13:16, 17:9, 19:15, 19:23, 20:7, 20:10, 31:8, 31:9, 31:19, 35:20, 35:21, 37:11, 37:16, 37:22, 38:2, 38:15, 38:16, 38:17, 38:19, 38:24, 39:11, 39:22, 39:25, 40:10, 44:12, 45:25, 48:18, 48:23, 49:11, 53:6, 53:24, 53:25, 55:3, 56:10, 57:8
**unemployed** [1] - 8:4
**unemployment** [25] - 5:4, 5:6, 5:11, 7:3, 8:6, 16:13, 16:17, 16:24, 17:2, 17:3, 17:11, 18:11, 18:17, 18:21, 19:19, 21:16, 24:10, 25:19, 40:24, 46:20, 59:6, 59:7, 59:8, 59:10
**Unemployment** [1] - 7:2
**unfair** [3] - 31:4, 31:6, 49:22
**unfrozen** [1] - 14:1
**unique** [4] - 16:10, 16:14, 48:24, 48:25
**UNITED** [2] - 1:1, 1:8
**United** [3] - 38:23, 46:16, 47:25
**unlawful** [1] - 13:20
**unnamed** [1] - 31:18
**unrelated** [1] - 60:16
**unsafe** [1] - 30:6
**unsigned** [1] - 8:23
**unusual** [1] - 16:10
**up** [11] - 3:24, 6:20, 16:11, 22:5, 27:15, 30:20, 33:19, 49:15, 50:15, 51:18, 58:14
**updated** [1] - 9:12
**urge** [2] - 58:21, 58:22
**urgency** [1] - 35:24
**uses** [4] - 27:25, 28:13, 32:6, 35:6

## V

**vaccinated** [2] - 2:19, 2:21
**valid** [1] - 54:21
**validation** [1] - 35:11
**value** [3] - 34:17, 35:13, 60:2
**various** [3] - 29:18, 38:12, 43:7
**vendor** [1] - 50:19
**verification** [3] - 35:11, 50:24, 51:12
**verify** [3] - 16:24, 51:15, 51:16
**version** [1] - 8:14
**versus** [1] - 25:7
**veterans** [2] - 35:16
**Vietnam** [1] - 35:16
**view** [23] - 18:23, 35:23, 39:8, 41:18, 42:3, 47:5, 47:21, 47:22, 47:24, 50:6, 52:19, 53:15, 53:25, 54:3, 54:15, 55:1, 55:19, 56:1, 56:10, 59:15, 59:25, 60:5
**views** [3] - 34:20, 47:19, 60:9
**violated** [2] - 31:12, 31:23
**violation** [7] - 14:24, 16:2, 31:5, 32:1, 32:18, 48:22
**violence** [1] - 58:3
**Virginia** [2] - 1:17, 2:15
**virtue** [1] - 54:7
**voice** [1] - 6:20
**vs** [2] - 1:4, 2:6

## W

**wait** [2] - 37:14, 60:25
**walk** [2] - 16:8, 46:2
**walked** [1] - 19:6
**wallet** [1] - 51:14
**wants** [2] - 28:6, 43:2
**War** [1] - 47:16
**warrant** [2] - 38:23, 44:11
**ways** [1] - 18:24
**we'll..** [1] - 43:3
**website** [1] - 9:24
**weeds** [1] - 5:19
**weeks** [1] - 60:25
**welfare** [7] - 24:9, 43:22, 44:3, 44:15, 45:6, 45:21, 46:7
**Wells** [1] - 25:7

**whole** [7] - 11:22, 11:25, 19:12, 24:24, 48:12, 48:16, 56:7
**wholly** [1] - 39:6
**William** [1] - 21:20
**window** [2] - 15:4, 15:16
**wisdom** [1] - 47:24
**wondering** [2] - 4:9, 60:14
**word** [1] - 42:8
**words** [4] - 39:6, 39:8, 39:11, 40:25
**worker** [1] - 46:21
**workers** [1] - 16:18
**works** [3] - 7:23, 11:10, 24:8
**world** [1] - 27:23
**World** [1] - 47:16
**worry** [2] - 13:8, 60:17
**worth** [1] - 12:20
**written** [1] - 41:12
**wrongfully** [1] - 14:23
**wrote** [3] - 33:13, 34:3, 55:9

## Y

**YAGOUB** [1] - 1:3
**year** [4] - 9:14, 10:2, 10:3, 25:8
**years** [5] - 10:11, 12:8, 35:3, 35:7
**yesterday** [3] - 9:24, 54:25, 60:15
**Yick** [2] - 3:15, 3:24

## Z

**zero** [3] - 11:19, 11:24, 15:12
**zoning** [1] - 24:5

## §

**§1005.15** [1] - 18:2
**§1005.2** [1] - 36:23
**§139** [1] - 38:2
**§165** [1] - 38:20