## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| YAGOUB M. MOHAMED, *individually and on behalf of all others similarly situated,* | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | Civil No. 21-1283-BAH |
| BANK OF AMERICA, N.A., | * |
| | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Yagoub Mohamed brought suit against Defendant Bank of America, N.A. ("Bank of America" or "the Bank") alleging violations of federal and state statutes in the Bank's administration of pandemic-era unemployment benefits. ECF 1. Pending before the Court is Defendant's motion to dismiss (the "Motion."). ECF 54. Plaintiff filed an opposition, ECF 59, and Defendant filed a reply, ECF 62. All filings include memoranda of law.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's Motion will be **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

### A.    Factual Background

The facts of this case concern unemployment benefits provided during the COVID-19 pandemic. Plaintiff is a Baltimore resident who, prior to the pandemic, worked as a mechanic and

---

[1] Plaintiff's complaint, Defendant's motion to dismiss, and Plaintiff's response in opposition contain exhibits. The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

small business owner. ECF 1, at 4 ¶ 11. In July 2020, following a business downturn precipitated

by the pandemic, Plaintiff applied for and was awarded unemployment insurance benefits through

the Maryland Department of Labor's Division of Unemployment Insurance ("the Division"). *Id.*

at 19 ¶¶ 67–68. Plaintiff elected to receive his benefits through a Bank of America debit card,

which was meant to be mailed directly to his home address. *Id.* ¶ 69. By the end of November,

however, Plaintiff had not received the card, despite following up multiple times with the Division

as to its whereabouts. *Id.* ¶ 74.

From the time Plaintiff enrolled in the unemployment insurance program in July through

the end of October, while he was still waiting for the card, Plaintiff was entitled to receive $14,644

in benefits. ECF 1, at 19 ¶ 71. To try and supplement his income during this time, Plaintiff

enrolled in a vocational training program and became licensed to provide HVAC repairs for a

home warranty company. *Id.* ¶ 73. Though Plaintiff stopped filing for unemployment insurance

benefits for a short period while working for the home warranty company, it soon ran out of work

for Plaintiff, and he renewed his benefits application. *Id.* ¶ 73.

At the end of November 2020, having still not received the debit card, Plaintiff again called

the Division to ask for updates but was told to contact Bank of America instead. ECF 1, at 20 ¶

74. When Plaintiff called Bank of America's customer service line, he was informed that the card

had already been mailed to his home address but that the Bank "would re-send another debit card."

*Id.* ¶ 75. On December 5, 2020, Plaintiff finally received the debit card, which he notes "had a

magnetic stripe and did not have an EMV [security] chip." *Id.* ¶¶ 76–77. Upon receiving the card,

Plaintiff tried to activate it but was unsuccessful. *Id.* ¶ 78. Plaintiff then called the service number

listed on the back of the card and "heard from the automated system that the card had a zero dollar

[ ] balance." *Id.*

At first, Plaintiff was unconcerned and believed that Bank of America would deposit the funds into his account within a business day. ECF 1, at 20 ¶ 79. However, on December 7, 2020, Plaintiff again called Bank of America's customer service line and was advised that the full $14,644 benefits sum had been entirely spent and the balance of the card was, in fact, $0. *Id.* ¶¶ 80–81. Plaintiff explained that he had just received the card and had never used any of the funds nor even had access to them. *Id.* at 21 ¶ 82. Plaintiff was then transferred to a representative from Bank of America's Claims Department, who "read each transaction aloud to Mr. Mohamed and asked him to verify whether he had made any of the charges." *Id.* ¶ 84. Plaintiff responded "one-by-one" that he had not made or authorized any of the transactions, nor had he shared the card or account information with anyone else. *Id.* ¶¶ 83–84. Plaintiff notes that the transactions at issue had occurred between August 20 and October 1, 2020, during which time an apparently unauthorized user "purchased merchandise and made withdrawals against" the balance of the card. *Id.* ¶ 85. While on the phone with the Claims Department, Plaintiff wrote down a full list of the charges, which "occurred in a wide range of locations throughout the United States, from as nearby as Towson, Maryland to an ATM transaction within a hotel in California[.]" *Id.* ¶ 86. The Claims Department representative provided Plaintiff with a case number and advised him to file a police report. *Id.* ¶¶ 88–89.

On December 8, 2020, Plaintiff "filed a police report for false pretenses" regarding the missing funds at the Baltimore City Police Department. ECF 1, at 22 ¶ 90. While he was making the report, Plaintiff called Bank of America's Claims Department to verify that he had provided "all required information" in making the report. *Id.* ¶ 91. The Claims Department representative instructed Plaintiff to fax the necessary paperwork to Bank of America and advised that Plaintiff would receive an update within 45 days. *Id.* ¶¶ 91–92. On December 16, 2020, Plaintiff faxed the

police report information, along with his Bank of America claim number and a copy of his driver's license, to the number provided by the Claims Department and received an automated message verifying receipt of the documents. *Id.* ¶ 94. The next week, Plaintiff contacted Bank of America to ask about the status of his claim and was advised to call back regularly for updates. *Id.* ¶ 96. During this time, Plaintiff also frequently called the Division of Unemployment Insurance but each time "received a message stating that the office was too busy to accept his call." *Id.* ¶ 97.

Plaintiff reports being under severe financial strain while waiting for an update from either Bank of America or the Division. He relied on credit cards to make essential purchases, thereby lowering his credit score and incurring late fees. ECF 1, at 22 ¶ 98. He also struggled with symptoms of depression and anxiety, including a panic attack for which he was treated at an urgent care facility. *Id.* at 23 ¶ 100.

On January 5, 2021, Plaintiff received a letter from Bank of America entitled, "important notice about your prepaid debit card for state unemployment benefits or other benefits/payments." ECF 1, at 23 ¶¶ 101–02. The letter explained, "it has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you" and noted that a freeze had been placed on Plaintiff's account. *Id.* ¶ 102. Further, the letter indicated that the freeze on the account would be lifted and the balance would become available if "a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on [the] account." *Id.* ¶ 103.

The following month, on February 3, 2021, Plaintiff received an email notification from Bank of America "stating that his Account had a deposit of $1,050." ECF 1, at 24 ¶ 105. Plaintiff then called the Bank and spoke to a representative who informed him he should use the same debit card that had been compromised to access these funds in his account. *Id.* ¶ 106. However, Plaintiff

did change the PIN code for the card in the hopes of avoiding future unauthorized transactions. *Id.*
Once he had gained access to the account, Plaintiff was able to see "an incomplete list of prior
transactions" on his debit card and noted that an unauthorized user had unsuccessfully attempted
to make ten different transactions during the period between October 2 and October 13, 2020. *Id.*
¶ 107. Plaintiff notes that these transactions occurred during the time he had temporarily stopped
filing claims for his monthly unemployment benefits. *Id.* While still on the call with the Bank
representative, Plaintiff was told that although the Bank had previously stopped processing his
claim because the Division had frozen his account, the claim could now be reopened since the
freeze had been lifted. *Id.* ¶ 108. Plaintiff alleges, however, that "the Bank," not the Division,
"was the only party who could freeze or unfreeze Mr. Mohamed's access to his account" and that
the Bank "often provided erroneous information to Plaintiff" and the putative class members
"regarding the source of their account freezes." *Id.* ¶ 110. Though, Plaintiff alleges, the Bank
frequently informed customers that the Division had frozen their accounts, the ability to freeze
accounts was "entirely within the Bank's control." *Id.*

During the February 3, 2021 phone conversation, Plaintiff asked for a status update on his
claim and was told by the representative to resend his fax from December 16, 2020, as the
documents "looked blurry." ECF 1, at 25 ¶ 111. Plaintiff sent in clearer copies on February 17.
*Id.* ¶ 112. Though Plaintiff called Bank of America "every day" for an update on his claim, "he
regularly experienced long hold times, was transferred to different representatives, and, on the
occasions where he did speak to a representative, was provided with 'false' or 'contradicting'
information." *Id.* ¶ 114. On February 28, 2021, Plaintiff spoke to a Bank representative who
informed Plaintiff that his fraud claim had been denied and advised that Plaintiff would receive a

letter of explanation in the mail. *Id.* ¶ 115. However, Plaintiff indicates that he never received such a letter. *Id.*

On March 3, 2021, Plaintiff received another letter entitled, "important notices about your prepaid debit card for state unemployment benefits or other benefits/payments." ECF 1, at 25 ¶ 116. This letter indicated that the Bank had removed the freeze on the account and the card was active again. *Id.* Upon receipt of this letter, Plaintiff again called Bank of America and asked whether he could now file for reconsideration of his claim. *Id.* at 26 ¶ 117. He was unable to obtain a clear answer and continued to seek advice from different representatives of the Bank from March to April of 2021. *Id.* At a certain point, one representative told him that he could not seek reconsideration "because he had received two denials of his [fraud] claim," though Plaintiff indicates that he heard from another representative that "his first claim had merely been reopened, rather than denied." *Id.* During another conversation with a separate representative, Plaintiff was told that he still needed to wait to receive a denial letter in the mail before he could appeal anything. *Id.* ¶ 118. While Plaintiff was told that the denial letter had been re-sent, he avers that, at the time of the filing of his complaint, he had not received any written communication from the Bank regarding the reasons for the denial of his claim. *Id.* ¶¶ 118–19. Plaintiff also notes that he did not receive even any oral update, as different representatives of the Bank repeatedly advised that they could not give him a reason for the denial over the phone. *Id.* ¶ 119. Further, Plaintiff reports that he did not receive a replacement account or debit card and instead had to continue to use the one that had been compromised. *Id.* ¶ 120. Though at the time of filing Plaintiff had not received "either a provisional or permanent credit" for the lost $14,644 of his unemployment insurance benefits, he nonetheless received a tax notice from the State of Maryland requiring him to pay income tax on the "full amount" of the benefits. *Id.* ¶¶ 121–22.

Plaintiff avers that "Bank of America's inadequate response" to the fraud issue "results from the Bank's failure to adequately staff its customer service and fraud investigation departments," as well as from "procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct" customers' efforts to submit their fraud claims and receive reimbursement. ECF 1, at 27 ¶ 123. Based on these failures, Plaintiff brings six counts[2]: violations of the Electronic Fund Transfer Act ("EFTA") (Count I); violations of the Maryland Personal Information Protection Act ("MPIPA") (Count II); violations of the Maryland Consumer Protection Act ("MCPA") (Count III); breach of contract (Counts IV and V); and negligence (Count VI). *Id.* at 31–41 ¶¶ 139–201.

### B.    Procedural Background

Plaintiff filed his complaint on May 24, 2021. *See* ECF 1, at 44. The case was first assigned to Magistrate Judge Gesner, *see* ECF 4, and then to District Judge Blake. Defendant responded with an initial motion to dismiss on August 2, 2021. *See* ECF 18. Following receipt of Plaintiff's response to this initial motion, ECF 22, and Defendant's reply, ECF 23, Judge Blake scheduled a motions hearing, held on June 9, 2022, *see* ECF 35. On August 11, 2022, Judge Blake issued a memorandum and order dismissing Plaintiff's federal EFTA claim and declining to exercise supplemental jurisdiction over the remaining state claims. *See* ECFs 37, 38.

On September 6, 2022, Plaintiff filed a notice of appeal. *See* ECF 39. The Court of Appeals for the Fourth Circuit vacated the decision of the district court and remanded the case for further

---

[2] Plaintiff brings these claims on his own behalf as well as on behalf of a putative class. *See* ECF 1, at 27 ¶ 125. At the motion to dismiss stage, Plaintiff's claim only survives based on his own unique and specific facts. *See Parrish v. Arvest Bank*, 717 F. App'x. 756, 760 (10th Cir. 2017) ("A putative class action complaint should be dismissed if the named plaintiff's individual claims fail to state a claim for relief.").

proceedings.[3]    ECF 43.    The case was transferred to the undersigned on March 11, 2024. Defendant filed the motion at issue on May 15, 2024, *see* ECF 54, while Plaintiff filed a response, ECF 59, and Defendant a reply, ECF 62, on May 29 and June 12, respectively.    Defendant seeks to dismiss Counts II–VI of Plaintiff's complaint.    ECF 54-1, at 8.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted."    In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).    A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).    "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).    At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

---

[3] The Fourth Circuit determined that Plaintiff's account with the Bank qualified as a "government benefit account" under the EFTA and remanded the case for further proceedings consistent with that finding.    ECF 43-1, at 15.

Moreover, because Plaintiff brings a claim under the MCPA, and MCPA actions sound in fraud, Plaintiff's fraud-related claims must meet the heightened pleading standard of Rule 9(b). *See Wood v. Blue Diamond Growers*, 722 F. Supp. 3d 554, 564 (D. Md. 2024). Rule 9(b) requires a plaintiff "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake."

In evaluating a motion to dismiss, the Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

## III.    ANALYSIS

### A.    Violation of the MPIPA (Count II)

The MPIPA states in relevant part:

> To protect personal information from unauthorized access, use, modification, or disclosure, a business that owns, maintains, or licenses personal information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of the personal information owned, maintained, or licensed and the nature and size of the business and its operations.

Md. Code Ann., Com. Law ("Com. Law") § 14-3503(a). The MPIPA further obligates business to "conduct in good faith a reasonable and prompt investigation" in the event of a security breach and to "determine the likelihood that personal information . . . has been or will be misused as a result of the breach." *Id.* § 14-3404(b)(1). "Personal information" is defined as "[a]n individual's first name or first initial and last name" in combination with certain non-encrypted or non-redacted data elements, including "[a]n account number, a credit card number, or a debit card number, in

9

combination with any required security code, access code, or password, that permits access to an individual's financial account." *Id.* § 14-3501(e)(1).

Plaintiff alleges that Defendant violated section 14-3503 by using magnetic stripe technology and by collecting, storing, and transmitting information in "an unsafe manner." ECF 1, at 36 ¶ 161. Further, Plaintiff contends that Defendant violated section 14-3504 because its "actions enabled unauthorized third parties to breach the security system to access" Plaintiff's account information and other personal data. *Id.* ¶ 163. Defendant responds that Plaintiff fails to plead that Bank of America's security practices, specifically the use of magnetic stripe technology, are prohibited under MPIPA; that Plaintiff's complaint does not raise any facts that "implicate [Defendant's] collection, storage, and transmission of [Plaintiff's] information"; and that Plaintiff has not alleged he suffered an injury as a result of the Bank's conduct. ECF 54-1, at 27, 29.

Caselaw discussing the MPIPA is scarce. However, Judge Grimm considered the statute at length in a case involving a breach of hotel customers' personal data. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020). There, Judge Grimm determined that the *Marriott* plaintiffs' claims under the MPIPA survived dismissal because the plaintiffs had alleged that "[a] company with proper information security would not have allowed outsiders to have access to such a massive variety of information systems[.]" *Id.* at 487. The *Marriot* plaintiffs therefore sufficiently alleged a violation of the MPIPA on the theory that the hotel "failed to employ reasonable security measures to protect the Personal Information it collected," even though the precise scope of the breach and details of how it occurred were not yet known. *Id.* at 487–88.

Following *Marriott*, the Court finds that Plaintiff here has sufficiently stated a claim for a violation of the MPIPA. Though Defendant is correct that the MPIPA does not specifically *require*

card issuers to use more secure EMV chips in place of magnetic stripes on cards, the operative question at this stage of the litigation is, as noted in *Marriot*, whether Plaintiff has adequately alleged that Defendant failed to adopt *reasonable* security measures. *Id.* at 488. Plaintiff sufficiently alleges that the Bank has failed to do so. Specifically, Plaintiff contends that Bank of America does use the more secure EMV chips on "all its other debit and credit cards" but reserves the "outdated magnetic stripe technology" for debit cards used by recipients of unemployment insurance, despite acknowledging on its own website that EMV chip technology is "the credit and debit card security standard in many countries around the world." ECF 1, at 2 ¶ 4, 14 ¶ 51. And Plaintiff further argues that this magnetic stripe technology renders the debit cards "readily susceptible to cloning and other schemes" that make fraudulent access to and use of the cardholder's account easier. *Id.* Though Plaintiff does not detail the exact method by which his card information was stolen and used for unauthorized charges, he is not required to at this stage. His claims need only be plausible, and indeed he has plausibly alleged that the inadequate security measures on the card, and Defendant's failure to investigate the subsequent fraud, led to the theft of his benefits and thus both economic and emotional injury. As such, the Court finds that Plaintiff has adequately stated a claim under the MPIPA.[4]

---

[4] The Court notes that Defendant has failed to challenge Plaintiff's MPIPA claim on the grounds that the compromised information did not amount to "personal information" within the meaning of the statute. The MPIPA defines "personal information" as constituting "[a]n individual's first name or first initial and last name in combination with," *inter alia*, "[a]n account number, a credit card number, or a debit card number, in combination with any required security code, access code, or password, that permits access to an individual's financial account." Com. Law § 14-3501(e)(1)(i)(3). Because the Court draws all reasonable inferences in Plaintiff's favor at this stage in the litigation, *see Nemet Chevrolet*, 591 F.3d at 253, the Court will infer that Plaintiff's name and any code required to access his account were compromised.

**B.    Violation of the MCPA (Count III)**

"The MCPA prohibits any entity doing business in Maryland from engaging in '[u]nfair, abusive, or deceptive trade practices,' including, 'deception, fraud . . . misrepresentation, or knowing concealment . . . of any material fact with the intent that a consumer rely on the same in connection with [ ] [t]he promotion or sale of any consumer goods[.]'" *Innovations Surgery Ctr., P.C. v. United Healthcare Ins. Co.*, 722 F. Supp. 3d 582, 594 (D. Md. 2024) (quoting Com. Law § 13-301(9)). The MCPA, in relevant part, defines a misrepresentation as constituting a statement that "[c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have," Com. Law § 13-301(2)(i), or else "are of a particular standard, quality, grade, style, or model which they are not," *id.* § 13-301(2)(iv).

Plaintiff argues that Defendant violated section 13-301(2)(i) of the MCPA by representing that the debit card "was private and secure, when it was not." ECF 1, at 37 ¶ 171. Further, Plaintiff contends that Defendant violated section 13-301(2)(iv) "by failing to adhere to the standards set forth in the EFTA and the MPIPA" when Defendant was informed of account errors. *Id.* ¶ 172. Plaintiff's complaint also alleges general violations of the MCPA for Defendant's failure "to adhere to the terms of the Cardholder Agreement, especially the Zero Liability Policy"; failure "to adhere to the terms of the Benefits Contract"; and violation of the MPIPA. *Id.* ¶¶ 173–76. In response, Defendant contends both that Plaintiff has not alleged any misrepresentation with the required particularity and that Plaintiff cannot bring a MCPA claim for breach of contract. ECF 54-1, at 21, 25.

"To bring an action under the MCPA, the plaintiff must allege '(1) an unfair or deceptive practice or misrepresentation that (2) is relied upon, and (3) causes [him] actual injury.'" *Daniyan v. Viridian Energy LLC*, Civ. No. GLR-14-2715, 2015 WL 4031752, at *1 (D. Md. June 30, 2015)

12

(alteration in *Daniyan*) (quoting *Farasat v. Wells Fargo Bank, N.A.*, 913 F. Supp. 2d 197, 205 (D. Md. 2012)). At this stage in the case, Plaintiff's MCPA claims "must plausibly aver that the defendant engaged in an unfair or deceptive practice on which the plaintiff relied, and which caused actual injury" in order to survive dismissal. *Innovations Surgery*, 722 F. Supp. 3d at 594 (citing *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249, 270 (D. Md. 2015)). Furthermore, Plaintiff must also allege such facts with particularity in light of the Rule 9(b) standard for claims sounding in fraud. *Wood*, 722 F. Supp. 3d at 564.

The Court first determines that Plaintiff's MCPA claim survives because he has plausibly alleged a violation of the MPIPA. Under the MCPA, a violation of the MPIPA automatically constitutes "an unfair or deceptive trade practice" within the meaning of the statute. Com. Law § 14-3508; *see also In re Marriot*, 440 F. Supp. 3d at 489 (finding that plaintiffs "sufficiently alleged" a violation of the MCPA because they had "adequately pled a violation of the [MPIPA]").

However, Plaintiff does not sufficiently support his claim that Defendant violated the MCPA by "representing that Plaintiff's . . . [d]ebit [c]ard was private and secure, when it was not." ECF 1, at 37 ¶ 169. As noted, claims that allege "false statements, deceptive actions, misrepresentations, [or] omissions," including claims brought under the MCPA, sound in fraud and are accordingly subject to the heightened pleading requirements of Rule 9(b). *Haley v. Corcoran*, 659 F. Supp. 2d 714, 724 n.10 (D. Md. 2009). Plaintiff's complaint does not meet such a standard. While Plaintiff seems to identify the Bank's online statement regarding the security of all of its debit cards as the operative misrepresentation, *see* ECF 1, at 15 ¶ 52, he does not state with any specificity when or even if he saw this statement prior to electing to receive his benefits through Bank of America. *Cf. Bryant v. Koppers, Inc.*, 627 F. Supp. 3d 466, 478 (D. Md. 2022) (finding that plaintiffs could not sustain a claim under the MCPA where they cited to a

representation made online but did not "detail when this representation was made or by whom[,]"

nor that defendants made the same representation directly to them). Further, Plaintiff does not

point to any other specific statement from the Bank regarding the security of the card, nor indeed

that he relied on such a statement. Plaintiff has therefore failed to state his claim of

misrepresentation with particularity.

Nor is Plaintiff's MCPA claim supported by a finding of breach of contract. He does not

allege any facts that suggest that Defendant's alleged failure to abide by either the terms of the

Cardholder Agreement or the terms of the Benefits Administration Contract ("Benefits Contract")

executed between the Bank and the State of Maryland gave rise to any misrepresentation or unfair

or deceptive practice. *See also Javitt v. Cunningham Contracting, Inc.*, Civ. No. 1649, 2016 WL

4493367, at *6 (Md. App. Aug. 26, 2016) (determining that "proof of a breach of contract does

not compel a finding of a breach of the MCPA"). Moreover, MCPA liability cannot be premised

on finding liability under the EFTA, closing this avenue to Plaintiff as well. *See Barimah v. Bank*

*of Am., Inc.*, Civ. No. PWG-14-3324, 2016 WL 4089564, at *6 (D. Md. Aug. 2, 2016) (finding

that, in contrast to other statutory violations, the EFTA is not "a guide in determining whether the

MCPA is applicable").[5]

---

[5] Plaintiff's response appears to advance an additional theory that the Bank's "inconsistent and misleading written and oral statements" after Plaintiff reported the fraud also constitute a violation of the MCPA. ECF 59, at 24. However, "a memorandum in opposition to a motion is not a proper vehicle for amending a complaint or adding new claims[.]" *Moise v. Howard Cnty. Det. Ctr.*, Civ. No. RDB-18-1355, 2019 WL 454101, at *4 (D. Md. Feb. 4, 2019), *aff'd*, 807 F. App'x 272 (4th Cir. 2020) (citing, *inter alia, Cutrera v. Board of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113–14 (5th Cir. 2005); *Woodbury v. Victory Van Lines*, 286 F. Supp. 3d 685, 692 (D. Md. 2017)). Because Plaintiff does not make this argument in his complaint, the Court will not consider it in its analysis.

### C.    Breach of Contract (Counts IV and V)

As an initial matter, the Court reiterates that it may review documents "attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro*, 930 F.3d at 248 (quoting *Philips*, 572 F.2d at 180). Typically, a contract is considered an integral document to a breach of contract action. *D.C. Water & Sewer Auth. v. Samaha Assocs., PC*, 729 F. Supp. 3d 511, 517 (D. Md. 2024) (citing *Thaler v. Donald J. Trump for President, Inc.*, 304 F. Supp. 3d 473, 477 n.5 (D. Md. 2018)). Plaintiff argues that Defendant breached its duties under both the Cardholder Agreement and the Benefits Contract, *see* ECF 1, at 38 ¶ 180, 39 ¶ 185, and attaches copies of each to the complaint. *See* ECF 1-4 (Cardholder Agreement), ECF 1-3 (Benefits Contract). Defendant does not dispute the authenticity of either document. Accordingly, the Court will treat both agreements as integral to its evaluation of Plaintiff's breach of contract claims.

#### 1.    Breach of the Cardholder Agreement

Plaintiff contends that Defendant failed to uphold its duties under the Cardholder Agreement to timely resolve the fraud claims; reimburse Plaintiff for the unauthorized transactions; provide Plaintiff with provisional credit when the fraud investigation exceeded ten business days; and limit Plaintiff's liability for unauthorized transactions. ECF 1, at 38 ¶ 182. The Court will analyze these claims below as arising from the Bank's contractual duties pertaining to the investigation and resolution of unauthorized transactions. Plaintiff further asserts that Defendant breached its duties to refrain from unnecessarily freezing the benefits debit card and to make funds available "on the day the Bank had been instructed by the [Department of Unemployment Insurance] to fund [Plaintiff's] [a]ccount[.]" *Id.* The Court will consider these two arguments in turn.

First, however, the Court must resolve choice-of-law questions. Though Defendant's motion cites to Maryland law regarding breach of contract actions, *see* ECF 54-1, 18–21, and Plaintiff's response primarily references Supreme Court precedent as the relevant law, *see* ECF 59, 7–8, the Cardholder Agreement explicitly stipulates that, outside of the portions of the contract which come under federal law, the agreement is governed "by the laws and regulations of the State of North Carolina," ECF 1-4, at 11 ¶ 18. In determining the applicable law for the interpretation of a contract, a federal district court will apply the choice-of-law rules of the state in which it sits. *Schaefer v. Aetna Life & Cas. Co.*, 910 F. Supp. 1095, 1098 (D. Md. 1996). Maryland law looks either to the law of the place where the contract was made or, if present, to any choice-of-law provision in the contract. *Dominion Fin. Serv., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 741 (D. Md. 2023). Such provisions are "enforceable unless the choice of law jurisdiction has no substantial relationship to the transaction, or there is a fundamental policy difference in the laws of another jurisdiction with a more substantial interest in the parties or the transaction." *Brito v. Major Energy Elec. Servs., LLC*, 526 F. Supp. 3d 95, 110 (D. Md. 2021) (internal citations omitted). Neither exception appears to be at issue here. As Plaintiff's complaint acknowledges, Bank of America is "headquartered in North Carolina," ECF 1, at 5 ¶ 12, and so it is reasonable to conclude that North Carolina law has a "substantial relationship" to the contract. Moreover, it does not appear that there is a "substantial difference" between the law of North Carolina and that of Maryland as to breach of contract actions.[6] And while neither Plaintiff nor Defendant relies on

---

[6] To compare, under Maryland law, a breach of contract action requires a showing that "(a) the defendant was under a contractual obligation owed to the plaintiff, which (b) the defendant breached." *John v. Essentia Ins. Co.*, 708 F. Supp. 3d 694, 699 (D. Md. 2023) (citing *Yousef v. Trusbank Sav., F.S.B.*, 568 A.2d 1134, 1137 (Md. App. 1990)). In North Carolina, "[t]he elements of a claim for breach of contract are (1) the existence of a valid contract and (2) breach of the terms of that contract." *Kasparov, Pte Ltd. v. Zacherl*, 729 F. Supp. 3d 524, 532 (E.D.N.C. 2024)

North Carolina law in making their breach of contract arguments, the parties do not bring a challenge to the validity of the Cardholder Agreement's choice-of-law provision. Accordingly, the Court will apply North Carolina law to the contractual claims at issue.

"To allege breach of contract in North Carolina, a complaint must allege facts sufficient to prove that (1) there was a valid contract between the parties and (2) that the defendant breached the terms of that contract." *Superior Performers, LLC v. Carey*, 716 F. Supp. 3d 373, 378 (M.D.N.C. 2024) (internal citations omitted).

### i.    *Contractual duties regarding unauthorized transactions*

The Cardholder Agreement sets out Bank of America's "zero liability" policy for unauthorized transactions, which provides,

> Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft or your Card, Card number or PIN or its unauthorized use . . . .

ECF 1-4, at 7 ¶ 9. The Agreement further stipulates that, after receiving a notice of fraud or other error, the Bank will "determine whether an error occurred within 10 business days" and will "correct any error promptly." *Id.* at 9 ¶ 11. If more time is required, the Agreement provides that the Bank may take "up to 45 days" from the time the error notice is received to investigate the complaint or question but will "credit [the] Account within 10 business days for the amount" in error, so that the customer "will have the money during the time it takes [ ] to complete [the] investigation." *Id.* Upon completion of the investigation, the Bank is to inform the customer of the results within "three business days" and send a "written explanation" if no error was found. *Id.* at 10 ¶ 11.

---

(quoting *Poor v. Hill*, 530 S.E.2d 838, 843 (N.C. App. 2000)). These formulations represent the same essential standard.

Plaintiff has pleaded sufficient facts to indicate that Defendant failed to abide by certain obligations regarding unauthorized transactions under the terms of the Cardholder Agreement. Plaintiff's complaint explicitly states that Plaintiff contacted Bank of America to report the unauthorized transactions as soon as he discovered the funds were missing, *see* ECF 1, at 20–21 ¶¶ 75–87, thereby triggering Defendant's contractual duties to respond to and investigate the fraud. Further, Plaintiff sufficiently pleads that the Bank failed to credit his account for the full amount in error within ten business days of his reporting the fraud, as is required by the Cardholder Agreement. *See* ECF 1, at 26 ¶ 121 (At the time of filing the complaint, several months after he first reported the fraud, Plaintiff had not "received [ ] either a provisional or permanent credit of his lost [unemployment insurance] funds, totaling $14,644."). Plaintiff also sufficiently alleges that he never received a written explanation of why the Bank determined no error had occurred, despite the contract's stipulation that a written explanation must be provided if no error is found. *See id.* ¶ 119 ("As of the date of this filing [of the complaint], Mr. Mohamed has not received a written or oral statement for the denial of his claim.").

As to Plaintiff's contentions that Defendant breached the Cardholder Agreement by failing to reimburse Plaintiff for the unauthorized transactions and failed to limit Plaintiff's liability for unauthorized transactions, the contractual language does not, at least facially, suggest that the Bank had any specific duty to do either. Instead, the Cardholder Agreement merely obligates the Bank to undertake an investigation and determine, in its own discretion, whether "the facts and circumstances [ ] reasonably support a claim of unauthorized use." ECF 1-4, at 7 ¶ 9. However, North Carolina law stipulates that where, as here, one party to a contract has discretionary power impacting the rights of the other, "this discretion must be exercised in a reasonable manner based on good faith and fair play." *All. Comm'n Enhancement, LLC v. Carey*, 716 F. Supp. 3d 366, 371

(M.D.N.C. 2024) (quoting *Mezzanotte v. Freeland*, 200 S.E.2d 410, 414 (N.C. App. 1973), *cert. denied*, 201 S.E.2d 689 (N.C. 1974)).

With this principle in mind, and viewing the facts in the light most favorable to Plaintiff, Plaintiff has sufficiently alleged that the Bank's determination that no fraud occurred was unreasonable. For instance, Plaintiff contends that he informed the Bank that he had never shared his account or card information, ECF 1, at 21 ¶ 83; that he "had not made nor authorized" any of the charges, *id.* ¶ 84; and that at least two of the charges occurred in California, far away from his home in Baltimore, *id.* ¶ 86. Further, Plaintiff provides that he promptly complied with the Bank's request for additional documentation, including a copy of the police report he made, and indeed resubmitted the information when asked. *Id.* at 22 ¶ 94, 25 ¶ 112. Given these circumstances, Plaintiff has sufficiently alleged that the facts of his case supported a claim for unauthorized use, and has adequately alleged that the Bank was unreasonable in failing to limit Plaintiff's liability and provide a reimbursement. *C.f. Beaman v. Bank of America, N.A.*, No. 2:21-CV-20561, 2023 WL 4784254, at *14 (D.N.J. July 27, 2023) (finding that, in a factually similar case, a plaintiff had not sufficiently alleged that "the facts and circumstances surrounding the transaction supported a claim for unauthorized use" where, in contrast to Plaintiff's representations at issue here, the *Beaman* plaintiff merely told bank defendant that "a fraudulent person made purchases on the account" and did not provide further details). Accordingly, the Court finds that Plaintiff has sufficiently stated a claim for breach of contract as to Defendant's duties to reimburse him and limit his liability, as well as to Defendant's obligations to temporarily credit his account and explain resolution of his case in writing, as discussed *supra*.

Finally, Plaintiff's breach of contract claim may also proceed as to the length of time the Bank took to resolve the fraud claim. The Cardholder Agreement provides that the Bank may take

19

up to 45 days to look into reports of error, ECF 1-4, at 9 ¶ 11, and Plaintiff received the same information from a Bank of America claims representative, ECF 1, at 22 ¶ 92. The complaint alleges that Plaintiff reported the fraud to Bank of America on December 7, 2020, *id.* at 20 ¶ 80 but did not hear until February 3, 2021 that his claim had been denied for the first time, potentially due to the "blurry" quality of the faxed supporting documentation, *id.* at 25 ¶ 111. By the Court's count, a period of 58 days had elapsed between those two dates, outside of the 45-day window stipulated by the Cardholder Agreement.[7] Even then, the Bank did not initiate contact, and Plaintiff had to call the customer service line in order to obtain an update on his claim. *Id.* at 24 ¶ 106. Plaintiff has therefore sufficiently stated a claim for breach of contract as to the timeliness, or lack thereof, of Bank of America's resolution of the fraud investigation.

Ultimately, Defendant argues, Plaintiff's breach of contract claim may not rest on the Bank's alleged failure to investigate because, since the filing of the complaint, Plaintiff has been reimbursed for the full amount of his stolen benefits. ECF 54-1, at 12. Therefore, Defendant asserts, Plaintiff's claim is moot and should be "dismissed for lack of standing under Rule 12(b)(1)." *Id.* at 13. In response, Plaintiff does not dispute that Defendant credited his account in full but avers that his claim is not moot. ECF 59, at 7. The Court notes that North Carolina law permits parties claiming breach of contract "to recover nominal damages," even in the absence of actual damages. *Bryan Builders Supply v. Midyette*, 162 S.E.2d 507, 512 (N.C. 1968); *see also Superior Performers*, 716 F. Supp. 3d at 379; *Staffing Advantage LLC v. Definitive Staffing Sols.,*

---

[7] The language of the Cardholder Agreement distinguishes between "days" and "business days." For example, the contract specifically provides that account credits will issue "within 10 business days," with business days defined as spanning Monday to Friday. ECF 1-4, at 9 ¶ 11, 2 ¶ 1. By contrast, the plain language of the contract says only that the investigation may take up to 45 days to complete, without specifying business days. The Court therefore concludes that the 45-day period is inclusive of holidays and weekends and calculates the time span accordingly.

*Inc.*, No. 7:20-CV-00150, 2021 WL 2426340, at *6 n.7 (E.D.N.C. June 14, 2021); *Crescent Univ.*

*City Venture, LLC v. AP Atl., Inc.*, Civ. No. 15 CVS 14745, 2019 WL 3765313, at *44 (N.C. Super.

Ct. Aug. 8, 2019). Though the Cardholder Agreement limits the Bank's liability for "special,

indirect or consequential damages" resulting from unauthorized transactions, ECF 1-4, at 8 ¶ 9,

this provision does not reach nominal damages. Plaintiff therefore maintains an interest in his

breach of contract claim and the Court will not find that he lacks standing.[8]

> ii.    *Contractual duties regarding account freezes*

The Cardholder Agreement provides that Bank of America may "'freeze' (or place a hold

on) the balance [of the account] pending an investigation" into suspected "irregular, unauthorized,

or unlawful activities" and will give affected customers "notice required by law." ECF 1-4, at 3 ¶

2. Plaintiff argues that he has successfully alleged a breach of contract because he plausibly claims

that Defendant froze his card for too long and for reasons not specified in the Cardholder

Agreement. ECF 1, at 38 ¶ 182. Defendant counters that the Agreement gave the Bank the

authority to freeze Plaintiff's account and so Plaintiff cannot sustain a breach of contract action on

this theory. ECF 54-1, at 14. The Court agrees with Defendant.

Plaintiff's complaint alleges that he received notice of the freeze on January 5, 2021 and

that the notice letter cited possible "irregular, unauthorized, or unlawful activities involved with

the prepaid debit card" as grounds for freezing Plaintiff's account. ECF 1, at 23 ¶ 101–02. The

---

[8] Defendant points the Court to the outcome in *In re California Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 930 (S.D. Cal. 2023), where a similar breach of contract claim was dismissed on the grounds that plaintiff had been reimbursed and therefore had no damages. That court, however, applied the law of California, not North Carolina, to the contractual analysis. In another, similar action, a court in the District of Massachusetts properly applied North Carolina law and reached the same conclusion regarding nominal damages as the Court does here. *Eggiman v. Bank of Am., N.A.*, No. 1:22-CV-10298, 2023 WL 2647071, at *5 (D. Mass. Mar. 27, 2023) ("The Court finds that the plain terms of this contract provision do not bar nominal damages and therefore, despite the reimbursement of his funds, Eggiman continues to have an interest in his breach of contract claim.").

letter arrived after Plaintiff reported the unauthorized transactions on December 7, 2020. *Id.* at 20

¶ 82. On February 3, 2021, a representative from the Bank informed Plaintiff his account had been

unfrozen. *Id.* at 24 ¶ 108. Then, on March 3, 2021, Plaintiff received a letter from the Bank

confirming that the freeze had been removed. *Id.* at 25 ¶ 116. Per Plaintiff, this second letter also

stated the freeze had been imposed in response to potential "irregular, unauthorized, or unlawful

activities" on the account. *Id.* None of these facts support a reasonable inference that Defendant

breached its duties under the Cardholder Agreement. While Plaintiff argues that Defendant froze

the account "beyond the length of time necessary for a reasonable investigation," *id.* at 38 ¶ 32,

the language of the contract does not define what constitutes a "reasonable" amount of time for

the duration of a freeze, nor does Plaintiff offer any extrinsic facts that suggest the duration of the

freeze—according to the complaint, January 5 to February 3, 2021—was unreasonable. Even

assuming that the same 45-day window applied to account freezes as it does to investigations of

error, the facts of the complaint only suggest that Plaintiff's account was frozen for the 29-day

period between January 5 and February 3, within the contractual timeframe. Moreover, the

complaint offers no facts to support Plaintiff's claim that the Bank froze his account for a reason

not specified in the contract. Instead, Plaintiff admits that both letters regarding the freeze cited

to suspected unauthorized activity as the rationale, and the timeline of the facts makes clear that

the Bank imposed the freeze following on Plaintiff's fraud report. Plaintiff's breach of contract

claim may therefore not proceed under this theory.[9]

---

[9] Though Plaintiff avers in the complaint that the Bank's representatives "often provided erroneous information to Plaintiff and Class Members regarding the source of their Account freezes," ECF 1, at 24 ¶ 110, this allegation does not support his claim for breach of contract on the grounds that the Bank froze the account for too long and for reasons not specified in the Cardholder Agreement.

### iii.    Contractual duties regarding availability of funds

Under the terms of the Cardholder Agreement, funds are to be made available for customer use "on the day [the Bank is] instructed by [the Maryland Department of Labor] to fund [the] Account." ECF 1-4, at 2. Plaintiff claims that the Bank failed to make funds available on the day instructed by the Division, ECF 1, at 38 ¶ 182, but Defendant responds that Plaintiff offers no facts in support of this allegation, ECF 54-1, at 15.

Again, the Court agrees with Defendant. The only facts alleged of any relevance to this claim are that Plaintiff enrolled in unemployment insurance in July 2020, that he had not received the card as of November, and that he learned in December of the theft of the account balance. ECF 1, at 19 ¶¶ 68–74, 20 ¶¶ 80–81. There is no allegation, or even a mere suggestion, that the Bank did not deposit the money in Plaintiff's account in July 2020. The facts that Plaintiff does offer do not support the inference that the Bank failed to make the funds available for use as instructed by the Division. Plaintiff may therefore not base his breach of contract claim on this theory, either.

### 2.    Breach of the Benefits Contract

In addition to the claims arising under the Cardholder Agreement, Plaintiff also asserts that Defendant owed certain duties to Plaintiff as a third-party beneficiary under the Benefits Contract between Bank of America and the State of Maryland. ECF 1, at 39–40 ¶¶ 186–88. In response, Defendant counters that Plaintiff's claims fail as to the Benefits Contract for lack of standing as a true third-party beneficiary. ECF 54-1, at 15.

Because the Benefits Contract contains a Maryland choice-of-law provision, *see* ECF 1-3, at 4, the Court will apply the law of Maryland for the reasons discussed *supra*. Maryland law recognizes a third-party beneficiary to a contract only where "the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise"; "[i]t is not enough that the contract merely operates

23

to an individual's benefit[.]" *CX Reinsurance Co. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016), *aff'd sub nom. CX Reinsurance Co. Ltd. v. Loyal*, 691 F. App'x 130 (4th Cir. 2017) (quoting *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012)). "In determining whether that standard is met, the court looks to 'the intention of the parties . . . as expressed in the language of the instrument and consideration of the surrounding circumstances[.]'" *WM. T. Burnett Holding LLC v. Berg Bros. Co.*, 175 A.3d 876, 882 (Md. App. 2017) (quoting *CR-RSC Tower*, 56 A.3d at 170).

The language at issue here makes no mention of any intended third-party beneficiaries to the Benefits Contract. Instead, the copy of the agreement that Plaintiff attaches to the complaint at ECF 1-3 clarifies that the aim of the contract is specifically for Bank of America to "provide Electronic Payment Card Services" for the State of Maryland. ECF 1-3, at 2 ¶ 1.1. While Plaintiff's complaint asserts that the Bank pledged to adopt certain security measures for cardholder accounts, ECF 1, at 7 ¶ 21, these provisions[10] are not sufficient to indicate that the Bank and the State of Maryland intended cardholders to be the true beneficiaries of the Benefits Contract. The available language suggests only that the contract operated to the benefit of card users, not that they were the primary party in interest. Instead, the Court determines that the facts here are analogous to the ones at issue in *Burnett Holding*, wherein Maryland's intermediate appellate court determined that third party beneficiaries of government contracts are generally deemed to be incidental beneficiaries and therefore do not have the right to enforce the contract. *Burnett Holding*, 175 A.3d at 216–17 (citing *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town*

---

[10] The Court notes that this portion of Plaintiff's complaint cites provisions of the Benefits Contract that are not found in the copy of the contract docketed at ECF 1-3. Likewise, Plaintiff's response to the motion to dismiss includes citations to contractual sections that do not appear in the attached copy of the agreement. *See* ECF 59, at 12.

*Corp.*, 944 A.2d 1055, 1065 (D.C. 2008)). Though Plaintiff's response tries to distinguish that case on the theory that *Burnett Holding* involved "third parties who seek to interfere with the government's rights under a contract," ECF 59, at 11, this purported distinction is of little significance to the case's central holding that third party beneficiaries of a government contract are, absent clear intent to the contrary, merely incidental beneficiaries with no right to enforce the contract on their own. As an incidental beneficiary himself, Plaintiff does not have standing to pursue a third-party beneficiary claim under the Benefits Contract.

### D.    Negligence (Count VI)

Plaintiff's final count alleges that Defendant breached a duty of care owed to him as a customer of Bank of America. ECF 1, at 41 ¶¶ 192–96. Defendant responds that the relationship between a bank and its customer does not give rise to a duty of care and thus cannot support a negligence action. ECF 54-1, at 11.

Maryland law[11] has not traditionally recognized a cause of action for negligence arising solely from a contractual relationship. *See Spaulding v. Wells Fargo Bank, N.A.*, 920 F. Supp. 2d 614, 620 (D. Md. 2012) ("Absent special circumstances, the court is reluctant to 'transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement.'") (citing *Parker v. Columbia*

---

[11] "'Maryland adheres to the *lex loci delicti* rule' to determine the applicable law in tort actions." *Williams v. Gyrus ACMI, Inc.*, 790 F. Supp. 2d 410, 414 (D. Md. 2011) (quoting *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000)). An injury "is deemed to occur where the plaintiff first suffers harm[.]" *Id.* (citing *Burnside v. Wong*, 986 A.2d 427, 438 (Md. 2010)). Here, the complaint alleges that Plaintiff suffered injury in Maryland. *See* ECF 1, at 22–23 ¶¶ 98–100. Moreover, both parties apply Maryland law in analyzing Plaintiff's negligence claim. *See* ECF 54-1, at 18–21; ECF 59, at 13–19. In addition, though Plaintiff bases his negligence claim on Defendant's contractual duties, the Court determines that the North Carolina choice-of-law provision in the Cardholder Agreement only extends to the terms of the contract itself and does not contemplate any related actions. *See Aegis Bus. Credit, LLC v. Brigade Holdings, Inc.*, No. 8:21-CV-00668-AAQ, 2023 WL 5352407, at *3 (D. Md. Aug. 18, 2023) (collecting cases). The Court will therefore apply Maryland law in evaluating Plaintiff's negligence claim.

*Bank*, 604 A.2d 521, 531 (Md. App. 1992)). However, exceptions do apply. "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Jacques v. First Nat. Bank of Maryland*, 515 A.2d 756, 759 (Md. 1986). Thus, Maryland courts "permit[] negligence claims arising from a contractual relationship in circumstances involving a vulnerable party." *Laws. Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292, 294 (4th Cir. 2002) (citing *Jacques*, 515 A.2d at 762–63)).

In *Jacques*, Maryland's highest court wrestled with the question of "whether a bank that has agreed to process an application for a loan owes to its customer a duty of reasonable care in the processing and determination of that application." *Jacques*, 515 A.2d. at 756. Having found that the application process created a contract with an implied promise to use reasonable care, the *Jacques* court went further and held that the unique nature of the agreement between the parties gave rise to a "concomitant tort duty" because the plaintiffs were particularly "dependent upon the Bank's exercise of due care." *Id.* at 762. Key to this finding was the fact "that the rather extraordinary financing provisions contained in the [ ] contract, and thereby integrated into the loan application, left the [plaintiffs] particularly vulnerable and dependent upon the [b]ank's exercise of due care." *Id.* The *Jacques* court's analysis also rested on what it deemed to be the "public interest" inherent in holding banks and their officers to "a high degree of integrity and responsiveness to their public calling." *Id.* at 763. Following *Jacques*, subsequent caselaw does acknowledge the general Maryland rule that "[c]ontractual obligations, by themselves, do not create tort duties" but still continues to find an independent duty of care in contract cases involving "parties thought to be 'vulnerable' and in need of protection or [in] instances when the public at

26

large would be protected by imposing a duty." *Universal Plant Servs. of Nashville, Inc. v. Boland Trane Servs., Inc.*, Civ. No. TJS-21-1188, 2024 WL 3690810, at *8 (D. Md. Aug. 6, 2024).

Plaintiff alleges in the complaint that a duty of care arises, at least in part, pursuant to an "implied-in-fact contractual relationship" between the Bank and its customers. ECF 1, at 41 ¶ 192. Defendant responds that Maryland law forbids the assertion of implied or quasi-contractual claims where an express contract exists. ECF 54-1, at 19–20 (citing *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000)). This statement is generally true, but as discussed *supra*, Maryland law does appear to recognize an exception in the special context of a banking relationship. *See also G&D Furniture Holdings, Inc. v. SunTrust Bank*, Civ. No. TDC-16-2020, 2017 WL 2963350, at *3 (D. Md. July 11, 2017) (citing *Schultz v. Bank of America, N.A.*, 990 A.2d 1078, 1092 (Md. 2010) and concluding that Maryland law recognized both express and implied contracts in special context of "the banking relationship"); *Gillen v. Maryland Nat'l Bank*, 333 A.2d 329, 333 (Md. 1975) (describing the "relationship between a savings bank and a depositor [a]s a contractual one, of which the rules and regulations of the passbook are a *part*" but also finding an inherent duty "to use ordinary care in disbursing the depositor's funds") (emphasis in original). Critically, Maryland law recognizes that in the event of a breach of this implied contract, "bank customers may enforce the duty of ordinary care *not only in tort,* but *also through an action for breach of contract.*" *Schultz*, 990 A.2d at 1092 (citing *Gillen*, 333 A.2d at 333) (emphasis added).

This precedent suggests that, under Maryland law, a bank customer may bring a tort action alleging that their bank has failed to abide by its non-voidable contractual obligation to exercise ordinary care. Though the traditional rule forbade imposing a tort duty on the basis of a contract, and though the traditional exception to this rule applied narrowly in circumstances involving

vulnerable parties or the public interest, the Maryland Supreme Court's *Schultz* decision apparently announces a definitive rule specific to the banking context. Indeed, the *Schultz* court specifically cited *Jacques* in support of the proposition that there is "no contradiction in allowing a party to enforce the duty of ordinary care through a contract claim, a tort claim, *or both*." *Schultz*, 990 A.2d at 1092 n.21 (emphasis added). Plaintiff's contention that the Bank "owes a duty of ordinary care to its customers" as part of its contractual obligations is therefore sufficient to allow him to bring a claim for negligence. *See also Bank of Am., N.A. v. Jericho Baptist Church Ministries, Inc.*, Civ. No. PX 15-02953, 2017 WL 193498, at *7 (D. Md. Jan. 17, 2017) (citing *Schultz* and finding that "a bank owes a duty of ordinary care to its customers that may be enforced by its customers via an action for both breach of contract and negligence").[12]

The Court now addresses the sufficiency of Plaintiff's negligence claim. "Under Maryland law, a plaintiff must establish four elements to prove negligence: (1) a duty owed by the defendant; (2) breach of that duty by the defendant; (3) 'a legally cognizable causal relationship between the breach of duty and the harm suffered;' and (4) damages." *McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 105 (D. Md. 2010) (quoting *Jacques*, 515 A.2d at 758). "Whether a legal duty exists between parties is a question of law." *H&M Co., Inc. v. Technical Heat Transfer Servs., Inc.*, Civ. No. TDC-14-1518, 2015 WL 1472000, at *5 (D. Md. Mar. 30, 2015). Having determined that Plaintiff has established that the Bank owed him a duty of ordinary care, the Court

---

[12] Even if the broad principle announced in *Schultz* does not apply here, at the motion to dismiss stage, the Court will apply the holding in *Jacques* and determine that Plaintiff has sufficiently pleaded that he is a vulnerable party on the basis of his loss of employment and lack of access to any other funds besides the ones provided by the Maryland Division of Unemployment Insurance through Bank of America. *Cf. Titan Custom Cabinets, Inc. v. Truist Bank*, 505 F. Supp. 3d 558 (D. Md. 2020) (finding that plaintiffs plausibly alleged a claim for negligence under the *Jacques* rule even where they had not yet "established" that "such narrow exception" definitively applied to the facts of their case).

also finds that Plaintiff has satisfied the remaining elements to allege a claim for negligence. Plaintiff alleges that Defendant breached its duty of care "by allowing unauthorized access" to Plaintiff's account; by "failing to apply security measures and fraud protection that it normally affords its regular customers" to unemployment benefits accounts; and by "failing to protect Plaintiff's . . . information from misuse by an unauthorized user." ECF 1, at 41 ¶¶ 197–99. The complaint clearly connects the alleged fraud and the Bank's failure to prevent it with Plaintiff's experience of "severe financial strain" and mental health difficulties. *Id.* at 22–23 ¶¶ 98–100. And Plaintiff sufficiently alleges that he suffered both economic and emotional damages. *Id.* While Defendant counters that "Plaintiff's own allegations are that his debit card was used without his authorization because it was stolen from his mail" and therefore this supposed thief, not the Bank, is liable, ECF 54-1, at 20–21, Plaintiff correctly points out that he did not, in fact, make such an allegation, ECF 59, at 18.[13] Rather, Plaintiff has sufficiently pleaded a negligence claim against Defendant.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

A separate implementing Order will issue.

Dated: March 18, 2025

/s/
Brendan A. Hurson
United States District Judge

---

[13] Plaintiff alleges that he "signed up to receive his benefits on a Bank of America [ ] Debit Card that was to be mailed directly to his home address[.]" ECF 1, at 19 ¶ 69. He further alleges that he did not receive the card in a timely manner. *Id.* at ¶ 74. A second card was then sent to his address and received. *Id.* at 20 ¶ 76. Though he alleges that his account was compromised, Plaintiff does not allege that this was because his initial card was stolen from his mail. The precise manner in which the account was compromised is, as Plaintiff contends, "the subject of discovery." ECF 59, at 18.